# EXHIBIT 1

94

Electronically Received by Superior Court of California, County of Orange, 11/18/2025 05:41:00 PM.
30-2023-01323759-CU-OR-CJC - ROA # 589 - DAVID H. YAMASAKI, Clerk of the Court By G. Galon, Deputy Clerk.

AARON M. MAY (SBN 207751)
Aaron.May@halpernmay.com
JOSEPH J. YBARRA (SBN 218130)
Joseph.Ybarra@halpernmay.com
THOMAS RUBINSKY (SBN 302002)
Thomas.Rubinsky@halpernmay.com
HALPERN MAY YBARRA GELBERG LLP
550 South Hope Street, Suite 2330
Los Angeles, California 90071-2680
Telephone: (213) 402-1900

Attorneys for Plaintiffs
MOHAMMAD HONARKAR and 4G WIRELESS,
INC.

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

DEC 0 5 2025

DAVID H. YAMASAKI, Clerk of the Court

BY: H. BRADLEY ,DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| MOHAMMAD HONARKAR, et al., | Case No. 30-2023-01323759-CU-OR-CJC |
| Plaintiffs, | Related Case No. 30-2023-01322886-CU-OR-CJC 30-2023-01337525-CU-BC-WJC |
| v. | Assigned for All Purposes to: Hon. Bradley Erdosi, Dept. C27 |
| MAHENDER MAKHIJANI; et al., | |
| Defendants, | [PROPOSED] **JUDGMENT CONFIRMING ARBITRATION AWARD** |
| and | |
| MOM AS INVESTCO, LLC, et al., | |
| Nominal Defendants. | Date: October 13, 2025 Time: 2:00 p.m. Dept.: C27 |
| | Reservation ID: 74590414 |
| | Action Filed: May 3, 2023 Trial Date: None |

**[PROPOSED] JUDGMENT CONFIRMING ARBITRATION AWARD**

The petition of Petitioners Mohammad Honarkar and 4G Wireless, Inc. (collectively, "Petitioners") for an order confirming the Partial Final Award rendered on May 23, 2025 (the "Award") by the Hon. David A. Thompson's (Ret.) in the matter of *Honarkar, et al. v. Makhijani, et al.*, JAMS Case No. 5220003126 (Consolidated with JAMS Case No. 5200001122) (the "Arbitration") came on regularly for hearing before the undersigned as noticed on October 13, 2025. Appearances are as stated on the record. A true and correct copy of the confirmed Award is attached hereto as Exhibit A. The Capitalized terms used in this Judgment shall have the same meaning as those terms have in the Award.

The Court, having read and considered the pleadings, all supporting and opposing documents filed in connection therewith, and argument of counsel, and good cause appearing therefore:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1. Proof having been made to the satisfaction of the Court that the Petition should be granted, IT IS ORDERED that the Award is confirmed in all respects as the judgment of this Court.

2. Judgment is entered in Petitioners' favor against respondents and cross-claimants Mahender Makhijani; Continuum Analytics, Inc.; MOM AS Investor Group LLC; MOM BS Investor Group LLC; MOM CA Investor Group LLC; MOM AS Manager LLC; MOM BS Manager LLC; MOM CA Manager LLC; and Nano Banc.

3. All claims, cross-claims, and counterclaims asserted by Respondents MOM AS Investor Group LLC, MOM BS Investor Group LLC, MOM CA Investor Group LLC in the Arbitration were expressly denied by the arbitrator and are hereby dismissed with prejudice and denied in full as part of this judgment and that each of Respondents MOM AS Investor Group LLC, MOM BS Investor Group LLC, MOM CA Investor Group LLC shall take nothing by virtue of their claims, cross-claims, and counterclaims against Petitioners.

4. Petitioners are awarded and shall recover a total of $9,197,426.31 in attorney fees and costs as set forth in the Award. The MOM Parties (which are Respondents MOM AS Investor Group LLC, MOM BS Investor Group LLC, MOM CA Investor Group LLC, MOM AS Manager LLC, MOM BS Manager LLC, and MOM CA Manager LLC) and the Makhijani Parties (which are Respondents Mahender Makhijani and Continuum Analytics, Inc.) are jointly and severally liable for the entire $9,197,426.31 total. But of the $9,197,426.31 total, Respondent Nano Banc is jointly and severally liable (with the MOM Parties and Makhijani Parties) for only $5,229,185.14.

5. Post-judgment interest shall accrue at 10 percent per annum from the date of entry of this Judgment in accordance with Code of Civil Procedure § 685.010.

Dated: _____    *Signature follows last page of Exhibit A*

Hon. Bradley Erdosi
Judge of the Superior Court of the State of California

-3-

JUDGMENT CONFIRMING ARBITRATION AWARD

97

# EXHIBIT A

98

**JAMS ARBITRATION**
**No. 5220003126**
**(Consolidated with JAMS Case No. 5200001122)**

Mohammad Honarkar and 4G Wireless, Inc.,
individually and on behalf of MOM AS Investco LLC,
MOM BS Investco LLC, and MOM CA Investco
LLC,

      Claimants and Derivative Claimants,

v.

Mahender Makhijani; Continuum Analytics, Inc.;
MOM AS Investor Group LLC; MOM BS Investor
Group LLC; MOM CA Investor Group LLC; MOM
AS Manager LLC; MOM BS Manager LLC; MOM
CA Manager LLC; and Nano Banc,

      Respondents,

and,

MOM AS Investco LLC, MOM BS Investco LLC, and
MOM CA Investco LLC,

      Nominal Respondents.

---

**Consolidated case:**

MOM AS Investco LLC, MOM BS Investco LLC,
MOM CA Investco LLC, MOM AS Investor Group
LLC, MOM BS Investor Group LLC, and MOM CA
Investor Group LLC,

      Claimants,

v.

Mohammad Honarkar,

      Respondent.

**PARTIAL FINAL AWARD**

1

99

**Counsel:**

*For Claimant and Cross Respondent Mohammad Honarkar ("Honarkar"); Claimant 4G
Wireless, Inc. (individually "4G," and collectively with Honarkar, the "Claimants"); and
Derivative Claimants MOM AS Investco LLC ("MOM AS JV"), MOM BS Investco LLC ("MOM
BS JV"), MOM CA Investco LLC ("MOM CA JV") (collectively, the "MOM JV Entities"):*

Aaron May, Esq., Joseph Ybarra, Esq., Abigail E. Marion, Esq., Thomas Rubinsky, Esq., and
Halpern, May, Ybarra, Gelberg LLP; and Sam Maralan, Esq., and Maralan Law, P.C.

*For the MOM JV Entities:*

Anthony Bisconti, Esq., and Bienert Katzman Littrell Williams, LLP.

*Counsel for Respondents Mahender Makhijani ("Makhijani") and Continuum Analytics Inc.
(individually "Continuum," and collectively with Makhijani, the "Makhijani Parties"):*

Marc Cohen, Esq., and Cohen Law Group, APC.

*For Respondents and Cross Claimants MOM AS Investor Group LLC ("MOM AS Member"),
MOM BS Investor Group LLC ("MOM BS Member"), MOM CA Investor Group LLC ("MOM
CA Member") (collectively, the "MOM Members") and MOM AS Manager LLC ("MOM AS
Manager"), MOM BS Manager LLC ("MOM BS Manager"), MOM CA Manager LLC ("MOM
CA Manager") (collectively, the "MOM Managers"):[1]*

Michael Farrell, Esq., Scott Leipzig, Esq., Tim Hsu, Esq., Stephanie Roberts, Esq., Gabriela
Perez, Esq., Leilee Ghassemi, Esq., Shauna Woods, Esq., Suzanne Kenney, Esq., and Allen
Matkins Leck Gamble Mallory & Natsis LLP.[2]

*For Respondent Nano Banc ("Nano"):*

Ann Marie Mortimer, Esq., Lawrence DeMeo, Esq., Hakop Stepanyan, Esq., and Hunton
Andrews Kurth LLP.

**Arbitrator:** Hon. David A. Thompson (Ret.)

**Place of Arbitration:** JAMS, Los Angeles, California

**Date of Partial Final Award:** May 23, 2025

---

[1] At times, the Arbitrator will refer to the MOM Members and the MOM Managers together as the "MOM Parties;"
to the MOM Parties and the Makhijani Parties as the "MOM Respondents;" and to the MOM Respondents and Nano
Banc as the "Respondents."

[2] Allen Matkins also represented: (i) the MOM JV Entities, at all times prior to April 23, 2025, including during the
Hearing and the post-Hearing briefing and argument, and (ii) Makhijani and Continuum, prior to November 9, 2023.

2

THE UNDERSIGNED ARBITRATOR, having been designated by JAMS in accordance with § 19.10 of the Operating Agreements (the "Operating Agreements") for the MOM JV Entities, dated as of June 8, 2021, and having examined the claims, defenses, evidence, and arguments of the parties; now finds, concludes, rules, orders, and issues this Partial Final Award:

## I. INTRODUCTION AND KEY PROCEDURAL HISTORY

This is a real estate joint venture dispute centered on fraud and breach of contract claims. The joint venture ("JV") comprises a portfolio of commercial properties that were previously owned by Claimants and are now owned by the MOM JV Entities. The MOM JV Entities are managed by the MOM Managers, and the members of the MOM JV Entities are the MOM Members and Honarkar. Claimants filed the operative First Amended Statement of Claims in Arbitration ("FAC") on October 13, 2023. Claimants claim they were fraudulently induced by Makhijani, Continuum, and the MOM Parties into signing the Operating Agreements (Exs. 313-315) and other JV related agreements (the "Other JV Related Agreements"),[3] and further claim Nano is liable for conspiracy to commit and aiding and abetting the commission of fraudulent inducement by the MOM Respondents.[4] Claimants also claim the MOM Parties breached the Operating Agreements and a Management Agreement that predated the JV (Ex. 37, the "Management Agreement"). In addition, Claimants claim the MOM Respondents violated California's forcible entry and detainer laws in connection with an incident at the 4G offices.

Finally, Claimants assert derivative claims on behalf of the MOM JV Entities (as Derivative Claimants) against Makhijani, Continuum, the MOM Parties, and Nano for conversion and violation of Penal Code section 496 ("Section 496"), for unjust enrichment against the MOM Parties, and for breach of contract against Nano based on the loan agreement between the MOM JV Entities and Nano.

Nano filed an Answer to the FAC on November 3, 2023. The MOM Parties and the MOM JV Entities (represented by Allen Matkins) and Makhijani and Continuum (represented by the Cohen Law Group) filed Answers to the FAC on November 21, 2023.

In a separate (now consolidated) demand for arbitration filed with JAMS on September 28, 2023, and amended on June 6, 2024, the MOM JV Entities and the MOM Members alleged (counter) claims against Honarkar for conversion, intentional interference with contractual relations and prospective economic advantage, and declaratory relief in connection with the parties' rights and obligations under the Operating Agreements and other JV agreements. They also brought claims for trespass related to incidents at two JV properties in Laguna Beach.

---

[3] The Other JV Related Agreements include: the June 8, 2021, Asset Contribution Agreement (Ex. 304, the "ACA"); the June 8, 2021, Release Agreement (Ex. 317, the "Release"); the June 07, 2021, Consulting Agreement (Ex. 232).

[4] Nano became a party pursuant to the October 11, 2023, Arbitration Agreement between Claimants and Nano.

3

**Motions Contesting Arbitrability and Jurisdiction**

On November 29, 2023, the MOM Parties, Makhijani and Continuum filed motions contesting arbitrability and jurisdiction. Both motions were denied in the Arbitrator's "Rulings on Motions Contesting Arbitrability," dated January 3, 2024. Among other things, the Arbitrator rejected: (1) the MOM Parties' arguments that the FAC was not arbitrable, and should be transferred back to state superior court for resolution because (i) Claimants' declaratory relief and accounting claims could not be arbitrated, and (ii) Claimants had waived their right to arbitration; and (2) Makhijani's and Continuum's assertions that (i) the issue of whether Makhijani and Continuum could be compelled to arbitrate under the Operating Agreements had to be determined by the court, not the Arbitrator, since they are not signatories to the Operating Agreements, and (ii) Makhijani and Continuum could not be compelled to arbitrate in any event.

**Other Pre-Hearing Proceedings, Orders and Rulings**

Preliminary, interim, final status, and discovery conferences, motion hearings, and other pre-hearing proceedings were conducted on the following dates: February 2, March 15, March 20, March 22, May 25, May 29, and June 12, 2024. The Arbitrator issued: Scheduling Order Nos. 1-5, and Consolidated Scheduling Order Nos. 100 and 101; and rulings on discovery disputes, claim amendments, hearing logistics, and motions to continue the arbitration hearing.

**The Evidentiary Hearing and the Partial Interim Award**

The evidentiary hearing ("Hearing") was conducted on June 24-28 and July 1-12, 2024. The following witnesses testified: Honarkar, Brian Buchanan, Michael Kluchin ("Kluchin"), Makhijani, Kara Cobb, Marc Cohen, Glenn Taxman, Daniel Niazi, Anthony Gressak ("Gressak"), Michael Spindler (Claimant expert), Frederick Gartside, Joseph Pohlot (Respondent expert), Deba Shyam ("Shyam"), Max Prendergast, and Wayne Platt (Respondent expert). The documents and deposition transcripts in the Joint Admitted Exhibit List dated August 22, 2024, were admitted into evidence. The Hearing was reported by Katherine Thomas, CSR 14378.

At the conclusion of the Hearing, the parties confirmed there was no further evidence for the Arbitrator to consider. The parties filed simultaneous closing, opposition and reply briefs on August 23, 2024, September 20, 2024, and October 4, 2024, respectively.

Virtual oral closing argument was conducted on December 17, 2024, the matter was then deemed "closed" by application of JAMS Rule 22(i) and by the agreement of the parties, and a Partial Interim Award (the "Partial Interim Award") was timely rendered on February 21, 2025.[5]

---

[5] *See* 7.12 Tr. at 3940:21 through 3941:5, and the discussion which follows; *see also* JAMS Rule 24(a) and the January 10, 2025, Notice of Award Due Date.

4

**Post-Hearing Proceedings, Orders and Rulings**

On February 28, 2025, the MOM JV Entities filed for Chapter 11 bankruptcy. On April 28, 2025, the Bankruptcy Court, modified the automatic stay "to allow the Honarkar Parties to: (i) pursue and obtain an award of attorneys' fees and costs in the Arbitration; and (ii) proceed in the ... bankruptcy cases ... with the accounting granted in the Arbitration Award ...."[6] The Arbitrator conducted Post-Hearing status conferences and motion hearings on April 14, May 2, and May 12, 2025; issued Consolidated Scheduling Order Nos. 102-106; and issued rulings on Claimants' request to clarify one aspect of the Partial Interim Award, and on Claimants' motion for attorney fees and costs (§ III.N.5.; and § IV.14. below).

## II.    FACTS

These factual findings are necessary to this Partial Final Award. They are derived from admissions in the pleadings and the testimony, argument, and evidentiary exhibits presented at the Hearing. All relevant evidence that has a tendency in reason to prove or disprove a fact of consequence to this decision has been considered, even if not specifically mentioned herein. To the extent that these findings differ from any party's position, that difference is the result of determinations by the Arbitrator as to witness credibility, relevance, burdens of proof, legal principles, and weighing of the evidence, both oral and written.

**Honarkar's Cell Phone Business, Real Estate Business and Financial Distress**

Shortly after Honarkar moved to the United States from Iran, in the mid-1980's, he started a small business selling wireless cell phones. Honarkar built the cell phone business, which ultimately became 4G, into a highly successful enterprise that included 160 stores in five states. He currently owns 100% of 4G, though he sold the cell phone business assets of 4G to Verizon Wireless in January 2016.

With the proceeds from the sale of the cell phone business, Honarkar began amassing a real estate portfolio. Properties were purchased both in his name and through 4G and held by various limited liability companies ("LLCs"). Over time, Honarkar developed the portfolio into an operation worth several hundred million dollars. The properties ranged from large hotels to commercial real estate to individual homes used as luxury vacation rentals, most of which were located in Laguna Beach or Palm Desert and the surrounding areas.

By March 2020, COVID-19 surged and the global pandemic was declared. Over the following year, the pandemic had a devastating effect on the hospitality and commercial industries. Honarkar's real estate businesses were similarly affected.

---

[6] On May 5, 2025, the Bankruptcy Court also dismissed the Chapter 11 bankruptcy filed by the MOM Members.

At that time, Honarkar was also involved in a contentious divorce. In July 2020, his former wife obtained the appointment of a receiver, Blake Alsbrook, to oversee Honarkar's properties. (Ex. 3905.) In addition to the effects of the pandemic, Alsbrook reported the infrastructure, staff, and systems in place were "woefully inadequate" to profitably operate the properties in the portfolio. (Ex. 2008, ¶¶ 9(a), 9(b).) He also reported the accounting and tax practices were inadequate and corporate formalities were generally ignored, pointing out the "brazen" movement of funds after a special report on interference had been submitted to the court. (*Id.*, ¶¶ 9(b), 71.) Most importantly, Alsbrook reported the "cash on hand was woefully insufficient to make the vast loan, payroll, creditor and settlement payments." (*Id.*, ¶ 9(b).) To resolve the dispute with his wife and to remove the receivership, Honarkar entered into a stipulated judgment to pay his former spouse $17.5 million on or before June 12, 2021. (Ex. 2107.) Alsbrook was discharged as receiver in late December 2020.

Around that time, a loan from LoanCore Capital to Honarkar (the "LoanCore Loan") in the original principal amount of $195 million dollars was coming due. The LoanCore Loan was secured by, among other things, deeds of trust encumbering the majority of Honarkar's real estate assets, as well as a personal guarantee. In December 2020, Honarkar failed to make a $136 million balloon payment when due, and the LoanCore Loan went into default.

In January 2021, at the request of LoanCore, a new receiver, Douglas Wilson, was appointed over the Honarkar properties that secured the LoanCore Loan. (Ex. 3716, at 10-11, 13-17.) LoanCore obtained the receiver on the basis that Honarkar had been diverting rents from the properties in which LoanCore asserted it had a security interest. (Ex. 3716, at 8-9, 15.) The receivership was to be in place until Honarkar refinanced and paid off the LoanCore Loan.

A few months after Wilson was appointed as receiver, DIG PFSS LBCP Holding Company LLC ("DIG") purchased the LoanCore Loan. Honarkar and his team were concerned that DIG intended to foreclose on the properties that secured the LoanCore Loan. (Exs. 4085, at 182; 2411 at 4.) These concerns were legitimate. DIG immediately acted and scheduled foreclosure sales to begin on June 15, 2021. (*Id.*)

**Honarkar's Search for Funding and Introduction to Makhijani and Continuum**

During the first half of 2021, under considerable time pressure as a result of the DIG purchase of the LoanCore Loan, the pending foreclosures, and the payment due to his former wife, Honarkar sought funding from multiple sources, including Nano. As expected, it was challenging for Honarkar to obtain financing, given the extraordinary time pressures, dollar amounts and risks involved, together with the uncertainties created by the pandemic.

6

104

Honarkar had previously borrowed money from Nano and had an existing relationship with Gressak, Nano's then-Chief Credit Officer (and later interim CEO). Gressak referred Honarkar to Makhijani at Continuum, an entity that acquires and manages distressed real estate assets for groups of investors. (Ex. 52.)

Both Makhijani and Continuum had established, long-standing, and deeply ingrained affiliations with Nano. Nano was founded by, among others, Continuum's legal owner, Shyam, along with several of Continuum's largest investors (Gerald Marcil, Andrew Stupin, and Bhajneet Singh Malik), all of whom provided millions in seed capital, remain shareholders in Nano, and have borrowed over $100 million from the bank. (Ex. 1000 at 181:18-190:6.) Gressak, though no longer with Nano, remains a significant shareholder. (7.8 Tr. at 2609:22-25.) Makhijani is one of Nano's largest referral sources and is also involved in the bank's management. (Ex. 1000 at 200:20-203:3.) The relationships between Makhijani, Continuum, Nano, and their employees and investors including Shyam are interwoven and overlapping.

Ultimately, Nano and Continuum became the sole solution for Honarkar's financial difficulties. On May 19, 2021, Nano provided to Honarkar a letter of intent ("LOI") for a $150 million loan to pay off the LoanCore Loan. (Ex. 106.) This loan was to be made by Nano and "participant banks" and be secured by deeds of trust on a number of Honarkar's properties. Though Gressak was actively signaling otherwise, Daniel F. Patrick, Nano's Person Most Knowledgeable ("PMK") witness testified (via deposition admitted into evidence) Nano was incapable of extending that amount of financing to anyone. (Compare Exs. 139 [Gressak May 21 email to Honarkar: "We are aware of foreclosure sales starting June 15th on the properties and we can close prior to that date"], 211 [Gressak June 3 email to Honarkar *et al.*, seeking update from Honarkar's counsel: "[W]e are ready to fund man!!!"], and 171 [email thread with Gressak, Makhijani, Honarkar et al. on "imminent" refinance with $150 million from Nano]; with Exs. 1000 at 40:9-41:6 [Patrick PMK testimony: $150 million is "well beyond the bank's legal lending limit for a single loan"]; 7.8 Tr. at 2600:15-21 [Gressak testimony – "Q: And Nano Banc never would have approved Mr. Honarkar for a $150 million loan, correct? A: Correct"].)

During this time, Honarkar was also negotiating the JV terms with Makhijani and Continuum. Most interesting, on May 20, 2021, one day after Nano provided the $150 million LOI to Honarkar, Nano provided to Shyam an LOI for a $20 million loan (the "Nano Loan") to the MOM JV Entities, entities that had not yet been formed, and the proceeds of the $20 million Nano Loan were to be used to help pay off the LoanCore Loan. (Ex. 130.) The $20 million Nano Loan was to be secured by an assignment of membership interests in 689 South Coast Hwy LLC, Laguna HI LLC, Laguna HW LLC, and The Masters Building LLC, and "abundance of caution" deeds of trusts encumbering properties held by these four subsidiary LLCs, all of which were then wholly owned by Claimants. (*Id.* at 2.) At that time there were no agreements between Honarkar and any of the MOM Parties.

7

**The Term Sheet**

On May 24, 2021, just days after Nano issued the $20 million Nano Loan LOI to Shyam, Honarkar, 4G, and Continuum entered into the Term Sheet for the JV. (Ex. 148, the "Term Sheet".) It was signed by Honarkar on behalf of 4G and by Makhijani on behalf of Continuum.

The Term Sheet contemplated an initial capital contribution of $35 million by Continuum, characterized as "cash equity," in addition to Continuum's obligation to secure refinancing to pay off the balance of the LoanCore Loan, then estimated at $140 million. (Ex. 148 at 2.) The initial contribution by Continuum was to be credited to two existing projects in Honarkar's portfolio, Hotel Laguna, and a property in Los Angeles' Koreatown, though both Honarkar and Kluchin, Director of Operations at Continuum, testified that half of the initial contribution ($17.5 million) was first intended to be used to pay off the stipulated judgment in favor of Honarkar's former wife. (*Id.*; 6.24 Tr. at 108:11-109.4; 6.28 Tr. at 1214:6-15.)

In exchange, Claimants were obligated to contribute their interests in the subsidiary LLCs that held title to some of the properties in their portfolio. (Ex. 148 at 2, Exs. A and C.) The Term sheet was binding on Honarkar but not Continuum. (Ex. 148 at 8-10.) So, Continuum could terminate at any time, but Honarkar could not pursue other refinancing options.

Aside from the Hotel Laguna and Koreatown projects, Honarkar was entitled to sell and/or refinance the other real estate assets covered by the Term Sheet, subject to Continuum's qualified consent rights. (Ex. 148 at 8 [Managers provision].) Further, assuming Continuum received a 20% preferred return on all of its capital contributions, Honarkar was entitled to the entirety of the sale proceeds of those other assets. (*Id.* at 4-6 [Distributions provision].)

**The Draft Operating Agreements**

Glenn Taxman, Honarkar's transactional counsel, offered to provide initial drafts of the Operating Agreements, but Continuum's lawyers took the lead instead. On May 28, 2021, Kluchin shared draft Operating Agreements, not with Honarkar but with First Choice Bank, one of the banks through which Continuum was seeking financing to pay off the LoanCore Loan. (Ex. 1479 [attachments include MOM Manager Operating Agreements].) Kluchin did not send Honarkar and Taxman draft Operating Agreements until June 2, 2021. (Ex. 191.)

Everyone agrees the JV document negotiation and drafting process was chaotic and frantic. Kluchin pressured Honarkar into signing early, before the documents were finalized. (*E.g.,* Ex. 288 [Kluchin to Honarkar team – "We are in a mad rush to produce documents for the bank. We need signature blocks...tonight asap with the understanding the JV is not final until both attorneys...send final versions of the full agreements"]; Exs. 347, 352.)

8

There was a constant flurry of emails back and forth between the parties and their respective counsel, in which it was unclear whether comments from Honarkar's side had been acknowledged and/or incorporated in existing drafts or if comments from Honarkar's side had even been solicited. All of this confused the process further and caused additional delay. (Ex. 0217 at 2-3 [Taxman to Kluchin – "Why are you sending us a different JV Agreement now?...We are sticking with the prior document you sent to us for negotiating purposes...My partner is already 80% thru the other draft....[This] makes zero sense and it actually delays the process...I am going to run a redline of what [Kluchin] originally sent against this new document..."]; Ex. 2382 at 3 [Taxman to Continuum "Guys, time to cut to the chase here if we have any chance of getting to final documents. Please include your outside counsel on an email to us so we can deal directly with them. [Kluchin] playing middleman is slowing down the process and getting a redline of Document A vs. Document B is not helping the process'"].)

Admittedly, the process included "lots of moving targets." (Ex. 217 at 3 [email from Makhijani to Taxman and Honarkar].) Many of the documents were approved piecemeal. The initial drafts of the Operating Agreements had blank or incomplete exhibits. (Compare Exs. 191 at 38-41; 276 at 14-18; 298 at 17-21, with Ex. 315 at 40-46.) Plus, Exhibit C to the draft Operating Agreements was supposed to list Honarkar's "Other Owned LLC's" to be contributed to the JV. (Ex. 315 at 43.) But Exhibit C was not finalized and sent to Honarkar and his team until after 11pm on June 7, 2021, the night before the JV formation and LoanCore refinancing closing date. (Ex. 2554.) To populate Exhibit C, Makhijani used a comprehensive list of entities owned by and affiliated with Honarkar's businesses provided by Dan Niazi, 4G's Chief Operating Officer, earlier that day, on June 7, 2021. (Ex. 1397.) According to Honarkar and Niazi, that list was provided only for the Continuum investor's due diligence purposes, not as a final inventory of contributed entities. (6.24 Tr. at 128:25-131:25; 7.5 Tr. at 2467:17-2471:13.)

**The Final Operating Agreements**

Because Continuum was unable to secure enough financing to pay off the LoanCore Loan, Makhijani proposed that Continuum reduce its initial contribution to $30 million, and use it to "close the gap," despite Continuum's $35 million initial contribution obligation in the Term Sheet. (Exs. 2411, 385; 6.24 Tr. at 139:7-141:6.) Honarkar testified these changes in the initial contribution terms prevented him from paying off his former spouse as agreed, and resulted in his loss of their former residence. (6.24 Tr. at 152:14-153:24.)

Still, the Operating Agreements were signed and the MOM JV Entities were formed on June 8, 2021. (Exs. 313 [MOM AS JV]; 314 [MOM BS JV]; 315 [MOM CA JV].) That same day, the parties also closed escrow on the LoanCore Loan refinancing. (Ex. 308.) The refinancing Escrow Closing Statement showed two separate wire transfers from Continuum to the escrow holder: one in the amount of $20 million and one in the amount of $10 million. (*Id.*)

9

The Operating Agreements are substantially similar and the pertinent provisions include:[7]

(1)     The parties to the MOM CA JV Operating Agreement are the MOM CA Manager as the Managing Manager, the MOM CA Member as the MOM Member, and Honarkar as the MO Member and the Administrative Manager.[8]  (Ex. 315 at 6; §§ 9.1, 9.2, 9.3.)  Honarkar signed for himself.  Shyam signed as the Manager of the MOM CA Manager on behalf of both the MOM CA Manager and the MOM CA Member.  (Ex. 315 at 38.)[9]

(2)     The MOM CA JV Operating Agreement obligated the MOM CA Member to make a $30 million "Contribution" to be used "for the Hotel Laguna Project, which shall be disbursed as set forth on Exhibit B...." (Ex. 315 at § 6.1(c) ["Initial Contributions"].)  Exhibit B in turn stated, "Fund shortfalls in the refinance of debt completed on or about the date hereof." (*Id.* at Ex. B [Disbursement of Contribution for Hotel Laguna Project].)  "Contribution" was defined as "money or property, or a promissory note or other binding obligation to contribute money or property" that a "Member contributes ... as capital." (*Id.* at § 1.19.)  But loans by the MOM CA Member "shall not be considered Contributions for purposes of this Agreement." (*Id.* at § 6.5.)

(3)     The Operating Agreements required Honarkar to contribute certain LLCs he and 4G owned or controlled, defined as either "Subsidiaries/Other Owned LLCs" or "Projects." (Ex. 315 at §§ 1.40, 1.48, 1.45, 6.1(a), Ex. C.)  For the MOM CA JV, the only identified "Project" was the Hotel Laguna Project. (*Id.* at § 1.45.)  Each of the other listed entities was a "Subsidiary/Other Owned LLC." (*Id.* at Exs. C, D.)  Makhijani and Continuum through the MOM Member had the discretion to make a capital contribution to a "Subsidiary/Other Owned LLC" property and convert it to a "Project" under the Operating Agreement. (*Id.* at § 6.1.)

(4)     The Managing Member was not entitled to sell the assets of or ownership interests in the "Subsidiary/Other Owned LLCs" absent Honarkar's prior written consent, unless Honarkar was in default, as defined. (Ex. 315 at §§ 9.3(b), 1.36.)

(5)     Self-dealing transactions were prohibited without the written consent of both the Managing Manager and the Administrative Manager. (Ex. 315 at § 9.15.)

---

[7] The Arbitrator will use the MOM CA JV Operating Agreement as the reference agreement. (Ex. 315.)  The material terms of the MOM AS JV and MOM BS JV Operating Agreements are substantially similar.

[8] On July 14, 2022, the parties executed a Letter Agreement (the "Letter Agreement") amending the Operating Agreements to clarify that 4G was the MO Member of the MOM JV Entities, not Honarkar personally. (Ex. 583 at § 3 ["It was intended for 4G and not [Honarkar] to be the MO Member of the Companies.  Accordingly, the Salient Documents shall be deemed amended so that the MO Member is 4G without any further action by the parties"].)

[9] Similarly, Banayotis Haddad, a Continuum employee, signed the MOM AS JV Operating Agreement as the Manager of the MOM AS Manager on behalf of both the MOM AS Manager and the MOM AS Member. (Ex. 313 at 39.)  And Jason Miller signed the MOM BS JV Operating Agreement as the Manager of the MOM BS Manager on behalf of the MOM BS Manager and the MOM BS Member. (Ex. 314 at 38.)

10

108

(6)    The Managing Manager was required to keep "full and accurate books and records" for the MOM JV Entities, reflecting "all of the income, expenses and transactions." (Ex. 315 at § 12.1.)  The Managing Manager was also required to provide monthly and annual financial reports, including balance sheets, profit and loss statements, and tax returns.  (*Id.* at § 12.2.)

That same day, Honarkar and the MOM Managers also executed the ACA, restructuring and contributing Honarkar's and 4G's membership interests in the Other Owned LLCs to the MOM JV Entities.  (Ex. 304 at § 2.)  The ACA specified certain entities (the "Held-Back LLCs") were not subject to restructuring or contribution by Honarkar.  (*Id.* at Ex. E.)  But according to Honarkar, the Operating Agreements mistakenly list multiple properties as Other Owned LLCs.[10] (*E.g.*, Exs. 304, 315 at 43 [listing 4G itself and Modan LLC, which is owned by Niazi].[11])

Once the Operating Agreements were executed, Continuum assumed control of the MOM JV Entities' bank accounts, as well as the bank accounts of the Other Owned LLCs.  Honarkar continued the day-to-day business operations of the Other Owned LLCs.

**Continuum's Alleged Wrongdoing in Operating the JV**

Less than one month after the MOM JV Entities were formed, on or around July 1, 2021, Continuum caused Tesoro Redlands DE LLC ("Tesoro Redlands"), an Other Owned LLC,[12] to obtain a $1 million loan (the "Tesoro Loan") from Nano.  (Exs. 403, 409, 411.)  That same day, one of the MOM investors, Enrico Arvielo, was repaid his $3 million investment in one of the MOM Members.  (Ex. 405.)  The Tesoro Loan was secured by a deed of trust encumbering real property owned by Tesoro Redlands, which was not recorded until March 2022.  (*Id.*)  When Honarkar's staff received a monthly billing statement for the Tesoro Loan on September 23, 2021, an employee of Nano indicated it was "a billing error and not applicable to Tesoro."  (Ex. 2723.)  Honarkar was not involved in or aware of the Tesoro Loan.  (Ex. 488 [Tesoro Loan not included in list of JV loans sent to Honarkar in Dec. 2021]; 6.27 Tr. at 960:14-961:7.)

---

[10] Notably, in September 2022 Kluchin sent a list of the "Contributed Entities" to an outside accounting firm to prepare the MOM JV Entities' 2021 tax returns, but he did not include 4G, Modan LLC, BMV Apartments LLC, 7 Star Trade-In LLC, Marquis Marine LLC, Poppy and Seed LLC, The Fullest LLC, Pizza 90 Inc., Laguna Beach Company Inc., MJA Restaurants Inc., MS Nosh LLC, 331 N. Coast LLC, 331 North Coast Hwy. LLC, 2711 E. Coast Hwy. LLC, 113 Canyon Acres LLC, Terra Laguna Beach Inc., Seven Degrees Laguna Inc., Rancho San Joaquin Golf Course LLC, 14 West Coast LLC, Cliff Drive NB Properties LLC, Blue Lagoon Resort LLC, Buena Vida RSM LLC, Pershing82 LLC, or Brookline Aliso Viejo LLC. (Ex. 1354; 7.3 Tr. at 1915:7-1919:6.)

[11] 6.24 Tr. at 130:10-17; 7.5 Tr. at 2469:16-2470:1; Ex. 622 [Kluchin email to Nano – "Modan LLC account has nothing to do with Continuum or 4G.  This account belongs only to Dan Niazi"].

[12] Tesoro Redlands is owned by Tesoro Redlands LLC, an Other Owned LLC/Subsidiary of the MOM JV Entities. (Ex. 279 at 2; Ex. 315 at 43.)

11

109

In early 2022, Honarkar proposed a sale of Tesoro Redlands, intending to use the proceeds to pay off debts owed to Makhijani/Continuum and other obligations. (Exs. 527, 533.) Makhijani refused to consent to the sale and instead refinanced the Tesoro Loan with Preferred Bank. (Exs. 530, 531, 533.) Though Honarkar ultimately consented to the Preferred Bank refinancing on February 25, 2022, conditioned upon his ability to sell the property after the refinance, Makhijani and Shyam (on behalf of the MOM CA Manager and MOM CA Member) set up the refinance and signed the relevant documents on February 22, 2022, prior to Honarkar's consent. (Exs. 529, 531, 533, 535.) Honarkar testified he was not informed where the refinance proceeds went and did not receive documentation relating to the refinance until over six months later. (Ex. 602 [email from Taxman on September 27, 2022 – "Mo has zero idea as to the amount of the refinance proceeds, the terms of the refinance loan and the use of the proceeds"].)

The evidence shows that when the Tesoro Redlands refinance with Preferred Bank closed on February 24, 2022, only some of the $39 million in proceeds were used to pay off existing debt. (Ex. 530.) Approximately $8.8 million was listed as a cash-out to the borrower, and $8.8 million was transferred directly into the Continuum bank account from the Tesoro Redlands bank account on March 1, 2022. (Ex. 541.) In addition, $2.8 million was held back by escrow and four months later transferred from the Tesoro Redlands bank account to the Continuum bank account. (Ex. 2894; 7.2 Tr. at 1528:5-1531:19.) It is unclear why these funds were transferred to Continuum or for what purpose they were ultimately used.

On April 10, 2022, the MOM Respondents sold a tenant-in-common (TIC) interest in Hotel Laguna, LLC for $1 million to Jaachak LLC ("Jaachak"), an entity owned and controlled by Continuum executive Jaspreet Singh Sethi. (Exs. 546, 549, 817; 6.27 Tr. at 983:19-990:17.) The TIC sale was consummated without using an escrow. Marc Cohen's client trust account was used instead because the trust company would not wire the sale proceeds to Continuum, which was not a party to the transaction. (Ex. 555 at 3-4; Ex. 558.) Upon receipt, Cohen sent the proceeds to Continuum. (Ex. 558; 7.5 Tr. at 2273:3-2280:14.) Both Honarkar and Niazi testified they were unaware of this transaction and did not receive any proceeds from it. In fact, the proceeds of the sale went directly to the MOM Members. (7.2 Tr. at 1766:6-1767:20 [Makhijani testimony that $1 million in TIC proceeds became Jaachak's capital contribution to a MOM Member].)

According to Honarkar and his attorney, Taxman, lack of transparency was a common theme in dealing with the MOM Respondents. Even when Honarkar and his team requested information, it seemed the complete financial picture was rarely provided. Taxman testified "[e]very time we met, we asked for information; we asked for financials. It was promised; it was never given. It was – you felt like Charlie Brown trying to kick the ball and Lucy pulling it up." (Tr. 7.5 at 2334:4-19.)

12

110

Also, Kluchin directed Nano to establish bank accounts for the LLCs contributed to the MOM JV Entities and to restrict access to Honarkar and his team. On October 29, 2021, Kluchin directed Nano to "set up a new The Masters Building, LLC [account]. Signers are [Shyam] and me. No one from 4G should be on this account. This is very important. [Honarkar], Chi Lu [4G's Controller] – no one. Only [Shyam] and I.... Again no one from 4G should see or be on this account." (Ex. 473; Ex. 590 [September 2022 email from Kluchin to Nano – "Note DO NOT COPY CHI or anyone from 4g or laguna beach company on this email thread"].)

**Honarkar's Alleged Discovery of the Nano Loan**

The Nano Loan closed and funded on June 7, 2021, one day prior to the effective date of the Operating Agreements and thus one day prior to the formation of the MOM JV Entities, and on that date all of the JV properties and subsidiary LLCs were still wholly owned by Claimants. The $20 million Nano Loan proceeds were deposited in a Continuum bank account and then transferred to escrow that same day. (Ex. 240 [Memorandum to Nano Loan Committee - "proceeds will need to be funded into a related DDA account (not owned by the Borrower) held at the Banc, Continuum Analytics...Nano Banc CCO, ... Gressak, has spoken with the Borrower and has approved the funding of the account"]; Ex. 308 [June 8, 2021 escrow statement with two separate Continuum payments in the amount of $10 million and $20 million].)

In early 2023, Honarkar began exploring options to exit the JV. In seeking alternative financing, on February 9, 2023, Honarkar discovered a deed of trust on one of the MOM JV Entities' properties, dated June 7, 2021, and securing the $20 million Nano Loan. (Ex. 656.) According to Honarkar, once he received the deed of trust, he ran title searches on the other properties in the MOM JV Entities. He then discovered the $30 million initial contribution the MOM Members were obligated to make under the Operating Agreements had been funded in part by the $20 million Nano Loan obtained in the name of the MOM JV Entities themselves; and further, that the Nano Loan was secured by assignments of the MOM JV Entities membership interests in the four subsidiary LLCs,[13] and by deeds of trust encumbering properties owned by these subsidiary LLCs.[14] (Ex. 239 at 78-82, 88-127; Exs. 234, 235, 236.)

On February 20, 2023, Honarkar sent a letter to Makhijani and Continuum, raising his concerns about several recorded instruments discovered as a result of the title searches, including deeds of trust relating to the Nano Loan, the Tesoro Loan, and loans from the Cantor Group V, and memoranda related to TIC transactions. (Ex. 659.) According to Honarkar, he received no response or further information pertaining to the issues raised in this letter.

---

[13] These are 689 South Coast Hwy LLC, Laguna HI LLC, Laguna HW LLC, and The Masters Building LLC.

[14] In these respects, the structure of the Nano Loan was similar to the structure of the loans from the other three lenders who participated in the LoanCore refinance (First Choice, Preferred, and Lone Oak).

On March 22, 2023, Honarkar's then-counsel (Latham & Watkins LLP) sent a formal books and records demand for each of the MOM JV Entities, seeking basic financial and transactional documents pursuant to the Operating Agreements. (Exs. 661-663.) On April 3, 2023, Respondents indicated they would provide documentation related to the $20 million Nano Loan only if Honarkar provided "a letter withdrawing the inspection demands." (Ex. 5480.) Honarkar refused. And, on April 27, 2023, Honarkar filed a Petition to Compel Books and Records in Los Angeles Superior Court, which Respondents opposed. (Ex. 1377.) Ultimately, on November 9, 2023, Judge James C. Chalfant granted Honarkar's Petition. (*Id.*)

**Honarkar's Demand for Arbitration**

On April 25, 2023, Honarkar filed his original Demand and Statement of Claim in this arbitration, seeking the recission of the Operating Agreements or, in the alternative, the appointment of a receiver over the MOM JV Entities, along with compensatory and punitive damages, a declaratory judgment regarding the Other Owned LLCs, and an injunction reinstating Honarkar as the Administrative Manager to protect his ownership interests.

**The MOM Respondents' Alleged Retaliation Against Honarkar**

Almost immediately following Honarkar's demand for books and records, on March 29, 2023, Makhijani, Continuum, and the MOM Parties utilized their power as Managing Managers and terminated Honarkar as the Administrative Manager of the MOM JV Entities. (Exs. 669-671, 3018.) The letters terminating Honarkar were drafted and sent by Marc Cohen, Esq., current counsel for Makhijani and Continuum in this arbitration. (*Id.*)

Two days later, a group of armed individuals working on behalf of Continuum and Makhijani entered and took control of numerous JV properties, including the Hotel Laguna, a Holiday Inn Hotel in Laguna Beach, and several other vacation rentals. (Exs. 681, 1196, 1198.)

In early May 2023, Honarkar returned to the Hotel Laguna, and there was a confrontation between Makhijani, Kluchin, and the MOM Respondents' agents. (Ex. 1165 [video of portion of incident, Makhijani stating "I'll put 32 fucking guards here"]; Ex. 1160 [video of portion of incident].) Each side blames the other, but the only person arrested that day was Banayotis Haddad, a Continuum employee and the Manager of MOM AS Manager, who was charged with assault. (Ex. 1305; 6.24 Tr. at 202:3-21; 7.2 Tr. at 1800:4-9.)

Both Honarkar and Kluchin also testified that, during the night of June 30, 2023 and the early morning of July 1, 2023, a group of armed individuals and other agents working on behalf of Continuum and Makhijani entered and took physical control of Terra (a restaurant located at the Laguna Festival of the Arts and operated by Honarkar for years).

14

On the afternoon of July 24, 2023, while Honarkar and the MOM Respondents were appearing before Orange County Superior Court Judge David J. Hesseltine arguing motions for injunctive relief, Kluchin, Haddad, and Jason Miller, along with more than a dozen men dressed in black broke into the 4G corporate headquarters, where both 4G and Honarkar maintained offices, while Honarkar's team was working. (Ex. 773 [police report].) A glass door located on the side of the building was shattered with a hammer to gain entry and the double doors at the front entrance were forced open. (*Id.* at 4; Ex. 1212.) Kluchin admitted he and his team broke into the offices. Video of the incident appears to show the MOM Respondents' agents removing documents, banker's boxes of hardcopy files labelled "LEGAL," computer equipment, and other objects from the office, including employees' personal effects. (Ex. 1158.)

On July 29, 2023, the MOM Respondents served eviction notices on Honarkar and both of his daughters at their residences, which were JV properties under the Operating Agreements. (Ex. 772 at 4-8.) In addition, Respondents initiated multiple eviction proceedings against tenants leasing other JV properties. According to Kluchin, these eviction notices and proceedings were instituted against those tenants for not paying rent directly to the MOM Respondents.

Also, during this time, the MOM Respondents hired mobile billboards to drive around Laguna Beach, displaying pictures of Honarkar with disparaging messages. One of the billboards included photos of police officer Jessie Schmidt (one of the officers present at the scene of the 4G offices break-in) and Shohreh Dupuis (city manager for the City of Laguna Beach), along with Honarkar's photo and the word "CORRUPTION??" in large bold capital letters. (Ex. 11506.27 Tr. [Kluchin testimony – "Our PR consultant worked on this [billboard] and suggested it, and we approved it because we believe it to be true"].) According to the MOM Respondents' testimony, they included Schmidt and Dupuis on the billboard because they felt Dupuis was "allow[ing] Mo [Honarkar] to get away with a lot [of] things that he probably shouldn't have" (Kluchin, 6.27 Tr. at 1049:6-9) and the police were "not protecting our rights to manage the property" (Makhijani, 7.2 Tr. at 1811:2-21).

Additional facts are set out in the analysis and discussion that follows.

## III.   ANALYSIS

The fraud and other non-contractual claims are governed by California law. The claims for breach of the Operating Agreements are governed by Delaware law. (*e.g.*, Ex. 315 at § 19.1.) The claim for breach of the Management Agreement is governed by California law. (Ex. 37 at § 13.4.) The parties bear the burden of proof on their respective claims and defenses by a preponderance of the evidence, except for the punitive damages claim, which requires clear and convincing evidence. (Civ. Code § 3294.) The JAMS Comprehensive Arbitration Rules apply.

15

### A.   Claimants' Direct Fraudulent Inducement Claim Against Makhijani, Continuum and the MOM Members (FAC at 22-23)

Claimants allege they were fraudulently induced by Makhijani, Continuum and the MOM Members into signing the Operating Agreements by the MOM Respondents' promise to make a $30 million initial contribution. They assert the MOM Respondents had no intent to perform the promise when they made it, and it was not performed.

The MOM Respondents argue the promise was performed because the Operating Agreements allowed them to use the $20 million Nano Loan to fund part of the $30 million initial contribution obligation.[15] They also insist Honarkar was informed about the Nano Loan and about commitments the MOM Members made to pay off the Nano Loan.

"Promissory fraud [aka fraudulent inducement] is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973.)[16] "[P]romissory fraud requires proof of (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promisee." (*Gruber v. Gruber* (2020) 48 Cal. App. 5th 529, 540.)

### 1.   Initial Contribution Promise

It is undisputed the MOM Members promised to make the $30 million initial contribution to the MOM JV Entities. (Ex. 315, § 6.1 [MOM CA Operating Agreement]; Ex. 148 at 2 [Term Sheet].) The required *form* of the initial contribution is the crux of this dispute. The Arbitrator's analysis will begin with the plain, unambiguous language of the Operating Agreements.

Recall the term "Contribution" is defined generally in the Operating Agreements as "any money or property, or a promissory note or other binding obligation to contribute money or property, or to render services as permitted by law, which a Member contributes to the Company as capital in that Member's capacity as a Member pursuant to this Agreement." (Ex. 315, § 1.19.) That defined term is used in connection with both Initial Contributions and Additional Contributions (compare Ex. 315, §§ 6.1 and 6.2) and throughout the Operating Agreements.

---

[15] Continuum also deposited $10 million in escrow but $3.9 million of that was immediately refunded. (Ex. 308.)

[16] For simplicity internal citations and quotation marks have been omitted from case quotations throughout.

16

The MOM CA JV Operating Agreement specifically states: "6.1 Initial Contributions. ... [¶] (c) Concurrently with execution hereof, by all of the Members, the MOM [CA] Member shall make a Contribution of $30 million to the Company for the Hotel Laguna Project, which shall be disbursed as set forth on Exhibit B attached hereto." (Ex. 315, § 6.1(c).) Exhibit B, titled "Disbursement of Contribution for Hotel Laguna Project," states it shall be used to: "Fund shortfalls in the refinance of debt completed on or about the date hereof." (Ex. 315 at Ex. B.)

Reading these sections together reveals the term "Contribution," defined generally in Section 1.19, is also subject to the specific requirements of Section 6.1. (*Kirkwood Knoll Maint. Corp. v. Warren* (Del. Com. Pls. Apr. 21, 2016) C.A. No. CPU4-14-003607, 2017 WL 8999315 at *5.) Thus, the MOM Member's $30 million *initial* Contribution had to be made June 8, 2021 (upon execution) in a form that could be disbursed to fund shortfalls in the LoanCore Loan refinance that same day. There is no other way to give meaning to both sections as required.

And the Nano Loan transaction itself did not satisfy the initial contribution obligation.

As a threshold matter, it appears the Nano Loan transaction was unauthorized and the Nano Loan documents are therefore invalid. This is true because on the day the Nano Loan closed and funded, June 7, 2021: (a) the putative Nano Loan borrowers – the MOM JV Entities - did not yet exist; (b) the Term Sheet was still in effect; (c) the JV properties and the membership interests in the subsidiary LLCs that owned them still belonged to Claimants; and (d) neither the MOM Managers, nor any other MOM Respondents, including Continuum, had any authority to encumber those properties or to assign those membership interests.

Even if the Nano Loan transaction was authorized and the Nano Loan documents are valid, the Nano Loan itself was not a "Contribution" by the "MOM CA Member" (MOM CA Investor Group LLC) to the "Company" (MOM CA Investco LLC) "as capital in that Member's capacity as a Member pursuant to this [Operating] Agreement." (Ex. 315, §§ 1.19, 6.1.) In fact, the MOM CA Member was not even a party to the Nano Loan transaction. Besides, nothing in either the Term Sheet or the Operating Agreements authorized the MOM Members to make the initial contribution in the form of a loan from Nano to the MOM JV Entities secured by their own assets. In short, Makhijani and Continuum used Claimants' assets to secure the Nano Loan, and used the Nano Loan proceeds to acquire an interest in and gain control of those same assets.

Perhaps recognizing the Nano Loan transaction itself did not satisfy the initial contribution obligation, the MOM Respondents argue it was satisfied because they made a binding oral promise the MOM Members (not the MOM JV Entities) would pay the Nano Loan; and that the oral promise was memorialized in a "Contribution Agreement" (Ex. 2433.) The substance of the promise was the MOM Members would "step in and pay" the Nano Loan upon "the earlier of the Maturity Date or any date on which [Nano] demands" payment. (*Id.* at 1.)

17

115

If the oral promise was made and if the Contribution Agreement is genuine, neither satisfied the initial contribution obligation, because neither obligated the MOM Members to make any payment on June 8, 2021. And any payment made or to be made after that date could not be used to fund shortfalls in the refinance of the LoanCore debt on that date.[17] What's more, the MOM JV Entities still owed Nano $20 million and the Nano Loan was still secured by the Nano Loan trust deeds and assignments of subsidiary LLC membership interests. So, the MOM JV entities were still at risk of losing their assets if the MOM Members failed to pay.

In any event, there is substantial reason to doubt the oral promise was made and the Contribution Agreement is genuine.

The MOM Respondents maintain the oral promise to pay the Nano Loan was made at in-person meetings with Honarkar before the JV was formed. Specifically, they note: Makhijani testified he informed Honarkar of this commitment (7.2 Tr. at 1897:3-1899:12; 7.3 Tr. 2018:24-2021:22); Kluchin testified it was explained to Honarkar during a meeting at the Corona del Mar restaurant (the "CdM Meeting") that flexibility was needed and that it would be the MOM Members' "binding obligation and promise to pay the loan" (6.28 Tr. at 1205:18 – 1507:7); Gressak testified "part of those discussions [at the CdM Meeting] was talking about how the MOM investors – with this [Nano] loan, and it would pay for the loan" (7.8 Tr. at 2548:13-16); Prendergast, a Nano employee, testified Honarkar was informed at the CdM Meeting the contribution would be made either in cash or through a loan (7.12 Tr. at 3714:14 – 3715:24.1); Prendergast testified about another meeting at the Montage (the "Montage Meeting"), where Honarkar was informed of the Nano Loan and that it would be used to refinance the LoanCore obligation (7.12 Tr. at 3716:16 – 3719:17); and finally, Kluchin and Gressak both testified there was also a meeting at Honarkar's house on June 6, 2021 where the matter was discussed. (7.3 Tr. at 2018:24-2021:22; 6.27 Tr. at 1057:12-1059:4; 7.8 at 2550:18-2552:21.)

But the testimony about these meetings and the oral promise was not credible. Regarding the CDM Meeting, the witnesses contradicted each other in parts. For example, Makhijani, Kluchin, and Gressak insisted Makhijani drew a diagram of the Nano Loan on a napkin and described it to Honarkar. But Prendergast remembered only that the diagram related to dilution of the MOM Members' capital percentages, an issue unrelated to the oral promise or the initial contribution. (7.12 Tr. at 3805:4-3808:12.) As for the Montage Meeting, no witness other than Prendergast even mentioned it. Plus, as the Arbitrator observed several times during the Hearing, based on basic witness credibility considerations, Kluchin, Makhijani, and Gressak were just not credible. (CACI 107 [Witness Credibility]; 7.1 Tr. at 1572:15-19 [re Kluchin]; 7.8 Tr. at 2506:3-2507:22 [re Kluchin and Makhijani]; 7.8 Tr. at 2773:8-13 [re Gressak].)

---

[17] For these same reasons, the Arbitrator rejects the MOM Respondents' claim additional funds they "infused" into the JV after June 8, 2021, satisfied the initial contribution obligation. Besides, there is insufficient evidence in the record establishing the form or amount of these infusions, by whom they were made, or where funds came from.

These credibility findings about the oral promise testimony are buttressed by the Respondents' pre-hearing verified discovery responses and deposition testimony. The initial interrogatory responses of Makhijani, Continuum, and Nano made only general statements that Honarkar was aware of the Nano Loan "through conversations with Responding Parties and Nano Banc." (Ex. 950 at 004-005; Exs. 937 at 007, 949 at 007.) They made no mention of any specific conversations where the Nano Loan was disclosed to Honarkar. Later, Nano's PMK deposition witness testified he was not aware of any written or oral communications with Honarkar about the Nano Loan. (Ex. 1000 at 93:21-94:11.) Still later, Makhijani made no mention of the CdM Meeting in his PMK deposition for Continuum. (Ex. 1009 at 39:25-40:10.) Then, less than a week before the Hearing, Nano's second supplemental interrogatory responses mentioned the CdM Meeting and the napkin diagram for the first time. (Ex. 1527.)

These credibility findings are also supported by the fact that there is no evidence of any written communications to Honarkar or his team at any time discussing the oral promise, nor are there any internal written communications between Honarkar and his team about the oral promise. Finally, Honarkar, Niazi, and Taxman all testified they were not aware of the Nano Loan until 2023. (6.24 Tr. at 169:22-178:14, 247:23-248:4 (Honarkar); 7.5 Tr. at 2301:4-2302:1 (Taxman), 2481:24-2483:14 (Niazi); 7.8 Tr. at 2526:5-2528:12 (Niazi); Exs. 656, 664, 659-63.)

In total, the weight of the evidence supports finding the oral promise was not made.

Turning to the Contribution Agreement, Kluchin testified he drafted it in "the morning of June 7, 2021." (6.28 Tr. at 1208:14-21, 1208:14-1209:7; 7.1 Tr. at 1544:13-1547:21.) He also testified it "was printed out, so it was signed in the office," "on June 7th" and was "signed in person and then scanned" the same day. (7.1 Tr. at 1544:13-16, 1548:18-1550:25.) Makhijani testified it was signed "mid-morning time on June 7" and that it was signed either using "a pen or a stamp." (7.2 Tr. at 1699:22-1701:25; 7.1 Tr. at 1548:22-1551:9.) But their testimony about the existence, creation, and execution of the Contribution Agreement is not credible.

There is no contemporaneous evidence the Contribution Agreement existed as of June 7, 2021. There are no written communications (emails, texts, or memoranda) about it. (7.1 Tr. at 1544:13-16, 1554:15-1557:7.) The MOM Respondents admit they never shared it with Honarkar or Nano. (6.28 Tr. at 1208:14-1210:15; 7.1 Tr. at 1544:13-1554:22; 6.24 Tr. at 254:23-255:22.) And they did not assert it existed until July 2023, months after the litigation began.

At the Hearing, when Claimants proffered a handwriting expert to testify the signatures on the Contribution Agreement were placed by electronic means, not by pen or stamp (7.7.24 Joint Letter), the MOM Respondents stipulated, contrary to Kluchin and Makhijani's testimony about it being printed, signed, and scanned on June 7, 2021, "the signatures on the Contribution Agreement were placed onto the document by electronic means." (7.12.24 Stipulation.)

19

117

The text of the Contribution Agreement also suggests it could not have existed and been signed in the mid-morning of June 7, as Kluchin and Makhijani testified, because Paragraph 2 refers to the final Operating Agreement's definition of Contribution in "Section 1.19." But on the morning of June 7, the draft Operating Agreements had the definition of "Contribution" in section 1.20—not section 1.19. (Ex. 1505 at 001, 023 [draft circulated at 12:58 p.m. on 6.7.21]; 7.10 Tr. at 3261:13-3263:5 [Gartside testified Exhibit 1505 was then-current draft].) Moreover, the definition of Contribution was not moved to section 1.19, until subsequent drafts exchanged later in the evening of June 7. (Exs. 282, 315 at 009, 313 at 009, 314 at 009.) The MOM Respondents' explanation for all of this is based on speculation, not evidence.

Even if the Contribution Agreement was authentic, it was invalid. Claimants argue it violated the Affiliate Transaction restrictions under the Operating Agreements. (Ex. 315 at 027.) Perhaps. The Mom Respondents contend the Affiliate Transaction restrictions do not apply because the June 7 Contribution Agreement predates the June 8 Operating Agreements. But again, on June 7: (a) the MOM JV Entities – who are putative parties to and beneficiaries of the Contribution Agreement - did not exist; (b) the Term Sheet was still in effect; and (c) the Contribution Agreement promise was not "cash equity" as required by the Term Sheet.

All told, the Contribution Agreement did not satisfy the initial contribution obligation.

To the extent the MOM Respondents downplay the materiality of the initial contribution to Honarkar and his decision to enter into the JV, their position is untenable. At the outset, it was intended to immediately pay off the $17.5 million debt to Honarkar's ex-wife and then fund the Hotel Laguna Project. When Continuum was unable to secure enough financing to pay off LoanCore, the initial contribution was also to be used to "close the gap" in the refinance. As the MOM Respondents recognized: "The cash needs of the contributed businesses were staggering at the outset of the joint venture, particularly given the financial troubles faced by Honarkar through his divorce, the subsequent foreclosure action brought by DIG, and the multiple receivers imposed over Honarkar's assets." (MOM Respondents' Opposition brief at 36.)

For these reasons, Claimants proved the first element of their fraud claim.

### 2. Intent Not to Perform

Claimants argue the MOM Respondents never intended to make the initial contribution from their own pockets, but instead planned to saddle the MOM JV Entities with debt in order to fund the initial contribution obligation. Again, "[a] promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Engalla, supra,* 15 Cal. 4th at 973.) And parol evidence is admissible to establish fraud. (Code Civ. Proc. ("CCP") § 1856(g).)

20

118

The evidence surrounding the JV negotiations is particularly instructive on this issue. While negotiating the Term Sheet, the drafts proposed by Continuum defined the form of the initial contribution as "debt with equity warrants and/or equity," whereas Honarkar's team repeatedly struck any reference to debt and inserted the term "cash." (Exs. 77 at 3; 84 at 13; 91 at 13; 92 at 17.) Obviously, Honarkar had no intention of allowing the MOM Respondents to saddle the JV Entities with debt to help fund the initial contribution. Eventually, the parties settled on the term "cash equity," suggesting the MOM Respondents intended to mollify Honarkar by including the word "cash" but intending to use the Nano Loan proceeds anyway.[18]

That the Nano Loan closed and the proceeds were taken by Continuum the day before the Operating Agreements were finalized and executed, also suggests the MOM Respondents fully understood their promise to provide the initial contribution was false when made. Even more telling, on May 20, 2021, four days before the Term Sheet was signed and two weeks before the Operating Agreements were signed, Shyam signed the Nano Loan LOI, with the then-theoretical MOM JV Entities as the borrowers and Claimants' assets as the collateral. (Ex. 130.) According to Kluchin, this loan idea was always Continuum's plan. (6.27 Tr. at 850:17-852.11.)

These facts prove the MOM Respondents had no intention of providing the initial capital contribution without borrowing $20 million of it from Nano using Claimants' assets.

### 3.    Intent to Deceive and Induce Reliance

Claimants argue the MOM Respondents' intent to deceive Honarkar as to the form of the contribution is evidenced by their active concealment of the Nano Loan. "A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an intent to induce reliance on it." (*Engalla, supra*, 15 Cal. 4th at 976.)

When the Nano Loan funded on June 7, 2021, Continuum requested that the proceeds be sent directly to a Continuum bank account at Nano "until the escrow company indicates that they will be ready to receive funds." (Exs. 237, 240.) Because it was unusual to transfer the loan proceeds to any entity other than the borrower, Nano employee Brian Buchanan drafted a memorandum requesting permission from the Nano Loan Committee, which stated Gressak had "spoken with the Borrower and [] approved the funding of the account." (Ex. 240.) And when the escrow closed on June 8, 2021, the escrow closing statement showed two transfers from Continuum – one for $10 million and one for $20 million. (Ex. 308.)

---

[18] The MOM Respondents fail to explain how "cash equity" differs from "cash" or how a debt could be considered a "contribution." (See, 6.26 Tr. at 806:5-7 [Kluchin cash equity "wouldn't be a loan that has to convert to equity"].) And in the financial and real estate industries, the term "cash equity" is commonly used to describe the portion of an investment that can be easily converted into cash. *See*, https://www.investopedia.com/terms/c/cash-equity.asp.

21

The MOM Respondents offer two explanations for these unusual transfers. First, they argue there were concerns the escrow would be delayed if the money came from the MOM JV Entities as borrowers on the Nano Loan, because the MOM JV Entities were not parties to the LoanCore payoff in the escrow holder's files (a problem created by the MOM Respondents in the first instance). Second, they posit the Nano Loan proceeds were initially transferred to Continuum because they were being submitted as the MOM Members' contribution and, as such, should be received through the MOM Members' agent, Continuum.

But these explanations are not consistent with the reason provided to Nano at the time the Nano Loan funded – that the escrow holder was not ready to receive the funds. (Ex. 240.) Nor are they consistent with Kluchin's testimony that the funds were transferred to a Continuum bank account because the MOM JV Entities did not have their own bank accounts set up. (6.27 Tr. at 868:15-871:4.) Regardless of the actual reason for Continuum's receipt of the Nano Loan proceeds, the escrow statement offered no further explanation. It certainly did not disclose that the $20 million deposit was from the proceeds of the Nano Loan to the MOM JV Entities. And there is no evidence that Respondents conveyed any of these reasons to Honarkar or his team.

Aside from Nano, three other lenders participated in the LoanCore refinance – First Choice Bank, Lone Oak, and Preferred Bank. (Exs. 220-222.) On June 4, 2021, just days before the close of escrow, Kluchin sent copies of the loan documents for each of those three lenders to Honarkar and Taxman. (*Id.*) He did not send over copies of the loan documents for the Nano Loan, despite admitting he had them available. (6.27 Tr. at 886:5-889:12.) Kluchin also sent an email chain on June 6, 2021 to Honarkar and the escrow company, indicating there were only three lenders involved in the refinance. (Ex. 229 at 2.) Neither the body of the email nor the attachment mentions the Nano Loan. (Ex. 229.) And, when Honarkar requested a list of all outstanding loans on the MOM JV Entities' assets in December 2021, the MOM Respondents sent a list from which the Nano Loan was conspicuously absent.[19] (Ex. 716 at 3, ¶ 8; 22-24.)

Nano did not record the Nano Loan deeds of trust encumbering the MOM JV Entities' properties until March 2022. (Exs. 234, 235, 236.) The recording was initiated by Marc Cohen, acting as counsel for Nano, on January 18, 2022 (Ex. 515), the same day Nano received an Order to Cease and Desist from the Federal Deposit Insurance Corporation.[20] (Ex. 514.) Thus, the weight of the evidence suggests the MOM Respondents were hiding and intentionally omitting information about the Nano Loan in their communications with Honarkar.

---

[19] This list also did not include the $1 million Tesoro Loan from Nano to Tesoro Redlands in July 2021.

[20] The order required Nano to engage an independent third party to review extensions of credit to insiders, remediate extensions made "on preferential terms or presenting more than the normal risk of repayment or other unfavorable features," and submit new procedures to "strengthen the Bank's internal controls related to financial transactions between the Bank and senior executives, directors, and/or any entities which they control." (Ex. 514, ¶¶ 5-8.)

22

Still, the MOM Respondents insist Honarkar and his team were aware of the Nano Loan based on a flurry of due diligence emails from Nano during the JV negotiations, as well as oral communications with Honarkar. As to the Nano emails, context matters. During the JV negotiations, on May 19, 2021, Nano provided Honarkar with the LOI for the $150 million loan from Nano and other "participant banks." (Ex. 106.) The next day, on May 20, Nano provided Shyam with the $20 million Nano Loan LOI. (Ex. 130.) Remarkably, both LOI's list the same Honarkar and 4G properties and subsidiary LLCs as collateral. (Exs. 106 at 1-2; 130 at 2.)

It is not surprising then that Honarkar and his team were receiving emails from Nano seeking due diligence on these properties. (Exs. 115 [May 19 email from Buchanan re underwriting]; 4017 [May 20 emails from Nano employee re certificates of insurance]; 4018-4020 [May 20 response emails from Honarkar's team attaching requested documents]; 5517 [May 21 email, 4G employee requesting insurance certificates – "[w]e still have the current lender, that has not changed, the bank we are refinancing the loan portfolio with is Nano Banc (who might be syndicating the loan with other lenders). They need the current certificates no matter the lender"]; 5518; 2296.) But none of these emails referenced the Nano Loan or clarified that Nano was underwriting the Nano Loan.[21] It is reasonable to believe Honarkar and his team assumed Nano was seeking documents for underwriting the $150 million loan or another outstanding Honarkar loan previously obtained from Nano (Ex. 123.) More importantly, Honarkar's reaction to discovering one of the recorded Nano Loan trust deeds in 2023 is consistent with his claimed lack of knowledge of the Nano Loan before then. (Exs. 656, 659.)

As for oral communications, again, no credible evidence was presented that the Nano Loan was disclosed to Honarkar during the CdM Meeting, the Montage Meeting, or the June 6 meeting at Honarkar's house. Rather, the weight of the evidence proves otherwise.

Respondents point to a perceived discrepancy in Honarkar's testimony, suggesting he was aware $143 million in secured loans refinanced the LoanCore Loan. (6.25 Tr. at 351:9-14; Ex. 2637 at 2; Ex. 2582 ("144M payout of DiG [for LoanCore Loan refinance] with $143M of Loan"); Ex. 3934.) Respondents argue this proves Honarkar was aware of the Nano Loan, because $143 million was the total amount of loans including the $20 million Nano Loan. This argument is not persuasive. Again, the evidence shows Honarkar was not aware the $20 million Nano Loan had been obtained, much less that it had been used to fund the MOM Members' initial Contribution. Plus, Honarkar's testimony is consistent with Nano and the other participating banks performing under the $150 million Nano LOI.

---

[21] Though Respondents rely heavily on Buchanan's testimony that Honarkar was fully informed of the Nano Loan, the Arbitrator points out Buchanan was in fact unaware of the $150 million Nano LOI, despite his signature being on the document. (Ex. 106; 6.26 Tr. at 566:13-567:25.) There were also other LOIs from Nano to Honarkar of which Buchanan was unaware. (6.26 Tr. at 563:11-566:12; 569:22-571:7, 575:19-577:11, 584:20-585:13; 6.28 Tr. at 1118:17-1119:5.) It is likely Buchanan and Honarkar were both focusing on different Nano loans when discussing due diligence, as it seems neither knew the Nano Loan existed.

23

Moreover, Honarkar had several other Nano loans, in addition to the LoanCore refinance loans, which could explain his conclusion there was a total of $143 million in loans. (Exs. 29 [Nano credit memo showing prior debts], 5501 [demonstrative]; 6.25 Tr. at 358:7-361:11.)

The MOM Respondents were aware of Honarkar's position that the initial contribution should not be provided in the form of a debt. As explained above, the Nano Loan transaction itself did not satisfy the initial contribution obligation. Yet, the MOM Respondents obtained the Nano Loan, muddied the waters, omitted basic information from their communications with Honarkar that would have informed him of the Nano Loan and, given the timing, conflated due diligence on the $20 million Nano Loan with the $150 million Nano LOI and other Nano loans.

If, as the MOM Respondents insist, they informed Honarkar of the Nano Loan and the MOM Members' promise to repay it, they provided no explanation for omitting the form of the initial contribution in their written communications with Honarkar. The evidence supports a finding the MOM Respondents intended to deceive Honarkar with respect to the Nano Loan.

### 4. Actual and Reasonable Reliance

Claimants must prove both actual and justifiable reliance or reasonable reliance. (*Beckwith v. Dahl* (2012) 205 Cal. App. 4th 1039, 1062-67.) "Actual reliance occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his legal relations, and when, absent such representation, he would not, in all reasonable probability, have entered into the contract or other transaction." (*Engalla, supra*, 15 Cal. 4th at 976.) "It is not necessary that a plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. It is enough that the representation has played a substantial part, and so has been a substantial factor in influencing his decision." (*Id.* at 976-77; *Whiteley v. Philip Morris Inc.* (2004) 117 Cal. App. 4th 635, 678 (same).) "Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." (*Engalla, supra*, 15 Cal. 4th at 977.)

Unquestionably, the $30 million initial contribution was material to Honarkar and his decision to enter into the JV, given his immediate needs for funds. And the evidence is certain Honarkar would not have agreed the initial contribution could be in the form of debt secured by the JV properties. (Exs. 77 at 3; 84 at 13; 91 at 13; 92 at 17; 6.24 Tr. at 150:24-151:7 ["That defeats the purpose. You're not putting money, you know; how could you be a partner?"].) The exclusivity provision in the Term Sheet also limited Honarkar's ability to pursue other options for financing prior to establishing the JV. (Ex. 148 at 8-9.)

24

So, the evidence shows the representations the MOM Respondents made about their initial contribution substantially influenced Honarkar's decision to enter into the JV and sign the Operating Agreements. (*Hoffman v. 162 N. Wolfe LLC* (2014) 228 Cal. App. 4th 1178, 1193-94 ["Reliance can be proved in a fraudulent omission case by establishing that had the omitted information been disclosed, the plaintiff would have been aware of it and behaved differently"].)

Honarkar must also show his "actual reliance on the representation was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault." (*Beckwith*, 205 Cal. App. 4th at 1066.) Justifiable reliance accounts for the particular "circumstances" of the plaintiff. (*Whiteley, supra,* 117 Cal. App. 4th at 684 [weighing, *inter alia*, plaintiff's "lack of sophistication" and "the evidence that she was addicted to cigarettes" in determining whether her reliance on statements about effects of cigarette use was reasonable or justified].)

The MOM Respondents argue Honarkar could not have justifiably relied on their representations because he failed to read the final Operating Agreements before execution. However, whether a plaintiff "read the entire [contract] is not dispositive" of reliance where there is "ample evidence of fraud." (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal. App. 5th 375, 392.) Given the chaos surrounding the negotiation and due diligence processes and the frantic push to get the documents finalized, Honarkar was not provided "reasonable opportunity to know of the character or essential terms of the proposed contract[s]." (*Rosenthal v. Great W. Fin. Sec. Corp.* (1996) 14 Cal. 4th 394, 423; 6.25 Tr. at 336:14-25 ["every five minutes, there was a new version. As soon as you get one, then it kicks in another version"].) He relied on his counsel to assist him with the documents. (6.24 Tr. at 132:1-133:2; 6.25 Tr. at 337:1-19, 322:5-25.) And again, Kluchin pressured Honarkar to sign early, before the Operating Agreements were finalized. (Ex. 288 ["We are in a mad rush to produce documents for the bank. We need signature blocks…tonight asap"]; Exs. 347, 352.)

Based on the financial wherewithal and resources available to the MOM Respondents, specifically Makhijani and Continuum, it was reasonable for Honarkar to assume Continuum's investors could and would follow through on their promises to fund the initial contribution. Honarkar was introduced to Makhijani by Gressak at Nano, a bank with which Honarkar already had an existing relationship and a "friend" in Gressak he trusted. (6.24 Tr. at 100:12-102:15; 6.25 Tr. at 501:2-24.) It is also important that many of the Continuum investors were also Nano shareholders and they had access to significant capital. (Ex. 1000 at 181:18-190:12.)

And finally, given the MOM Respondents' intentional concealment of the Nano Loan, there was little Honarkar could have done to discover the initial contribution obligation was going to be made by encumbering the MOM JV Entities assets with debt. (*Whiteley, supra,* 117 Cal. App. 4th at 684 ["Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent"].)

25

Based on the evidence in the record, the Arbitrator finds Claimants actually and justifiably relied on the MOM Respondents' representations.

### 5.    Nonperformance

As discussed (§ III.A.1. above), the MOM Respondents failed to provide the $30 million capital contribution as required. In addition, the MOM Respondents claimed the monthly payments on the Nano Loan as expenses of MOM JV Entities on at least two occasions (Exs. 574, 604; Exs. 2909, 5500 [Chi Lu, 4G's Controller, questioning payments to Nano]; 6.27 Tr. at 903:18-20, 904:1-4; 7.1 Tr. 1491:7-1492:3.) The MOM Respondents contend these payment entries were made in error and subsequently reversed. (Exs. 2909, 3625.) The Arbitrator rejects these contentions as not supported by the evidence. The MOM Respondents also insist the MOM Members alone have made all the payments on the Nano Loan. (Ex. 5530 at 2; Exs. 3410, 1042.) But the evidence supporting this position is of limited value since, as of July 2022, the MOM Respondents had recorded the Nano Loan on the JV's books and records as a long-term liability of the MOM JV Entities, and have provided no books and records since. (Ex. 507.) The fact remains - the MOM Respondents did not perform the promised capital contribution.

### 6.    Resulting Damage and Alternative Remedies

"To recover for fraud, a plaintiff must prove loss proximately caused by the defendant's tortious conduct." (*Fladeboe v. Am. Isuzu Motors Inc.* (2007) 150 Cal. App. 4th 42, 65.) The MOM Respondents contend Claimants have suffered no cognizable damages, as no MOM JV Entity funds were used to pay the Nano Loan. But again, the evidence shows: (1) the MOM Respondents' misrepresentations in connection with their initial contribution played a substantial part in inducing Honarkar to enter into the JV and (2) the MOM Respondents then encumbered Claimants' properties with the $20 million Nano Loan, along with hundreds of millions of dollars of additional encumbrances over the course of the JV. (Ex. 967.) These findings alone satisfy Claimants' initial burden to prove the fact that they were damaged by the MOM Respondents' conduct. (See also Exs. 1006 and 1509 [Spindler Reports].) Claimants are not required to prove the specific amount of their damages to perfect this claim, particularly since it would be impossible to quantify them without an accounting of the MOM JV Entities' finances.

For these reasons, the Arbitrator finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after the accounting is completed (§ III.K. below); or (b) rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet. (*Chapman v. Skype Inc.* (2013) 220 Cal. App. 4th 217, 234 ["A party alleging that she was fraudulently induced to enter into a contract may either rescind the contract, offer to restore any benefits received, and seek restitution or retain the benefits of the contract and seek damages for fraud]"); Civ. Code § 1692.)

26

124

**B.    Claimants' Direct Breach of Contract Claims Against the MOM Members and the MOM Managers (FAC at 24-25)**

Claimants allege the MOM Parties breached the Operating Agreements and the Management Agreement. (Exs. 313-315, 37.) Each will be discussed in turn.

### 1.    Applicable Law and Elements of Contract Claims

Again, Delaware law applies to the claims for breach of the Operating Agreements (Exs. 313-315, § 19.1.), and California law applies to the claim for breach of the Management Agreement. (Ex. 37, § 13.4.) The elements of a breach of contract claim under Delaware law are substantially similar to those under California law. (Compare *Humanigen, Inc. v. Savant Neglected Diseases, LLC* (Del. Super. Ct. 2020) 238 A.3d 194, 202 with *Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal. App. 4th 221, 228.)

### 2.    Breach of Operating Agreements – Failure to Provide Initial Contribution

Claimants assert the MOM Parties breached the Operating Agreements by failing to provide the initial contribution. (Ex. 315, § 6.1.) The Arbitrator agrees for the reasons discussed at length in connection with the fraudulent inducement claim above (§ III.A.1.), and therefore finds Claimants proved this breach of contract claim.[22] The Arbitrator further finds this breach was material and it resulted in a failure of consideration. (*Level 4 Yoga, LLC v. CorePower Yoga, LLC*, C.A. No. 2020-0249-JRS, 2022 WL 601862, at *27 (Del. Ch. Mar. 1, 2022) [under Delaware law, "a breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract"]; *Alchemy LTD LLC v. Fanchise League Co.*, C.A. No. 2021-0476-LWW, 2023 WL 4670954, at *5 (Del. Ch. July 20, 2023) ["Failure of consideration occurs when the bargained-for consideration is not rendered by one of the parties"].)

Hence, as a separate and sufficient basis apart from fraud, the Arbitrator finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after the accounting is completed; or (b) rescission of the Operating Agreements and the Other JV Related Agreements. (*United Engineers & Constructors, Inc. v. Babcock & Wilcox Co.*, C.A. No. 12540, 1993 WL 50309, at *3 (Del. Ch. Feb. 11, 1993) ["The courts of this State, of course, can grant rescission for a number of reasons, e.g., ... failure of consideration"].)

---

[22] The MOM Respondents' arguments to the contrary based upon the Release Agreement fail because: (i) by its own terms it does not apply to "claims for breach of any operating agreement..." (Ex. 317 at § 1(a)); and (ii) "[a] release obtained through fraud is invalid." (*Butler Am., LLC v. Aviation Assurance Co.* (2020) 55 Cal. App. 5th 136, 144.)

27

125

**3.    Breach of Operating Agreements – Unauthorized TIC Sale in Property Owned by Laguna HI, LLC**

Claimants assert the MOM Parties breached the Operating Agreements by causing Subsidiaries/Other Owned LLCs to engage in transactions, including the sale of TIC interests, without Honarkar's knowledge or consent. (Exs. 313-315, § 9.3(b) ["Managing Member shall not be entitled to sell the ownership interests in an Other Owned LLC or the asset owned by an Other Owned LLC without the prior written consent of MH…"].)  Again, the Arbitrator agrees.

In December 2022, the MOM Managers sold for $4.1 million a TIC interest in property owned by Laguna HI, LLC, a Subsidiary/Other Owned LLC owned by the MOM JV Entities. (Exs. 315 at 43; 632, 634, 645, 647.)  Honarkar was not informed or aware of the transaction. (6.24 Tr. at 180:11-22, 254:12-19; 7.8 Tr. at 2539:20-2540:9.)

The MOM Parties do not dispute the application of Section 9.3 or claim Honarkar was aware of this TIC sale.  Instead, they argue Laguna HI, LLC became a "Project" through the First Amendment to the Operating Agreements (the "First Amendment") on June 30, 2021, such that Honarkar's consent was unnecessary to sell the TIC interest.  (Ex. 689 at 72, § 1(a).)  Not so.

The Operating Agreements required the MOM Members to provide notice, make a Contribution, and agree on a development budget, in order to convert a Subsidiary/Other Owned LLC from a "Potential Project" to a "Project."  (Ex. 315, § 6.1(d).)  Moreover, while the First Amendment allowed the MOM Members to designate Potential Projects as Projects without further action by the MOM Managers or Members, *i.e.*, without Honarkar's knowledge or consent, it did not change or remove the notice and contribution requirements of section 6.1(d). (Ex. 689 at 72, § 1(a); Ex. 591 [Sep. 2022 Taxman email, noting there have been no notices or contributions to convert assets to Projects under amended agreements].)

In this way, the Operating Agreements still obligated the MOM Members to seek Honarkar's consent to recharacterize the asset.  (Ex. 315, § 6.1(d).)  Interpreting the interplay between the Operating Agreements and the First Amendment in any other way would negate the negotiated balance of power between the parties and lead to an absurd result, allowing the MOM Members to designate all properties as Projects as soon as the First Amendment was signed.

Further, there is no evidence, other than Makhijani's uncorroborated, self-serving testimony, that the proceeds from the sale of this TIC interest in the MOM JV Entities' assets were transferred to the MOM JV Entities or distributed to the MOM Members and MO Members as required by the waterfall provisions in the Operating Agreements.  (Exs. 313-315, § 8.) Accordingly, the Arbitrator finds the MOM Parties breached the Operating Agreements by selling the TIC interest and that breach resulted in monetary damages to Claimants.

28

126

### 4.    Breach of Operating Agreements – Unauthorized Insider/Self-Interested "Affiliate" Transactions With Cantor

Claimants assert the MOM Parties breached the Operating Agreements by entering into "contribution agreements" with the Cantor Group and its related entities ("Cantor"), all of which are affiliates of Shyam. Claimants contend the MOM JV Entities' assets are heavily encumbered with debt obligations, in part because of loans from Cantor, and they therefore have limited ability to obtain additional financing or liquidity.

The Operating Agreements plainly prohibit, without Honarkar's prior written approval, "Affiliate" transactions by the MOM Parties; that is, transactions between the MOM JV Entities and the MOM Managers or the MOM Members and entities controlled by or under common control of the Managing Managers or MOM Members. (Exs. 313-315, §§ 9.15, 1.3, 1.17, 1.20.) Cantor is surely an "Affiliate" of the MOM Managers or MOM Members. Cantor consists solely of Shyam; it has no employees and shares the Continuum offices. (7.12 Tr. at 3642:25-3643:8.) Shyam is the founder, CEO, and owner of Continuum and the Managing Member of MOM CA Manager (as well as part of the investor group as a MOM Member). (7.12 Tr. at 3640:17-3641:8.) Kluchin also admitted Cantor was Continuum's "affiliate" and testified he had explained that to Honarkar. (6.27 Tr. at 1086:4-19; 7.1 Tr. at 1567:24-1570:3.)

The evidence shows the MOM Parties caused the MOM JV Entities and some of the subsidiary LLCs to enter into "contribution agreements" regarding loans from Cantor Group IV LLC and Cantor Group V LLC, both Cantor affiliates. (Ex. 967 at 16-17; 6.27 Tr. at 1009:18-1010:7 [Kluchin testified all Cantor loans have an associated contribution agreement].) Shyam signed these contribution agreements as both the "borrower" and "lender." (6.27 Tr. at 1002:4-1005:18.) They permit the conversion of the loans made by Cantor into equity in the MOM JV Entities at the option of the MOM Members, if the MOM JV Entities that borrowed the money perform well. (Ex. 469, § 4 [contribution provision].) But if the MOM JV Entities do not perform well, then the MOM Parties can maintain the transaction as a loan, and require the MOM JV Entities to repay Cantor in full, with interest.[23] However, there is no evidence the MOM Respondents ever received written consent from Honarkar, or even informed him of the existence of these loans from the Cantor affiliated entities. (6.27 Tr. at 1008:2-1009:3 [Kluchin – "Q:…[Y]ou did not seek written consent from Mr. Honarkar for the contribution agreements associated with those loans before they were entered, correct? A: Not that I recall"].)

For these reasons, the Arbitrator finds the MOM Parties breached the Operating Agreements by entering into unauthorized Affiliate transactions with Cantor; that breach resulted in monetary damages to Claimants, the amount of which will be determined after the accounting discussed below is completed; and the contribution agreements are likely invalid.

---

[23] The Arbitrator notes this is a peculiar "heads I win, tails you lose" structure.

29

**5.     Breach of Operating Agreements – Failure to Keep and Provide
Books and Records for the MOM JV Entities**

Claimants assert the MOM Managers breached the Operating Agreements by failing to
keep and provide books and records as required by section 12.1 which states: "Books of
Account. The Managing Manager shall, at the [MOM JV Entities'] sole cost and expense, keep
separate, full and accurate books and records of the [MOM JV Entities] wherein shall be
recorded and reflected all of the Contributions and all of the income, expenses and transactions
of the [MOM JV Entities] and a list of the names and addresses of the Members.... The
Administrative Manager [Honarkar] or a Member [including the MO Member] shall have the
right at any time to inspect the [MOM JV Entities] books and records.." (Exs. 313-315, § 12.1.)
Claimants contend they have been damaged as a result of these breaches, because they were
forced to spend time and resources on needless litigation attempting to obtain these records.

This claim has merit. Both Honarkar and Niazi testified they repeatedly sought financial
information from the MOM Respondents and never received it. (6.24 Tr. at 157:22-162:14; 7.8
Tr. at 2525:1-2526:4; Ex. 5480 [MOM Respondents willing to provide financial documents only
if Honarkar submits "letter withdrawing inspection demands"].) The MOM Parties admitted
they only kept records for the MOM JV Entities for certain periods of time, despite evidence that
transactions occurred outside of these time periods. (Exs. 1385 at 3; 967 [loan on 11.15.23].)
Certainly, it is unclear where and how records of transactions between the MOM JV Entities and
MOM Members were maintained, if at all, particularly since Kluchin testified he had "no
information" on why QuickBooks data was not maintained for the MOM JV Entities during
certain time periods. (6.27 Tr. at 975:21-981:5.) Finally, the spreadsheet submitted by the
MOM Respondents carries minimal weight on this record. (Ex. 3625 [fails to track income into
the JV or funds transferred out to Continuum, Makhijani, or other investors].)

For these reasons, though the resulting damages may be nominal, the Arbitrator finds the
MOM Managers breached the Operating Agreements by failing to keep and provide books and
records as required. (*In re P3 Health Grp. Holdings, LLC* (Del. Ch. Oct. 31, 2022) Consol. C.A.
No. 2021-0518-JTL, 2022 WL 16548567, at *9 ["A court also can vindicate a breach of contract
through an award of nominal damages"].)

**6.     Breach of Management Agreement – Failure to Pay Management Fee**

Claimants assert the MOM Parties breached the separate Management Agreement
between Honarkar and 4G, under which Honarkar was supposed to be paid monthly management
fees for management services provided to Hotel Laguna, the Holiday Inn Laguna Beach, and
several Laguna Beach vacation rental properties. (Ex. 37.) Claimants insist the Management
Agreement remains valid because it predates the Operating Agreements.

30

128

The Management Agreement claim was not specifically alleged in the FAC and the evidence offered to support it was nominal at best. There is simply not enough in the record to determine the parties' rights, duties, and obligations at issue. Consequently, the Arbitrator finds Claimants have failed to prove the MOM Parties breached the Management Agreement.

**C. Claimants' Direct Forcible Entry and Forcible Detainer Claims Against Makhijani, Continuum, and the MOM Parties (FAC at 31-33)**

Claimants assert the MOM Respondents violated California's forcible entry and forcible detainer laws by breaking into and seizing the 4G offices. To establish this claim, "the plaintiff shall only be required to show, in addition to the forcible entry or forcible detainer complained of, that he was peaceably in the actual possession at the time of the forcible entry or was entitled to the possession at the time of the forcible detainer." (CCP § 1172.) The law explicitly prohibits entry "into any real property" "[b]y breaking open doors, windows, or other parts of a house, or by any kind of violence or circumstance of terror." (CCP § 1159.) Similarly, the law prohibits "[b]y force, or by menaces and threats of violence, unlawfully hold[ing] or keep[ing] the possession of any real property, whether the same was acquired peaceably or otherwise." (CCP § 1160.)

On July 24, 2023, while Honarkar and Respondents were in court on this matter, Kluchin, Haddad, and Miller, along with a number of other individuals, broke into the 4G offices at 775 Laguna Canyon Road as 4G employees were working. (Ex. 773.) A glass door was shattered with a hammer and the doors at the front entrance were forced open. (*Id.* at 4.) Property was removed from the 4G offices.

While the MOM Respondents do not dispute these facts, they contend no forcible entry or detainer occurred, because they were joint owners of 4G. But the evidence shows 4G was not a Contributed Entity. (Exs. 583, 1354; 7.3 Tr. at 1915:7-1919:6.) Regardless, the MOM Respondents' actions bear all the hallmarks of improper self-help under California law.

A party's "title or right of possession is no defense;" possession is irrelevant to the determination of forcible entry. (*Daluiso v. Boone* (1969) 71 Cal. 2d 484, 486.) An unlawful detainer action is the only legal way to obtain possession of real property. (*Glass v. Najafi* (2000) 78 Cal. App. 4th 45, 48-49 [forcible detainer and entry statutes "reflect a policy, with deep roots in English law, barring the use of forceful self-help to enforce a right to possession of real property and requiring instead the use of judicial process to gain possession"]; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal. App. 4th 1004, 1038 [landlords may enforce rights "only by judicial process, not by self-help"]; *Jordan v. Talbot* (1961) 55 Cal. 2d 597, 608 [forcible detainer found where forcible entry was followed by "removal of plaintiff's furniture and [defendant's] admonishment to 'Get the hell out of here.'"]; CCP § 1160.)

31

Accordingly, the Arbitrator finds the MOM Respondents violated both the forcible entry and forcible detainer statutes. Claimants are thus entitled to the restitution of the 4G offices and any property removed, plus incidental damages. (*Allen v. McMillion* (1978) 82 Cal.App.3d 211, 219 ["The plaintiff's interest in peaceable even if wrongful possession is secured against forcible intrusion by conferring on him the right to restitution of the premises, the primary remedy, and incidentally awarding damages proximately caused by the forcible entry"].)

### D. Claimants' Derivative Conversion Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 28-29)

Claimants assert the MOM Respondents are liable to the MOM JV Entities for conversion of the MOM JV Entities' assets (*e.g.*, loan and sale proceeds) in six separate instances. Specifically, Claimants claim conversion of (1) $20 million in Nano Loan proceeds, (2) $1 million in Tesoro Loan proceeds, (3) $5.1 million in proceeds from the sale of TIC interests, (4) $11.6 million in Tesoro Redlands Preferred Bank loan proceeds, (5) excessive distributions the MOM Parties made to themselves, and (6) deeds of trust on properties at issue in the potential $175 million loan from Coastline Loans, LLC ("Coastline Loan") in June 2021. These derivative claims are stayed as a result of the MOM JV Entities' bankruptcy. Consequently, the analysis and disposition of these claims set forth in § III.D. of the Partial Interim Award has been omitted from this Partial Final Award. However, these claims will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

### E. Claimants' Derivative Penal Code Section 496 Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 30-31)

Claimants argue the acts of conversion also violated Section 496. This derivative claim is stayed as a result of the MOM JV Entities' pending bankruptcy. Therefore, the analysis and disposition of this claim set forth in § III.E. of the Partial Interim Award has been omitted from this Partial Final Award. But this claim will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

### F. Claimants' Derivative Unjust Enrichment Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 29-30)

Claimants assert an unjust enrichment claim, arguing the MOM Respondents have looted the MOM JV Entities, using them as personal slush funds and enriching themselves. This derivative claim is stayed as a result of the MOM JV Entities' bankruptcy. Accordingly, the analysis and disposition of this claim set forth in § III.F. of the Partial Interim Award has been omitted from this Partial Final Award. Still, this claim will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

32

### G.    Personal Liability of Makhijani

Claimants argue Makhijani is personally liable for fraudulent inducement and forcible entry and detainer because an agent is always liable for his own torts; and he is an alter ego of Continuum and the MOM Parties. The MOM Respondents concede Makhijani is their agent, and is liable for his own torts, but argue Claimants failed to prove fraudulent inducement by Makhijani (apart from the other MOM Respondents) and failed to prove he is the alter ego of Continuum or the MOM Parties.[24]

The Arbitrator finds Claimants have proven Makhijani was personally involved in the fraudulent inducement and other non-contract claims discussed above. He directed and participated in the negotiation of the Term Sheet (7.2 at 1873:14-17), the Operating Agreements and the Other JV Related Agreements. (Exs. 2307, 2382, 319.) He admitted he "was personally involved" with the Term Sheet and other JV agreement negotiations. (Ex. 758 ¶ 5.) He even admitted he was "personally involved" in obtaining the Nano Loan. (Ex. 758 ¶¶ 10-11.) Finally, other MOM Respondent agents testified Makhijani controls and manages the MOM JV Entities' daily operations. (6.27 Tr. at 978:14-21.) Therefore, Makhijani is personally liable for the fraudulent inducement and other non-contract claims based on his own actions.[25]

The Arbitrator finds Claimants have not proven Makhijani is the alter ego of Continuum or the MOM Parties. Alter ego is "an extreme remedy, sparingly used." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal. App. 4th 523, 539.) It requires proof of two conditions: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." (*Hasso v. Hapke* (2014) 227 Cal. App. 4th 107, 155.)

The evidence shows Shyam, not Makhijani, is the owner of Continuum. (7.2 Tr. at 1650:5-14 [in the hierarchy of Continuum, Makhijani works under and reports to Shyam]; 7.11 Tr. at 3561:7-12, 3562:18-21, 3564:9-3565:5; *Hasso*, 227 Cal. App. 4th at 155.) And there would be no inequitable result if the acts in question were treated as those of Continuum or the MOM Entities, rather than as Makhijani's acts. (*Ibid.*) That is, there is no evidence that either Continuum or the MOM Parties are "judgment proof," such that they could not pay for any damages awarded to Claimants. (*Greenspan v. LADT, LLC* (2010) 191 Cal. App. 4th 486, 528 [adding alter ego manager and sister company to a judgment to avoid prejudice, when judgment debtors' actions caused assets to disappear].) Therefore, Makhijani is not personally liable for the fraudulent inducement and other non-contract claims based on the alter ego theory.

---

[24] The MOM Respondents make no such argument relative to the other personal liability claims.

[25] The Arbitrator notes no claims for conspiracy or aiding and abetting were alleged against Makhijani (unlike Nano) in the FAC and none were argued in the closing briefs. So, the Arbitrator expresses no opinion on those theories.

33

**H.    Claimants' Conspiracy and Aiding/Abetting Fraudulent Inducement Claims
Against Nano (FAC at 33-37)**

Claimants argue Nano is liable for the fraudulent inducement/promissory fraud discussed
above (§ III.A.), because Nano conspired with and aided and abetted the MOM Respondents.

Conspiracy is "a form of vicarious liability by which one defendant can be held liable for
the acts of another," where all have "agreed to a common design to commit a wrong" that
damages a plaintiff. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal. App. 5th 630, 652.)  Each member
of a conspiracy must have "acted in concert" and come to "a mutual understanding to accomplish
a common and unlawful plan," wherein one or more of them "committed an overt act to further"
the plan. *Id.*  The elements of the claim are: "(1) the formation and operation of the conspiracy,
(2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the
wrongful conduct." (*AREI II Cases* (2013) 216 Cal. App. 4th 1004, 1022.)  Participation,
cooperation, or unity of action in a conspiracy is typically proven by circumstantial evidence,
including, "the nature of the act done, the relation of the parties, [and] the interests of the alleged
conspirators." (*Rickley v. Goodfriend* (2013) 212 Cal. App. 4th 1136, 1166.)

Liability for aiding and abetting an intentional tort may be imposed if the person "(a)
knows the other's conduct constitutes a breach of duty and gives substantial assistance or
encouragement to the other to so act or (b) gives substantial assistance to the other in
accomplishing a tortious result and the person's own conduct, separately considered, constitutes
a breach of duty to the third person." (*IIG Wireless*, 22 Cal. App. 4th at 653-654.)  "[I]t
necessarily requires a defendant to reach a conscious decision to participate in tortious activity
for the purpose of assisting another in performing a wrongful act." (*Id.* at 654.)  However, a
person may be liable even in the absence of any independent duty to the plaintiff. (*Nasrawi v.
Buck Consultants LLC* (2014) 231 Cal. App. 4th 328, 345.)

The evidence shows Nano gave substantial assistance to, and acted in concert with, the
MOM Respondents in fraudulently inducing Claimants to enter into the JV.[26]  Gressak's actions
in particular indicate Nano and the MOM Respondents reached a "mutual understanding to
accomplish a common and unlawful plan," required for conspiracy.[27]  Nano knew of the MOM
Respondents' fraud, as required for aiding and abetting. (*IIG Wireless*, 13 Cal. 5th at 654.)

---

[26] A bank is not immune simply by virtue of its role as a bank – liability can be found where, for example, a bank
"allow[s] a person to deposit a check, payable to someone else, into a personal account, under circumstances that
should have alerted the bank to the possibility of fraud." (*Casey v. U.S. Bank Nat'l Ass'n* (2005) 127 Cal. App. 4th
1138, 1151, n.3.)  The Arbitrator notes these circumstances are comparable to Nano's diversion of the Nano Loan
proceeds from the MOM JV Entities directly into a Continuum bank account.

[27] The Arbitrator finds Gressak's self-serving contrary testimony carried little weight, as it was not credible or
consistent with the documentary evidence.  Regardless, his testimony as to Nano's obligations and responsibilities
did not materially move the needle in either direction. The documents told the story.

34

132

As to Nano's knowledge of and active participation in the fraud, Nano had an existing relationship with Honarkar, having issued him multiple loans prior to the JV negotiations, and Nano was aware Honarkar and 4G were the owners of the properties used to secure the Nano Loan. (Exs. 123; 130; 215 at 3-7, 16, 18-21.) Honarkar testified he sought out Gressak's advice because he believed he and Gressak were friends, and he trusted Gressak when Gressak introduced him to Makhijani for purposes of discussing a potential JV with Makhijani's investors. (Ex. 52; 6.24 Tr. at 100:12-102:15; 6.25 Tr. at 501:2-24.) Again, the ties and cross-connections between Nano, Continuum, and Makhijani run deep. (Ex. 1000 at 102:12-103:14, 181:18-190:6, 200:20-201:3; 6.26 Tr. at 587:24-588:22, 797:12-799:16.)

Against that background, Nano issued the $150 million LOI to Honarkar on May 19, 2021, for a loan to refinance (with other lenders) the LoanCore debt. (Ex. 106.) The $150 million Nano loan was to be secured by the same properties used to secure the $20 million Nano Loan. (Exs. 106, 130.) Though Nano now claims it did not have the capacity to make a $150 million loan, Gressak actively perpetuated the pretense in the days ahead of the "closing." (Exs. 139, 211, 171; Ex. 1000 at 40:9-41:6; 6.26 Tr. at 606:20-607:16 [Buchanan – funding would have been "near impossible"].) Gressak was aware the MOM Respondents had misrepresented only three lenders would be involved in the LoanCore refinance (First Choice, Preferred, and Lone Oak). (Exs. 187, 229.) In fact, Nano used the $150 million LOI to gather information about Honarkar's properties, failing to differentiate between the $150 million Nano LOI and the $20 million Nano Loan in their due diligence communications. (Exs. 4017-4020, 123.)

Simultaneously, Nano was working with Continuum/Makhijani/Shyam on the $20 million Nano Loan to the MOM JV Entities. On May 20, 2021, prior to the execution of the Term Sheet on May 24, 2021 (Ex. 148), Nano issued the Nano Loan LOI to Shyam, which contemplated securing the Nano Loan with properties Nano knew were owned by Claimants. (Exs. 130, 215.) Nano did not include Honarkar on any correspondence about the $20 million Nano Loan nor did it seek his consent to encumber the properties it knew belonged to him and 4G. Though Nano points to the Term Sheet as providing it authority to issue the Nano Loan to the MOM JV Entities, the Term Sheet does not mention the MOM JV Entities by name nor did they even exist before the Operating Agreements were signed on June 8, 2021.[28]

Nano knew the MOM Respondents intended to use the Nano Loan proceeds as their initial contribution to the JV because Makhijani told Gressak so before the Nano Loan LOI was even issued to Shyam. (7.8 Tr. at 2729:17-2730:6; 2549:5-2550:2.) But Nano never revealed the MOM Respondents' intent as to the initial contribution in any written communications or documents that might have alerted Honarkar. (Id. at 2730:7-2731:13, 2734:6-2739:19.)

---

[28] While Nano says its actions were similar to the other banks involved in the LoanCore refinance, it is important to note the other banks are on different footing as to their connections with Continuum and Makhijani. Also, Honarkar was aware of and consented to the other bank loans and related encumbrances on his properties. (Exs. 220-222.)

35

133

Internal records state Nano made the Nano Loan to "strengthen[] the Banc's position of the history and relationship with sponsors of the joint-venture [*i.e.*, Continuum and Makhijani]." (Ex. 215 at 4.)  Gressak was "strongly advocating for this loan to get made" and "overrode opposition to it" from other bank officers, including Buchanan and the chief lending officer, who were concerned the loan was not secured and would be scrutinized by regulators. (6.26 Tr. at 573:15-577:11, 586:2-24, 588:15-589:23.)

Buchanan drafted the June 7, 2021 memo to the Nano Loan Committee to memorialize the unusual request for the loan proceeds to be transferred to an entity other than the borrower, placing the onus on Gressak. (Ex. 240; 6.26 Tr. at 593:8-597:3 [Buchanan was concerned about "direction that [Nano] had received, as well as the optics with this particular loan"]; Ex. 1000 [Nano PMK – "Q: Was the loan committee consulted about the change in disbursement?  A: I don't think so"].)

But the June 7, 2021 internal memo falsely stated the loan proceeds had to be placed in Continuum's account because the MOM JV Entities had indicated the refinancing escrow was not open and could not receive transfers. (Ex. 240.)  Both Makhijani and Shyam testified they never told Nano the refinancing escrow was not yet open. (7.3 Tr. at 2159:20-2164:11; 7.12 Tr. at 3685:10-3686:10.)  And Nano obviously knew the refinancing escrow was open on June 7 – it wired $20 million from Continuum's bank account to the refinancing escrow less than an hour after first depositing the funds in Continuum's account. (Exs. 270, 272, 278 at 2.)

Nano closed and funded the $20 million Nano Loan on June 7, 2021, before the MOM JV Entities' Operating Agreements were finalized and executed, meaning the MOM JV Entities did not exist on the date the Nano Loan was made to them. (Ex. 4104 at 4-5.)  Nano also issued the Nano Loan based only on the signatures of Continuum employees, not Honarkar. (Ex. 239.)

Nano also placed the $20 million Nano Loan proceeds into a bank account belonging to Continuum, knowing Continuum was not the borrower and the assets used to secure the loan belonged to Honarkar and 4G. (Ex. 240 ["Gressak has spoken with the Borrower and has approved the funding of the account"].)  Nano routed this money to the Continuum bank account at Shyam's request, based on documents signed by Shyam, without verifying Shyam's authority to effectuate the transfer to his own corporate account on behalf of the MOM JV Entities. (Exs. 237, 270; 7.12 Tr. at 3794:20-3799:6 [Prendergast – "[Gressak] just told me that, yes, Deba Shyam, by reviewing the term sheet, he has the authority…I just took [Gressak's] word for it…."].)  Shyam is not mentioned in the Term Sheet, the only JV document in existence at the time of the Nano Loan funding. (Ex. 148.)  Nano also violated its own policy by failing to get a request in writing from all three of the MOM JV Entities as borrowers to reroute the funds from the approved use, since Shyam was the Manager of only the MOM CA Manager, not the MOM AS Manager or the MOM BS Manager. (Ex. 1000 at 139:10-15 [Nano PMK testimony].)

36

Nano then took security interests under the deeds of trust securing the Nano Loan, knowing they were Claimants' properties, and did so without Honarkar's consent. Nano only publicly recorded these deeds of trust after receiving a Cease and Desist Order from the Federal Reserve. (Exs. 234-236, 239 at 88-127, 515 at 6-47, 514 at 2; Ex. 4127 [Gressak – "these are nothing but AOC [abundance of caution] liens" and "I don't need to be on this anymore"].)

Finally, Nano collected fees and interest on the Nano Loan, despite knowing of the MOM Respondents' fraud. (Exs. 1087, 215, 389.) And after this action was filed, Nano obtained an indemnity from the MOM Respondents for Claimants' claims that, *inter alia,* the Nano Loan was obtained without "the necessary consent from Mohammad Honarkar." (Ex. 869, ¶ 19.)

Even after the JV was formed, Nano continued to assist the MOM Respondents by concealing material information from Honarkar. Nano issued the $1 million Tesoro Loan without Honarkar's knowledge. Then, in response to a 4G employee's question concerning receipt of a related monthly billing statement, Nano indicated it was "a billing error and not applicable to Tesoro." (Ex. 2723.) Nano also complied with Kluchin's instructions to conceal information from Honarkar and his team. (Ex. 473 [Kluchin - "No one from 4G should be on this account. This is very important...Only Deba and I"]; Ex. 590 [Kluchin – "DO NOT COPY CHI or anyone from 4g or laguna beach company on this email thread"].) Similarly, after the parties' dispute erupted in February 2023, Nano assisted the MOM Respondents by restricting Honarkar's access to all JV bank accounts, including those for 4G. (Ex. 677.)

Nano cites California's economic loss rule and argues Claimants' fraudulent inducement claim is barred. However, the California Supreme Court recently clarified, "[t]he doctrine only applies to bar tort recovery for negligently inflicted economic losses unaccompanied by physical or property damage under the limits recognized in *Sheen*." (*Rattagan v. Uber Techs., Inc.* (2024) 17 Cal. 5th 1, 38; citing *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal. 5th 905, 922.) The economic loss rule does not apply to the intentional fraudulent inducement at issue here.

In summary, the record is replete with evidence Nano acted in concert with, and was aware of, the MOM Respondents' fraudulent inducement. The Arbitrator therefore finds Nano jointly and severally liable with the MOM Respondents for conspiracy to commit and aiding and abetting the commission of the fraudulent inducement. As a consequence, the Arbitrator again finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after an accounting is completed; or (b) rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet.[29] (*Chapman*, 220 Cal. App. 4th at 234; Civ. Code § 1692.)

---

[29] This finding may also constitute a basis for the MOM JV Entities to set aside the Nano Loan documents (including the loan agreement, the deeds of trust, and the subsidiary LLC membership interest assignments), in addition to their invalidity for lack of authority as discussed in § III.A.1. above.

37

**I.    Claimants' Derivative Conversion and Penal Code Section 496 Claims Against Nano (FAC at 28-29, 30-31)**

Claimants argue Nano is separately liable to the MOM JV Entities for conversion of the $20 million Nano Loan and the $1 million Tesoro Loan proceeds, which belonged, respectively, to the MOM JV Entities and Tesoro Redlands as the borrowers (Exs. 239, 411). Claimants also argue Nano violated Section 496 because it concealed and withheld, and aided the MOM Respondents in concealing and withholding, the Nano and Tesoro Loan proceeds. These derivative claims are stayed as a result of the MOM JV Entities' bankruptcy. As a result, the analysis and disposition of these claims set forth in § III.I. of the Partial Interim Award has been omitted from this Partial Final Award. Nevertheless, these claims will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

**J.    Claimants' Derivative Breach of Contract Claim Against Nano (FAC at 37)**

Claimants assert as an "alternative" that Nano breached the Nano Loan agreement by converting the Nano Loan proceeds and transferring them to Continuum, rather than to the MOM JV Entities. This derivative claim is stayed as a result of the MOM JV Entities' bankruptcy. So, the analysis and disposition of this claim set forth in § III.J. of the Partial Interim Award has been omitted from this Partial Final Award. But this claim will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

**K.    Claimants' Accounting Claim Against the MOM Parties (FAC at 26)**

Claimants seek an accounting of the MOM JV Entities' books and records by an independent third party, from the creation of the JV to the present. "An action for an accounting has two elements: (1) 'that a relationship exists between the plaintiff and defendant that requires an accounting' and (2) 'that some balance is due the plaintiff that can only be ascertained by an accounting.'" (*Sass v. Cohen* (2020) 10 Cal. 5th 861, 869.)

Both prongs are satisfied here. First, the parties are in a business relationship with each other, as members and managers of the MOM JV Entities, responsible for owning and operating real estate assets worth hundreds of millions of dollars. Second, a balance is owed to Claimants that can only be ascertained by an accounting. The Operating Agreements required the MOM Parties to create and maintain adequate books and records for the MOM JV Entities, to provide regular financial reporting to Claimants, and to allow inspection of the complete books and records upon request; but they have failed to fulfill these obligations. (§ III.A.5. above; Ex. 313, 314, 315 §§ 12.1, 12.2; Ex. 1377, 6.24 Tr. at 250:1-254:1; Ex. 659; 7.8 Tr. at 2533:16-2539:19.) As a result, none of the damages experts could make an accurate determination of the JV's income, expenses, assets, or liabilities. (7.9 Tr. at 3008:6-3012:7, 3023:1-7.)

38

136

An accounting is particularly warranted here because, absent one, Claimants have no way to determine the full scope of the MOM Respondents' misconduct and the resulting damages. The MOM Parties remain in full control of the MOM JV Entities, and have excluded Claimants since Spring 2023. (Ex. 677; 7.12 Tr. 3850:12-3851:5; 6.25 Tr. at 459:20-23.) Claimants thus have no way of knowing what the MOM Respondents have done in almost two years.[30]

The MOM Respondents' arguments against an accounting are meritless. They claim neither Claimants nor the MOM JV Entities are owed any money, because: (a) there is no validity to any of Claimants' claims; and (b) the undisputed evidence shows that, in addition to the initial $30 million capital contribution, the MOM Members advanced $89.5 million to the JV, $49.5 million of which remains outstanding. The Arbitrator rejects these arguments.

The Arbitrator has found the majority of Claimants' claims are valid. Arbitrator also finds there is no reliable evidence establishing the fact or amount of the claimed "advances."[31] More broadly, due to Respondents' active concealment, Claimants have been unable to verify the accuracy and completeness of the few financial records the MOM Respondents have provided. The accounting is also needed to verify the amount of the MOM Respondents' claimed offsets.

Claimants have proven they are entitled to an accounting.

## L.    Claimants' Declaratory Relief Claim Against the MOM Parties (FAC at 27)

The parties have disputes as to their respective rights, duties, powers, and obligations under the Operating Agreements, and these disputes are generally amenable to declaratory relief. (CCP § 1060.) The Arbitrator finds Claimants are entitled to the declaratory relief they seek on the following specific issues and for the following reasons:

(1) The MOM Respondents fraudulently induced Claimants into entering into the Operating Agreements.

(2) On July 24, 2023, the MOM Respondents committed forcible entry and detainer at the 4G corporate offices. As a result, Claimants are entitled to immediate possession of the 4G offices. The MOM Respondents should be ordered to return all information and things removed from the 4G offices and to compensate Claimants for the value of any items lost or destroyed.

---

[30] The MOM Respondents admitted their discovery responses were incomplete as to what loans they obtained related to JV properties, and that they routinely did not inform Honarkar about large financial decisions because they "didn't think it was necessary." (6.27 Tr. at 1008:2-17, 1012:14-16, 1071:19-1073:10; see also Exs. 967, 3623.)

[31] The MOM Respondents and Nano also euphemistically refer to these "advances" as "infusions," a term seemingly calculated to obfuscate whether they were Contributions or loans to the MOM JV Entities.

39

(3)  Palm Desert Collective Resorts LLC, 424 Marguerite Ave. LLC, and 8871 Research Dr. LLC are "Held-Back LLCs" under the ACA and the Operating Agreements and thus, were never contributed to the MOM JV Entities.  (Ex. 304 and Ex. E attached thereto; Exs. 313-315.)

(4)  Although the following entities appear on Exhibit C of the Operating Agreements and ACA, they are not now and never have been owned by the MOM JV Entities:  4G (Ex. 583 [Letter Agreement – 4G is the MO Member]), Modan LLC (majority owned by Niazi), BMV Apartments LLC, 7 Star Trade-In LLC, Marquis Marine LLC, Poppy and Seed LLC, The Fullest LLC, Pizza 90 Inc., Laguna Beach Company Inc., MJA Restaurants Inc., MS Nosh LLC, 331 N. Coast LLC, 331 North Coast Hwy. LLC, 2711 E. Coast Hwy. LLC, 113 Canyon Acres LLC, Terra Laguna Beach Inc., Seven Degrees Laguna Inc., Rancho San Joaquin Golf Course LLC, 14 West Coast LLC, Cliff Drive NB Properties LLC, Blue Lagoon Resort LLC, Buena Vida RSM LLC, Pershing 82 LLC, and Brookline Aliso Viejo LLC.  (Ex. 1354; 7.3 Tr. at 1915:7-1919:6.)

(5)  The sole "Projects" as defined in the Operating Agreements and ACA are Hotel Laguna LLC and Newport Crossing (Aryabhata LLC).  (Ex. 315, § 1.45; Ex. 689, § 1(a).)

As to issues (1) and (2), the Arbitrator has found in favor of Claimants on the fraudulent inducement, forcible entry, and forcible detainer claims.  The Arbitrator has considered and rejected all of the MOM Respondents' factual and legal arguments against these claims.

As to issue (3), the MOM Respondents make no reasoned argument to support their bare assertion that these "Held-Back LLCs" were intentionally contributed pursuant to the ACA.

As to issue (4), the parties make a host of legal and factual arguments, principally focused on 4G and Modan, and the proper interpretation of the Operating Agreements and the ACA.  However, the applicable law and the weight of the evidence, including the admissible parol evidence,[32] shows: 4G and Modan were not intended to be "Other Owned LLCs" under the Operating Agreements (Exs. 313-315, § 1.40 and Ex. C), nor were they intended to be "Contributed Assets" or "MOM CA LLCs" under the ACA (Ex. 304, §§ 1.40, 2(a) and Ex. C). The Letter Agreement (Ex. 583, ¶ 3) further supports these conclusions.  And, at least as to 4G (a corporation, not an LLC), the opposite conclusions would mean 4G is both a Member and an asset of the MOM JV Entities.  This interpretation would be absurd.

As to issue (5), the MOM Respondents make no argument in their briefs to support their claim it "fails for the reasons set forth above, section [*]."  (Brackets and content in original.)

---

[32] See *Nw. Nat'l Ins. Co. v. Esmark, Inc.* (Del 1996) 672 A.2d 41, 43 [courts may consider extrinsic evidence where there is an ambiguity in the contract] and *Peden v. Gray* (Del. 2005) 886 A.2d 1278, 2005 WL 2622746, at *2 ["parol evidence is admissible to resolve a contractual term that is ambiguous"]; see also *Rosenfeld v. Abraham Joshua Heschel Day Sch., Inc.* (2014) 226 Cal. App. 4th 886, 897 (same).

40

### M.   MOM Members' (Counter) Claims Against Honarkar

The MOM Members claim Honarkar is liable for trespass, conversion, violation of Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory and injunctive relief.[33]  All of these claims depend on the existence and enforceability of the Operating Agreements and the Other JV related Agreements.  But the Arbitrator has found Claimants may rescind these agreements for fraud in the inducement and failure of consideration.  In any event, the MOM Parties' prior material breach of the Operating Agreements discharged Honarkar from any further duty to perform thereunder.  (*Level 4 Yoga*, *supra*, at \*27 ["Delaware law firmly supports the principle that a party to a contract is excused from performance if the other party is in material breach of his contractual obligations"]; see also Honarkar Response to MOM Respondents' Demand, at 4-5, Twelfth Affirmative Defense.)  It follows the MOM Parties' claims against Honarkar must fail.

### N.   Remedies

#### 1.   Rescission With Restitution and Consequential Damages

Claimants are entitled to rescind the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, all on account of Respondents' fraud in the inducement. Claimants are also entitled to rescind the Operating Agreements and the Other JV Related Agreements, for the failure of consideration due to the failure to provide the initial contribution. (§§ III.A.6., III.B.2., III.G., and III.H. above.)

In cases like this, "When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." (Cal. Civ. Code § 1691; *Santa Clara Waste Water Co. v. Allied World National Assurance Co.* (2017) 18 Cal. App. 5th 881, 888.)

"Rescission extinguishes the contract, terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. Thus, the relief given in rescission cases—restitution and in some cases consequential damages—puts the rescinding party in the status quo ante, returning him to his economic position before he entered the contract." (*Sharabianlou v. Karp* (2010) 181 Cal. App. 4th 1133, 1145.)

---

[33] These claims (except the Section 496 claim) were asserted in the demand filed by the MOM Respondents and the MOM JV Entities in the MOM Arbitration on September 27, 2023, together with Attachment 1 and the exhibits thereto, including the First Amended Complaint originally filed in OCSC Case No. 30-2023-01322886.  To the extent the MOM JV Entities assert these same claims, they are stayed as a result of their bankruptcy.  But these claims will be analyzed and disposed of in the Final Award to be issued in this arbitration.  (§ IV.17. below.)

41

Where rescission is warranted, "[t]he aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled." (Civ. Code § 1692; *Wong v. Stoler* (2015) 237 Cal. App. 4th 1375, 1387–88, 1389–90.) Although in general each party must return the consideration they received, if "defendant has been guilty of fraudulent acts or conduct which have induced the agreement between him and the plaintiff," courts "are not so much concerned with decreeing that defendant receive back the identical property with which he parted in the transaction, as they are in declaring that his nefarious practices shall result in no damage to the plaintiff." (*Wong, supra*, 237 Cal. App. 4th at 1389.) And the defrauding party has the burden to prove any offsets to which they claim they are entitled. (*McCoy v. West* (1977) 70 Cal. App. 3d 295, 302-303; *Gentry v. Kelley Kar Co.* (1961) 193 Cal. App. 2d 324, 337; *Grill v. Hunt* (1992) 6 Cal. App. 4th 73, 79 ["The implicit rationale of these cases is that risk of any difficulty in proof should not inure to the benefit of the party responsible for the failure of the contract"].)

All told, if Claimants elect rescission, they will be entitled to restitution and consequential damages in amounts to be determined following the accounting, and Respondents will have the burden of proving their right to any offsets.

### 2.    Damages Without Rescission

In the alternative, if Claimants elect to affirm and retain the benefits of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, then they will be entitled to recover damages for fraud in the inducement and breach of the Operating Agreements. (§§ III.A. and III.B. above.) While the fact of these damages is certain, and some amounts are known, the total amount will be determined following the accounting.

### 3.    Derivative Damages

Claimants contend they are entitled to recover damages from Respondents, for the derivative conversion, Section 496, and unjust enrichment claims asserted on behalf of the MOM JV Entities (§§ III.D., III.E., III.F. and III.I. above), with or without rescission. Spindler calculated Respondents' actions caused at least $45,011,937 and at most $169,845,578 in damages to the MOM JV Entities themselves. (Exs. 1006, 1509; 7.9 Tr. at 3081:17-3082:1.)

These derivative damages claims are stayed as a result of the MOM JV Entities' bankruptcy. The analysis and disposition of these derivative damages claims set forth in § III.N.3. of the Partial Interim Award has therefore been omitted from this Partial Final Award. But these claims will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.) At that time, the accounting will be completed and the Arbitrator will have determined the amount of these damages to be awarded (including any trebling).

### 4.    Punitive Damages

To recover punitive damages Claimants must prove, by clear and convincing evidence, that Respondents have "been guilty of oppression, fraud, or malice…." (Civ. Code § 3294.) Claimants argue they have proven oppression, fraud, and malice. The MOM Respondents argue they have not proven oppression, fraud, or malice. The Arbitrator has found Claimants have proven, by clear and convincing evidence, that Respondents committed fraud in the inducement. (§ III.A. above.) On this basis alone, Claimants are entitled to punitive damages. (Civ. Code § 3294(c)(3).) The Arbitrator further finds, based upon the totality of the evidence, Claimants have proven, by clear and convincing evidence, that Respondents have been guilty of oppression and malice as those terms are defined in Civil Code section 3294(c)(1) and (c)(2). However, until the accounting is complete, the full nature and extent of Respondents' wrongdoing, the damages Claimants have suffered as a result, and the other factors the Arbitrator will need to consider when awarding punitive damages cannot be determined. (See generally, 6 Witkin, Summary of California Law (11th ed. 2017) Torts, §§ 1727- 1785.) Therefore, the Arbitrator will determine the amount of punitive damages to be awarded after the accounting is complete.

### 5.    Attorney Fees and Costs

As the prevailing parties, Claimants are awarded a total of $9,197,426.31 in attorney fees and costs. The MOM Parties and the Makhijani Parties are jointly and severally liable for the entire $9,197,426.31 total. But of the $9,197,426.31 total, Nano is jointly and severally liable (with the other Respondents) for only $5,229,185.14. (See Arbitrator's Ruling on Motion for Attorney Fees and Costs dated and filed concurrently herewith; § IV.14. below; FAC at 38.)

### 6.    Interest

Claimants claims for pre and post-judgment interest will be resolved in the Final Award after the accounting is completed and the amount of damages to be awarded is determined.

### 7.    Receiver

Claimants request the appointment of a receiver on the grounds the MOM Respondents have had complete control of the JV since they excluded Honarkar in 2023. (FAC at 38; Ex. 677; 6.25 Tr. at 459:20-23.) They argue a receiver is necessary to place the JV in "safe hands" and to prevent the MOM Respondents from further dissipating the JV's assets before the accounting is completed and this arbitration is concluded. Claimants' request for a receiver is stayed as a result of the MOM JV Entities' bankruptcy. The analysis and disposition of this request set forth in § III.N.5. of the Partial Interim Award has been omitted from this Partial Final Award but will be included in the Final Award in this arbitration. (§ IV.17. below.)

43

141

## IV.   SUMMARY OF CONCLUSIONS AND FURTHER PROCEEDINGS

1.      Claimants have proven their fraudulent inducement claim against Makhijani, Continuum and the MOM Members; and Claimants are therefore entitled to elect the alternative remedies of either compensatory damages, or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.A., III.G., and III.N.1. above; ¶ 13 below; FAC at 22-23.)

2.      Claimants have proven their breach of contract (Operating Agreement) claims against the MOM Parties; and Claimants are therefore entitled to the alternative remedies of compensatory damages or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.B. and III.N.2. above; ¶ 13 below; FAC at 24-25.)

3.      Claimants have not proven their breach of contract (Management Agreement) claim against the MOM Parties.  (§ III.B.6. above; not pleaded in FAC.)

4.      Claimants have proven their forcible entry and forcible detainer claims against Makhijani, Continuum and the MOM Parties; and Claimants are therefore entitled to restitution of the subject premises (775 Laguna Canyon Road) and incidental damages in amounts to be determined.  (§§ III.C. and III.G. above; ¶ 13 below; FAC at 31-33.)

5.      Claimants derivative conversion claims against Makhijani, Continuum, the MOM Parties, and Nano (Partial Interim Award §§ III.D., III.G. and III.I.; ¶ 13 below; FAC at 28-29) are stayed as a result of the MOM JV Entities' bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

6.      Claimants derivative Section 496 claims against Makhijani, Continuum, the MOM Parties, and Nano (Partial Interim Award §§ III.E., III.G., and III.I.; ¶ 13 below; FAC at 30-31) are stayed as a result of the MOM JV Entities' bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

7.      Claimants derivative unjust enrichment claims against Makhijani, Continuum, and the MOM Parties (Partial Interim Award §§ III.F. and III.G.; ¶ 13 below; FAC at 29-30) are stayed as a result of the MOM JV Entities' bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

8.      Claimants have proven their conspiracy to commit and aiding and abetting fraudulent inducement claims against Nano; and Claimants are therefore entitled to the alternative remedies of compensatory damages, or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.A. and III.H. above; ¶ 13 below; FAC at 33-37.)

44

142

9.      Claimants derivative breach of contract claim against Nano (Partial Interim Award § III.J.; FAC at 37) is stayed as a result of the MOM JV Entities' bankruptcy, but it will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

10.      Claimants have proven their accounting claim against the MOM Parties; Claimants are therefore entitled to the accounting requested; and the accounting shall be the subject of further proceedings in this arbitration.  (§ III.K. above; ¶¶'s 15 and 17 below; FAC at 26.)  The further proceedings shall abide by the Bankruptcy Court order which modified the automatic stay and allowed Claimants to: "(ii) proceed in the above-captioned bankruptcy cases with the accounting granted in the [Partial Interim and now Partial Final] Arbitration Award in accordance with protocols to be agreed upon by the parties to the Arbitration or otherwise entered by this Court."

11.      Claimants have proven their declaratory relief claim against the MOM Parties; and Claimants are therefore entitled to the declaratory relief requested.  (§ III.L. above; FAC at 27.)

12.      The MOM Members have not proven their (counter) claims against Honarkar (trespass, conversion, Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory or injunctive relief).  (§ III.M. above.)  To the extent the MOM JV Entities also assert these claims, they are stayed as a result of their bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

13.      All amounts of restitution, consequential damages, compensatory damages, incidental damages, punitive damages and interest (if any) to be awarded to Claimants shall be determined in further proceedings in this arbitration.  (¶¶'s 1, 2, and 4-8 above; and ¶¶'s 15 and 17 below.)

14.      Claimants are awarded a total of $9,197,426.31 in attorney fees and costs.  The MOM Parties and the Makhijani Parties are jointly and severally liable for the entire $9,197,426.31 total; but of the $9,197,426.31 total, Nano is jointly and severally liable (with the other Respondents) for only $5,229,185.14.  (§ III.N.5. above; JAMS Rule 24(f) and (g); FAC at 38.)

15.      This Partial Final Award resolves all claims submitted to arbitration, with the exception of the issues (the "Remaining Issues") to be resolved in further proceedings in this arbitration including: (i) the claims stayed as a result of the MOM JV Entities' bankruptcy; (ii) the accounting; and (iii) the determination of the amounts of restitution, damages, interest, attorney fees and costs to be awarded.  The Arbitrator reserves jurisdiction to determine all aspects of the Remaining Issues, together with such additional issues as may arise between the parties.  It is intended this Partial Final Award will be subject to judicial review as to those issues finally determined herein, so Claimants may return to the Superior Court and seek to (i) confirm this Partial Final Award, and (ii) perfect their right to the accounting granted herein (§ III.K. above). (See JAMS Rules 24 and 25; *Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1437.)

45

143

16.    This Partial Final Award shall be considered final, for purposes of a judicial proceeding to enforce, modify or vacate, this Partial Final Award pursuant to JAMS Rule 25, fourteen (14) calendar days after service if no request for a correction is made, or as of the effective date of service of a corrected Partial Final Award.  (JAMS Rule 24(i) and (j).)

17.    After the Remaining Issues are determined; and after all further proceedings in this arbitration are concluded; the Arbitrator will issue a Final Award which will resolve all claims submitted to arbitration and will include a supplemental award for attorney fees and costs incurred through entry of the Final Award in this arbitration.  (See JAMS Rules 24 and 25; ¶ 14 above; *Hightower, supra*, 86 Cal.App.4th at 1437-1441 [Arbitrator has authority to issue partial award and reserve jurisdiction to issue a final award on the remaining issues.].)

18.    Consolidated Scheduling Order No. 100 as amended by Scheduling Order Nos. 101-106 shall remain in full force and effect and shall govern all further proceedings in this arbitration.

19.    The virtual interim status conference previously scheduled for at 8:30 a.m. on June 12, 2025 is continued to 8:30 a.m. on July 17, 2025.  A further interim status conference or a final status conference will be scheduled at that time.

20.    Nothing contained in this Partial Final Award is intended to constitute or to require any act contrary to the automatic stay issued pursuant to 11 U.S.C. § 362(a) in the MOM JV Entities' Bankruptcy.  If the Bankruptcy Court determines there is a conflict between anything contained in this Partial Final Award and the automatic stay, the latter shall prevail; but the provision of this Partial Final Award so affected shall: (i) be curtailed and limited only to the extent necessary to bring it into conformity with the requirements of 11 U.S.C. § 362(a); and (ii) automatically become one of the Remaining Issues to be resolved in further proceedings in this arbitration.

DATED:  May 23, 2025

_____
Hon. David A. Thompson (Ret.)

12-5-2025

IT IS SO ORDERED:

_____
Judge of the Superior Court
Bradley Erdosl

46

144