**BRYAN CAVE LEIGHTON PAISNER LLP**
Martin W. Taylor, California Bar No. 149744
Kristin S. Webb, California Bar No. 258476
David J. Root, California Bar No. 307251
Wenqing Wenny Zhu, California Bar No. 358792
1920 Main Street, Suite 1000
Irvine, California 92614-7276
Telephone:   (949) 223-7000
Facsimile:   (949) 223-7100
E-Mail:       marty.taylor@bclplaw.com
              kristin.webb@bclplaw.com
              david.root@bclplaw.com
              wenny.zhu@bclplaw.com

Attorneys for Defendant NANO BANC, a California corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| GERALD J. MARCIL, an individual; GERALD J. MARCIL AND CAROL L. MARCIL AS TRUSTEES OF THE MARCIL FAMILY TRUST, DATED May 9, 1997; WOODGLEN APTS., LLC, a California limited liability company; ARROWHEAD STANTON APARTMENTS, LP, a California limited partnership; AZUL APARTMENTS LIMITED PARTNERSHIP, a California limited partnership; MONTERRA INVESTMENTS LP, a California limited partnership; TORRANCE TERRACE INVESTMENT, LP, a California limited partnership; PACIFICA GARDEN APTS., LP., a California limited partnership; HARBOR GREEN INVESTMENTS, LP, a California limited partnership; MARINE TERRACE INVESTMENT LIMITED, PARTNERSHIP, a California limited partnership; SUNSET RIDGE INVESTMENT LP, a California limited partnership; and WATERSTONE GARDEN INVESTMENTS, LP, a California limited partnership,<br><br>                Plaintiffs,<br><br>        v.<br><br>NANO BANC, a California corporation; MAHENDER MAKHIJANI, an | Case No. 8:26-CV-01143<br><br>**DECLARATION OF DANIEL PATRICK IN SUPPORT OF DEFENDANT NANO BANC'S RESPONSE TO ORDER TO SHOW CAUSE**<br><br>Action Filed: May 11, 2026<br>Trial Date: Not set |

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

individual; CONTINUUM
ANALYTICS, INC.; and DOES 1
through 20,

        Defendants.

DECLARATION OF DANIEL PATRICK ISO OF DEFENDANT NANO BANC'S RESPONSE TO OSC

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# DECLARATION OF DANIEL PATRICK

I, Daniel Patrick, declare as follows:

1.     I am a Senior Vice President with Defendant Nano Banc ("Defendant" or "Nano"). I have personally worked on and supervised work relating to Defendant's rights and interests in its loan in the principal amount of $19,184,817.74 (the "$19MM Loan") to Gerald J. Marcil and the Marcil Family Trust, established on May 9, 1997 (collectively, "Marcil Borrower") and its loan in the principal amount of $8.5MM (the "$8.5MM Loan") to Pacifica Garden APTS., LP ("Pacifica Garden"). I make this Declaration in support of Defendant's Response to Order to Show Cause. I have personal knowledge of the facts contained in this Declaration, which I obtained through, among other things, a review of the business records in Defendant's custody, possession, and control. If called as a witness, I could and would competently testify to the facts set forth below.

2.     In the regular performance of my duties, I am familiar with the business records maintained by Nano for purposes of its loan files. Pursuant to Nano's policies and procedures, these records (which include data compilations, electronically imaged documents, and other documents and records) are made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records and are kept in the ordinary course of business activity conducted regularly by Nano. The information recorded includes documents and information associated with the origination of the loan, including but not limited to the loan agreement and any additional or related agreements, information on assets provided by borrowers in connection with the issuance of a given loan, information on payments from borrowers, and information relating to contact with borrowers. As part of the regular course of Nano's business, it maintains images of documents related to loan origination in its document database. I know that pursuant to Nano's policies and procedures,

1

images of documents are scanned into Nano's document database without alteration at or near the time they are generated or received. It is the regular practice of Nano to make these records. In connection with making this declaration, I have personally examined these records.

**The $19MM Loan**

3. On or about December 9, 2024, the Marcil Borrowers executed and delivered to Nano a Promissory Note dated December 9, 2024 (the "2024 Marcil Note") payable to Nano in the original principal amount of $19,184,817.74. The $19MM Loan had a maturity date of December 10, 2025. I have reviewed the 2024 Marcil Note, a copy of which is in Defendant's records relating to the $19MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made. A true and correct copy of the 2024 Marcil Note is attached hereto as **Exhibit A**.

4. In connection with the 2024 Marcil Note, Nano and the Marcil Borrowers entered into and executed a Business Loan Agreement (the "2024 $19MM Loan Agreement") evidencing Nano's agreement to loan the Marcil Borrowers the original principal amount of $19,184,817.74. I have reviewed the 2024 $19MM Loan Agreement, a copy of which is in Defendant's records relating to the $19MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made. A true and correct copy of the 2024 $19MM Loan Agreement is attached hereto as **Exhibit B**.

5. On or about April 3, 2025, Nano and the Marcil Borrowers agreed to, among other things, amend the maturity date for the $19MM Loan from December 10, 2025 to May 10, 2025, pursuant to a Change in Terms Agreement dated April 3, 2025. A true and correct copy of this Change in Terms Agreement is attached hereto as **Exhibit C.**

6. On or about April 23, 2025, Nano and the Marcil Borrowers agreed to, among other things, amend the maturity date for the $19MM Loan to April 10,

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

2032, pursuant to a Change in Terms Agreement dated April 23, 2025.  The Marcil Borrowers also agreed to "pay this loan in 83 payments of $294,393.31 each payment and an irregular last payment estimated at $294,393.48. Borrower's first payment is due May 10, 2025, and all subsequent payments are due on the same day of each month after that."  A true and correct copy of this Change in Terms Agreement is attached hereto as **Exhibit D**.

7. On or about May 22, 2025, Nano and the Marcil Borrowers agreed to, among other things, further amend the maturity date for the $19MM Loan to May 10, 2032, pursuant to a Change in Terms Agreement dated May 22, 2025.  The Marcil Borrowers also agreed to "pay this loan in 83 payments of $294,359.41 each payment and an irregular last payment estimated at $294,359.48.  Borrower's first payment is due June 10, 2025, and all subsequent payments are due on the same day of each month after that.  Borrower's final payment will be due on May 10, 2032, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest."  A true and correct copy of this Change in Terms Agreement is attached hereto as **Exhibit E**.

8. In connection with the Change in Terms Agreement dated May 22, 2025, the Marcil Borrower and Nano entered into a Business Loan Agreement dated May 22, 2025 (the "2025 $19MM Loan Agreement").  I have reviewed the 2025 $19MM Loan Agreement, a copy of which is in Defendant's records relating to the $19MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made.  A true and correct copy of the 2025 $19MM Loan Agreement is attached hereto as **Exhibit F**.

9. On or around September 12, 2025, Marcil Borrower and Nano entered into a Loan Amendment dated September 12, 2025 (the "$19MM Loan Amendment").  I have reviewed the "$19MM Loan Amendment, a copy of which is maintained in Defendant's records relating to the $19MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time

DECLARATION OF DANIEL PATRICK ISO OF DEFENDANT NANO BANC'S RESPONSE TO OSC

they were made. A true and correct copy of the $19MM Loan Amendment is attached hereto as **Exhibit G**.

10. The $19MM Loan Amendment includes a Company Consent and Acknowledgement, which defines Arrowhead Stanton Apartments, LP, Torrance Terrace Investment, LP, Azul Apartments, LP, and Monterra Investment LP, individually and collectively, as the Company. However, only the ownership interests of Arrowhead Stanton Apartments, LP and Monterra Investment LP are pledged as collateral according to Pledge and Security Agreement, Section B and C. Torrance Terrace Investment, LP and Azul Apartments, LP are not part of the pledged collateral structure, and accordingly, did not execute the Company Consent and Acknowledgement.

**The $8.5MM Loan**

11. On or about March 1, 2019, Pacifica Garden executed and delivered to Nano a Promissory Note dated March 1, 2019 (the "Pacifica Garden 2019 Note") payable to Nano in the original principal amount of $8,500,000.00. The Pacifica Garden Original Loan had a maturity date of February 28, 2020. I have reviewed the Pacifica Garden 2019 Note, a copy of which is in Defendant's records relating to the $8.5MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made. A true and correct copy of the Pacifica Garden 2019 Note is attached hereto as **Exhibit H**.

12. In connection with the Pacifica Garden 2019 Note, Pacifica Garden and Nano entered into a Business Loan Agreement dated March 1, 2019 (the "2019 Pacifica Garden Loan Agreement") evidencing Nano's agreement to loan Pacifica Garden the original principal amount of $8,500,000.00. I have reviewed the 2019 Pacifica Garden Loan Agreement, a copy of which is in Defendant's records relating to the $8.5MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made. A true and correct copy of the 2019 Pacifica Garden Loan Agreement is attached hereto as **Exhibit I**.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

DECLARATION OF DANIEL PATRICK ISO OF DEFENDANT NANO BANC'S RESPONSE TO OSC

13. On or about February 28, 2020, Nano and Pacifica Garden agreed to, among other things, change the maturity date for the $8.5MM Loan from February 28, 2020 to June 28, 2020 pursuant to a Change in Terms Agreement dated February 28, 2020. I have reviewed the Change in Terms Agreement dated February 28, 2020, a copy of which is in Defendant's records relating to the $8.5MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made. A true and correct copy of the Change in Terms Agreement dated February 28, 2020, is attached hereto as **Exhibit J**.

14. On or about June 27, 2021, Nano and Pacifica Garden agreed to, among other things, change the maturity date for the $8.5MM Loan to June 27, 2024, pursuant to a Change in Terms Agreement dated June 27, 2021. I have reviewed the Change in Terms Agreement dated June 27, 2021, a copy of which is in Defendant's records relating to $8.5MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made. A true and correct copy of the Change in Terms Agreement dated June 27, 2021, is attached hereto as **Exhibit K**.

15. On or about September 20, 2024, Nano and Pacifica Garden entered into and executed a Promissory Note (the "2024 Pacifica Garden Note") payable to Nano in the principal amount of $8,542,500.00, which has a maturity date of October 1, 2027. I have reviewed the 2024 Pacifica Garden Note, a copy of which is in Defendant's records relating to the $8.5MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made. A true and correct copy of the 2024 Pacifica Garden Note is attached hereto as **Exhibit L**. The 2024 Pacifica Garden Note "restates and replaces Promissory Note . . . dated March 1, 2019 from Borrower to Lender, in the original stated credit limit of $8,500,000.00."

16. In connection with the 2024 Pacifica Garden Note, Pacifica Garden

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

5

DECLARATION OF DANIEL PATRICK ISO OF DEFENDANT NANO BANC'S RESPONSE TO OSC

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

and Nano entered into a Business Loan Agreement dated September 20, 2024 (the "2024 Pacifica Garden Loan Agreement") evidencing Nano's agreement to loan Pacifica Garden the original principal amount of $8,542,500.00.  I have reviewed the 2024 Pacifica Garden Loan Agreement, a copy of which is in Defendant's records relating to the $8.5MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made.  A true and correct copy of the 2024 Pacifica Garden Loan Agreement is attached hereto as **Exhibit M**.

17.    On or around September 12, 2025, Pacifica Garden and Nano entered into a Loan Amendment dated September 12, 2025 (the "$8.5MM Loan Amendment").  I have reviewed the $8.5MM Loan Amendment, a copy of which is maintained in Defendant's records relating to the $8.5MM Loan, which is kept in the regular course of business for Defendant and reflects any changes at the time they were made.  A true and correct copy of the $8.5MM Loan Amendment is attached hereto as **Exhibit N.**

18.    As of the date of this declaration, Nano has not commenced any foreclosure action against the Evariste Guaranties, which include Harbor Green Investments, LP; Marine Terrace Investment Limited Partnership; Sunset Ridge Investment LP; and Waterstone Garden Investments, LP.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 26, 2026, at Irvine, California.


____/s/ Daniel Patrick_____
Daniel Patrick

DECLARATION OF DANIEL PATRICK ISO OF DEFENDANT NANO BANC'S RESPONSE TO OSC

# EXHIBIT A

Docusign Envelope ID: AE3985DE-57E1-4203-8ACD-B3BAAA771BC9

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $19,184,817.74 | 12-09-2024 | 12-10-2025 | ▮▮▮▮ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Gerald J. Marcil
The Marcil Family Trust, established on May 9, 1997
43D Malaga Cove Plaza
Palos Verdes Estates, CA 90274

**Lender:** Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA 92618
(844) 626-0262

**Principal Amount:** $19,184,817.74                     **Date of Note:** December 9, 2024

**PROMISE TO PAY.** Gerald J. Marcil; and The Marcil Family Trust, established on May 9, 1997 ("Borrower") jointly and severally promise to pay to Nano Banc ("Lender"), or order, in lawful money of the United States of America, the principal amount of Nineteen Million One Hundred Eighty-four Thousand Eight Hundred Seventeen & 74/100 Dollars ($19,184,817.74) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 10, 2025. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 10, 2025, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied to first, to the payment of unpaid and accrued interest, and, next, to the payment of any fees and charges due and owning under the the Loan Documents and, finally, to the payment of the outstanding principal due and owing under this Note. During the continuance of any Event of Default, then Lender shall be permitted to pay any sums due and owing under the Loan Documents in any order determined by Lender in its sole and absolute discretion. .

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 7.750% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point under the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 7.000%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 7.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA 92618

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Pacific Time on a business day, Lender will credit Borrower's payment on the next business day.  on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Nano Banc, Irvine Office, 7755 Irvine Center Dr., 3rd Floor, Irvine, CA 92618.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

Docusign Envelope ID: AF3985DF-57E1-4203-8ACD-D3BAAA771BC9

**INTEREST AFTER DEFAULT.**   Upon maturity of this Note, whether the scheduled maturity date (if applicable) or due to this loan being accelerated by Lender because of a default under this Note (including, without limitation, the failure to pay all amounts owed under this Note upon Lender's demand), the interest rate on this Note shall immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin").   The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.   However, in no event will the interest rate applied under this paragraph exceed the maximum interest rate permitted under applicable law.

**DEFAULT.**   Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**   Borrower fails to make any payment when due under this Note.

**Other Defaults.**   Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**   Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.**   Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**   The dissolution or termination of the Trust, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.   This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.   However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**   Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.**   A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.**   Lender in good faith believes itself insecure.

**Right to Cure.**   If any default, other than a default on indebtedness, is curable and if Borrower, Guarantor, or Grantor, as the case may be, has not been given a notice of a similar default within the preceding 12 months, it may be cured if Borrower, Guarantor, or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within 30 days; or (2) if the cure requires more than 30 days, immediately initiate steps that Lender deems in Lender's reasonable discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**CHANGE IN OWNERSHIP.** The Borrower agrees to promptly **notify Lender in writing** at Lender's address shown above (or such other address as Lender may designate from time to time) **prior to any of the below changes**. No change in the Ownership, Name, or state of organization will take effect until after Lender has received and approved the request. Borrower agrees that (a) said property shall not be sold, agreed to be sold, conveyed, transferred, assigned, disposed of, or further encumbered, whether voluntary, involuntary, by operation of law or otherwise, and/or (b) any change twenty-five percent (25%) in the Borrower, any manager of the Borrower, and/or any direct or indirect transfer of membership, partnership or other ownership interest of Borrower, shall constitute a breach. Any violation shall cause the then outstanding principal balance and interest and other sums, if applicable secured by said Deed of Trust, at the sole discretion of Lender, to become immediately due and payable.

**LENDER'S RIGHTS.**   Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**   Lender may hire or pay someone else to help collect this Note if Borrower does not pay.   Borrower will pay Lender that amount.   This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.   Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.   To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.   (Initial Here** _DM_  _DM_  _CM_ **)**

**GOVERNING LAW.   This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.   This Note has been accepted by Lender in the State of California.**

**CHOICE OF VENUE.**   If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**DISHONORED ITEM FEE.**   Borrower will pay a fee to Lender of $35.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.**   To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).   This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.   However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.   Borrower

authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.**  Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A)  a Commercial Security Agreement dated December 9, 2024 made and executed between Gerald J. Marcil and The Marcil Family Trust, established on   May 9, 1997 and Lender on collateral described as:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

(B)  Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Arrowhead Stanton Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(C)  Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Torrance Terrace Investment, LP, a California limited partnership, on the terms and conditions as stated therein.

(D)  Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Azul Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(E)  Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Monterra Investment, LP, a California limited partnership, on the terms and conditions as stated therein.

(F)  Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Arrowhead Stanton Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(G)  Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Torrance Terrace Investment, LP, a California limited partnership, on the terms and conditions as stated therein.

(H)  Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Azul Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(I)  Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997, pledging certain collateral pertaining to Monterra Investment, LP, a California limited partnership, on the terms and conditions as stated therein.

(J) Pledge, Assignment and Security Agreement made and executed by MOM AS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM AS Investor Group, LLC, on the terms and conditions as stated therein.

(K)  Pledge, Assignment and Security Agreement made and executed by MOM BS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM BS Investor Group, LLC, on the terms and conditions as stated therein.

(L)  Pledge, Assignment and Security Agreement made and executed by MOM CA Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM CA Investor Group, LLC, on the terms and conditions as stated therein.

**LINE OF CREDIT.**  This Note evidences a straight line of credit.  Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances.  Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph.  All oral requests shall be confirmed in writing on the day of the request, on forms acceptable to Lender.  All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above.  The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority:  **Gerald J. Marcil, Individually; Gerald J. Marcil, Trustee of The Marcil Family Trust, established on   May 9, 1997; and Carol L. Marcil, Trustee of The Marcil Family Trust, established on   May 9, 1997.**  Borrower agrees to be liable for all sums either:  (A)  advanced in accordance with the instructions of an authorized person or  (B)  credited to any of Borrower's accounts with Lender.  The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**SUCCESSOR INTERESTS.**  The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.**  Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Nano Banc 25220 Hancock Avenue Suite 140 Murrieta, CA 92562.

Docusign Envelope ID: AE3985DE-57E1-4203-8ACD-B3BAAA771BC9

**GENERAL PROVISIONS.**   This Note is payable on demand.   The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand.   If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.   Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.   Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower   (a) make one or more additional secured or unsecured loans or otherwise extend additional credit;   (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness;   (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral;   (d)   apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine;   (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose;   and   (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower.   Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor.   Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.   All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.   All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.   The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.   EACH BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

X _____

**Gerald J. Marcil, Individually**

**THE MARCIL FAMILY TRUST, ESTABLISHED ON   MAY 9, 1997**

By: _____

**Gerald J. Marcil, Trustee of The Marcil Family Trust, established on   May 9, 1997**

By: _____

**Carol L. Marcil, Trustee of The Marcil Family Trust, established on   May 9, 1997**

LaserPro, Ver. 24.1.10.032 Copr. Finastra USA Corporation 1997, 2024.   All Rights Reserved.   - CA   Z:\LaserPro\CFI\LPL\D20.FC   TR-1951   PR-7 (M)

# EXHIBIT B

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $19,184,817.74 | 12-09-2024 | 12-10-2025 | ▉▉▉▉▉ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Gerald J. Marcil
The Marcil Family Trust, established on   May 9, 1997
43D Malaga Cove Plaza
Palos Verdes Estates, CA   90274

**Lender:**  Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA   92618
(844) 626-0262

**THIS BUSINESS LOAN AGREEMENT** dated December 9, 2024, is made and executed between Gerald J. Marcil; and The Marcil Family Trust, established on  May 9, 1997 ("Borrower") and Nano Banc  ("Lender") on the following terms and conditions.  Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement.  Borrower understands and agrees that:  (A)  in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement;  (B)  the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and  (C)  all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of December 9, 2024, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**LINE OF CREDIT.**  The Indebtedness contemplates multiple loan advances.  Advances under the Indebtedness, as well as directions for payment from Borrower's accounts, may be requested either orally or in writing by Borrower.  All non-written requests shall be confirmed in writing on the day of the request.  Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person as described in the "Advance Authority" section below or (B) credited to any of Borrower's accounts with Lender.

**ADVANCE AUTHORITY.**  The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority:   **Gerald J. Marcil, Individually; Gerald J. Marcil, Trustee of The Marcil Family Trust, established on   May 9, 1997; and Carol L. Marcil, Trustee of The Marcil Family Trust, established on May 9, 1997.**

**CONDITIONS PRECEDENT TO EACH ADVANCE.**  Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.**  Borrower shall provide to Lender the following documents for the Loan:  (1)  the Note;  (2)  Security Agreements granting to Lender security interests in the Collateral;  (3)  financing statements and all other documents perfecting Lender's Security Interests;  (4)  evidence of insurance as required below;  (5)  together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Payment of Fees and Expenses.**  Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.**  The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.**  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**MULTIPLE BORROWERS.**  This Agreement has been executed by multiple obligors who are referred to in this Agreement individually, collectively and interchangeably as "Borrower."  Unless specifically stated to the contrary, the word "Borrower" as used in this Agreement, including without limitation all representations, warranties and covenants, shall include all Borrowers.  Borrower understands and agrees that, with or without notice to any one Borrower, Lender may   (A)  make one or more additional secured or unsecured loans or otherwise extend additional credit with respect to any other Borrower;  (B)  with respect to any other Borrower alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness;  (C)  exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral;  (D)  release, substitute, agree not to sue, or deal with any one or more of Borrower's or any other Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose;  (E)  determine how, when and what application of payments and credits shall be made on any indebtedness;  (F)  apply such security and direct the order or manner of sale of any Collateral, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine;  (G)  sell, transfer, assign or grant participations in all or any part of the Loan;  (H)  exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting;  (I)  settle or compromise any indebtedness; and  (J) subordinate the payment of all or any part of any of Borrower's indebtedness to Lender to the payment of any liabilities which may be due Lender or others.

**REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Business Activities.**  Gerald J. Marcil maintains an office at 544 Paseo Del Mar, Palos Verdes, CA   90274.  Unless Gerald J. Marcil has designated otherwise in writing, the principal office is the office at which Gerald J. Marcil keeps its books and records including its records concerning the

Collateral.   Gerald J. Marcil will notify Lender prior to any change in the location of Gerald J. Marcil's principal office address or any change in Gerald J. Marcil's name.   Gerald J. Marcil shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Gerald J. Marcil and Gerald J. Marcil's business activities.

The Marcil Family Trust, established on   May 9, 1997 is a trust which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California.   The Marcil Family Trust, established on   May 9, 1997 is duly authorized to transact business in all other states in which The Marcil Family Trust, established on   May 9, 1997 is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which The Marcil Family Trust, established on   May 9, 1997 is doing business.   Specifically, The Marcil Family Trust, established on   May 9, 1997 is, and at all times shall be, duly qualified as a foreign trust in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition.   The Marcil Family Trust, established on   May 9, 1997 maintains an office at 544 Paseo Del Mar, Palos Verdes, CA   90274.   Unless The Marcil Family Trust, established on   May 9, 1997 has designated otherwise in writing, the principal office is the office at which The Marcil Family Trust, established on   May 9, 1997 keeps its books and records including its records concerning the Collateral.   The Marcil Family Trust, established on   May 9, 1997 will notify Lender prior to any change in the location of The Marcil Family Trust, established on   May 9, 1997's state of organization or any change in The Marcil Family Trust, established on   May 9, 1997's name. The Marcil Family Trust, established on   May 9, 1997 shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to The Marcil Family Trust, established on   May 9, 1997 and The Marcil Family Trust, established on   May 9, 1997's business activities.

**Assumed Business Names.**   Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower.   Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.**   Borrower's execution, delivery, and performance of this Agreement and all the Related Documents do not conflict with, result in a violation of, or constitute a default under   (1)   any provision of any agreement or other instrument binding upon Borrower or   (2)   any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.**   Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender.   Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.**   This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.**   Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.**   Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that:   (1)   During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral.   (2)   Borrower has no knowledge of, or reason to believe that there has been   (a)   any breach or violation of any Environmental Laws;   (b)   any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or   (c)   any actual or threatened litigation or claims of any kind by any person relating to such matters.   (3)   Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws.   Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement.   Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person.   The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances.   Borrower hereby   (1)   releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and   (2)   agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral.   The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.**   No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.**   To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.**   Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.**   This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.**   Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.**   Promptly inform Lender in writing of   (1)   all material adverse changes in Borrower's financial condition, and   (2)   all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.**   Maintain its books and records in accordance with GAAP, or an OCBOA acceptable to Lender, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.**   Furnish Lender with the following:

**Additional Requirements.**   Borrowers to provide the following:

**Financial Statement, Real Estate Schedule, and Schedule of Debts.** No less than once annually and within fifteen (15) days after request, Borrower to provide a Personal Financial Statement ("PFS"), Real Estate Owned Schedule ("REO"), and Schedule of Debts (direct and contingent), in form and content acceptable to Lender. Information provided is to be signed and dated by Borrower.

**Liquid Asset Statements.** Borrower to provide Lender bank, brokerage, or other applicable month end statements no later than thirty (30) days after each December 31, and June 30, annually and no later than fifteen (15) days upon interim request of Lender.

**Borrower Tax Returns.** As soon as available, but in no event later than ten (10) days after filing, Borrower to provide annual tax returns. Tax returns are understood to be federal personal returns (form 1040, 1041, or 1065) with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities (form 1065 and K-1's for partnerships and LLC's, and form 1120S for Sub S Corporations)

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, or an OCBOA acceptable to Lender, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.**   Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**   Borrowers to comply with the following:

**Debt Service Coverage Ratio.**   Borrower(s) to maintain a minimum Personal Debt Service Coverage Ratio ("DSCR") of greater than 1.75:1.00 to be tested annually. DSCR to be defined as follows:  Borrower(s) Cash Flow Available for Debt Service ("CFADS"). Divided by: The sum of I) The contractual debt service of the subject facility, II) All other contractual debt service requirements of the Borrower(s), and III) All debt service requirements of the Borrower(s). Borrower(s) CFADS is defined: as gross income/receipts/rents less operating expenses, net of non-cash items and interest on debt requirements, and income tax.   Borrower(s) holding passive income entities require K-1 statements, or other funds transfer records, of applicable entities documenting cash distributions for inclusion in the NOI total. Borrower(s) federal tax return and/or operating and loan statements will be used to complete the calculation. Funds held by Lender in any applicable Payment Reserve Account shall be added to NOI for this calculation.

**Tangible Net Worth.** In aggregate, Borrower to maintain a Tangible Worth of not less than $340,000,000.  Tangible Net Worth to be defined as Borrower and Guarantor (collectively) total assets excluding all intangible assets (e.g. goodwill, trademarks, patents, employee advances, shareholder notes receivable, copyrights, organization expenses and similar intangible items) less total liabilities excluding shareholder notes which are formally subordinated to Lender. This requirement is to be maintained at all times and will be measured as of the end of each fiscal year.

**Net Liquid Assets.** In aggregate, Borrower shall maintain a minimum of $20,000,000 in Net Liquid Assets at all times, to be evaluated each June 30th and December 31st. Net Liquid Assets are defined as cash and marketable NYSE, AMEX, or NASDAQ listed securities net of margin debt in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity. If Guarantor does not maintain account balances with Lender in amounts sufficient to verify compliance with the Net Liquid Assets covenant, then Guarantor shall provide to Lender bank and/or brokerage house statements no later than thirty (30) days after each June 30th and December 31st, or fifteen (15) days after interim requests.

**Global Debt Service Coverage Ratio.** Borrower(s) to maintain a minimum Global Debt Service Coverage Ratio ("GDSCR") of greater than 1.75:1.00, to be tested annually. GDSCR to be defined as follows: The sum of I) Trailing twelve months, or annualized, Net Operating Income ("NOI") of the Borrower(s), and II) Guarantor(s) Cash Flow Available for Debt Service ("CFADS"). Divided by: The sum of I) The contractual debt service of the subject facility, II) and All other contractual debt service requirements of the Borrower(s). NOI is defined: as gross income/receipts/rents less operating expenses, net of non-cash items and interest on debt requirements, and income tax. Borrower(s holding passive income entities require K-1 statements, or other funds transfer records, of applicable entities documenting cash distributions for inclusion in the NOI total. Borrower(s) federal tax return and/or operating and loan statements will be used to complete the calculation. Funds held by Lender in any.

**Insurance.**   Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender.  Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.**   Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (1)  the name of the insurer;  (2)  the risks insured;  (3)  the amount of the policy;  (4)  the properties insured;  (5)  the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and  (6)  the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.  The cost of such appraisal shall be paid by Borrower.

**Other Agreements.**   Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.**  Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.**  Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.  Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as  (1)  the legality of the same shall be contested in good faith by appropriate proceedings, and  (2)  Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP or an OCBOA acceptable to Lender.

**Performance.**  Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender.  Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.**  Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Beneficial Ownership Information.**  Comply with all beneficial ownership information reporting requirements of the Corporate Transparency Act and its implementing regulations (collectively the CTA), if applicable to any Borrower.  Any Borrower that is or becomes a reporting company as defined in the CTA: (1) has filed, or will file within required timeframes a complete and accurate report of its beneficial ownership information with the Financial Crimes Enforcement Network (FinCEN) as required by the CTA; (2) will update or correct its beneficial ownership information with FinCEN within required timeframes upon any change in its beneficial ownership information; (3) will provide Lender with a copy of its beneficial ownership information report filed with FinCEN upon request; and (4) will notify Lender in writing of any change in its beneficial ownership information within 30 days of such change.

**Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.**  Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.**  Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Change in Ownership.** The Borrower agrees to promptly **notify Lender in writing** at Lender's address shown above (or such other address as Lender may designate from time to time) **prior to any of the below changes**. No change in the Ownership, Name, or state of organization will take effect until after Lender has received and approved the request. Borrower agrees that (a) said property shall not be sold, agreed to be sold, conveyed, transferred, assigned, disposed of, or further encumbered, whether voluntary, involuntary, by operation of law or otherwise, and/or (b) any change twenty-five percent (25%) in the Borrower, any manager of the Borrower, and/or any direct or indirect transfer of membership, partnership or other ownership interest of Borrower, shall constitute a breach. Any violation shall cause the then outstanding principal balance and interest and other sums, if applicable secured by said Deed of Trust, at the sole discretion of Lender, to become immediately due and payable.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower.  All such expenses will become a part of the Indebtedness and, at Lender's option, will (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon

payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**   Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.**   (1)   Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including finance leases,   (2)   sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or   (3)   sell with recourse any of Borrower's accounts receivable, except to Lender.

**Additional Financial Restrictions.**   Borrowers to comply with the following:

**Assignment.** Guarantor agrees not to hypothecate or transfer any interest in the assets they own.

**Additional Debt.** Apply for and/or accept any additional secured or unsecured debt greater than $500,000 in aggregate (except for ordinary course of business practices of payables/debt due within one (1) year) without prior approval from Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Guarantor is presently engaged, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business.

**Continuity of Operations.**   (1)   Engage in any business activities substantially different than those in which Borrower is presently engaged, or (2)   cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business.

**Loans, Acquisitions and Guaranties.**   (1)   Loan, invest in or advance money or assets to any other person, enterprise or entity,   (2)   purchase, create or acquire any interest in any other enterprise or entity, or   (3)   incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.**   Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.**   If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:   (A)   Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;   (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;   (C)   there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or   (D)   any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or   (E)   Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.**   To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).   This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.   However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.   Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.**   Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.**   Borrower fails to make any payment when due under the Loan.

**Other Defaults.**   Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**   Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.**   Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**   The dissolution or termination of the Trust, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.**   This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.**   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.   This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.   However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**   Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.**    A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.**    Lender in good faith believes itself insecure.

**Right to Cure.**    If any default, other than a default on indebtedness, is curable and if Borrower, Guarantor, or Grantor, as the case may be, has not been given a notice of a similar default within the preceding 12 months, it may be cured if Borrower, Guarantor, or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within 30 days; or (2) if the cure requires more than 30 days, immediately initiate steps that Lender deems in Lender's reasonable discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.**    If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional.    In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise.    Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.    Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.**    The following miscellaneous provisions are a part of this Agreement:

**Amendments.**    This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.    No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**    Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.    Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement.    Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.    Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**    Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.**    Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender.    Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters.    Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.    Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests.    Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan.    Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.    This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.    This Agreement has been accepted by Lender in the State of California.**

**Choice of Venue.**    If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**Joint and Several Liability.**    All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower.    This means that each Borrower signing below is responsible for all obligations in this Agreement.

**No Waiver by Lender.**    Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.    No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.    A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.    No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions.    Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.**    Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement.    Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.    For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.    Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.**   If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance.   If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.   If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.   Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.**   All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.   Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.**   Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents.   Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made,   and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.**   Time is of the essence in the performance of this Agreement.

**Waive Jury.**   To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.   (Initial Here ⬜ 𝒟𝓂 ⬜ 𝒟𝓂 ⬜ 𝓌 )

**Indemnity.** Borrower agrees to defend, protect, indemnify, and hold Lender harmless from and against all liabilities, claims, demands, actions, causes of action, damages, costs and expenses (including but not limited to reasonable legal fees and disbursements) arising out of, resulting from, or in any way connected with Borrower's use of the Property and any occurrence thereon, including but not limited to, any bodily injury or death occurring on or about the Property from whatever cause. Upon demand by Lender, Borrower shall defend any action or proceeding brought against Lender with counsel selected by Lender, or Lender may elect to conduct its own defense at the expense of Borrower. The provisions of this section shall survive the termination of this Agreement and the repayment of the Loan

**DEFINITIONS.**   The following capitalized words and terms shall have the following meanings when used in this Agreement.   Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.   Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.   Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code.   Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.**   The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.**   The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.**   The word "Borrower" means Gerald J. Marcil; and The Marcil Family Trust, established on   May 9, 1997 and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.**   The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.**   The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.**   The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.**   The word "GAAP" means generally accepted accounting principles.

**Grantor.**   The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.**   The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.**   The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.**   The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.   The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws.   The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Nano Banc, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated December 9, 2024 and executed by Borrower in the principal amount of $19,184,817.74, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**OCBOA.** The term "OCBOA" means Other Comprehensive Basis of Accounting, as designated by Lender in writing as an acceptable alternative to GAAP.

**Permitted Liens.** The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender;  (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and  (6)  those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS.  THIS BUSINESS LOAN AGREEMENT IS DATED DECEMBER 9, 2024.**

**BORROWER:**

X _____
    **Gerald J. Marcil, Individually**

**THE MARCIL FAMILY TRUST, ESTABLISHED ON   MAY 9, 1997**

By: _____

**Gerald J. Marcil, Trustee of The Marcil Family Trust, established on   May 9, 1997**

By: _____

**Carol L. Marcil, Trustee of The Marcil Family Trust, established on   May 9, 1997**

**LENDER:**

**NANO BANC**

By: _____
    **Max Prendergast, Vice President**

# EXHIBIT C

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $19,184,817.74 | 04-03-2025 | 05-10-2025 | ▮▮▮▮▮ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Gerald J. Marcil
The Marcil Family Trust, established on May 9, 1997
43D Malaga Cove Plaza
Palos Verdes Estates, CA   90274

**Lender:**  Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA   92618
(949) 259-2557

**Principal Amount:  $19,184,817.74**                                  **Date of Agreement:   April 3, 2025**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**  A Loan evidenced by a Promissory Note dated December 9, 2024, in the original principal amount of $19,184,817.74 and refencing Loan No. ▮▮▮▮▮ (Note) and all renewals, modifications/extensions thereof

**DESCRIPTION OF CHANGE IN TERMS.**
**The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") has changed from December 10, 2025, to May 10, 2025.**

**The Maturity Date has been reduced from an original term of approximately 12 months to approximately 30 days from the execution of this Change in Terms.**

Release of a certain a Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Monterra Investment, LP, a California limited partnership.

Release of a certain a Pledge and Security Agreement dated December 9, 2024 made and executed by Carol. Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Monterra Investment, LP, a California limited partnership.

Release of the following UCC filings:

1) UCC Financing statement bearing file number U250111846321 Re: Gerald Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997/Monterra Investment LP

2) UCC Financing statement bearing file number U250111850218 Re: Carol Marcil, Trustee of the Marcil Family Trust, established on May 9, 1997/Monterra Investment LP

3) UCC Financing statement bearing file number U250111845723 Re: Woodglen Apts., LLC/Monterra Investment LP ("Woodglen UCC, and collectively with the G. Marcil UCC and C. Marcil UCC, the "UCCs")

Add the following collateral:

1) an Assignment of Deposit Account dated April 3, 2025 made and executed between The Marcil Family Trust, established on May 9, 1997 and Lender on collateral described as: Grantor acknowledges and agrees Borrower must maintain a minimum Account balance of $1,000,000.00 in the Account at all times. The Account is hereby pledged as Collateral securing the Indebtedness and remain under Lender's sole and exclusive control. Grantor shall not debit this Account unless all Indebtedness owned by Borrower(s) to Lender has been paid in full. Grantor acknowledges and agrees that all funds in the Account are not eligible for release to the Grantor until all Indebtedness owned by Borrower(s) to Lender has been paid in full, and that all funds in the Account shall be held by Grantor for the benefit of Lender.

2) A Control Agreement - Deposit Account dated April 3, 2025 made and executed between The Marcil Family Trust, established on May 9, 1997 and Lender on collateral described as: Account number 6002017637 with the Depository Institution, and all amendments, extensions, renewals and replacements of the account (all called the "Account"), and all existing and future interest and other earnings on the Account, and all proceeds.

**All other terms and conditions remain the same.**

**PROMISE TO PAY.   Gerald J. Marcil; and The Marcil Family Trust, established on   May 9, 1997 ("Borrower") jointly and severally promise to pay to Nano Banc ("Lender"), or order, in lawful money of the United States of America, the principal amount of Nineteen Million One Hundred Eighty-four Thousand Eight Hundred Seventeen & 74/100 Dollars ($19,184,817.74) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance.   Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT.   Borrower will pay this loan in full immediately upon Lender's demand.   If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on May 10, 2025.   In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning April 10, 2025, with all subsequent interest payments to be due on the same day of each month after that.   Unless otherwise agreed or required by applicable law, payments will be applied to first, to the payment of unpaid and accrued interest, and, next, to the payment of any fees and charges due and owning under the the Loan Documents and, finally, to the payment of the outstanding principal due and owing under this Note. During the continuance of any Event of Default, then Lender shall be permitted to pay any sums due and owing under the Loan Documents in any order determined by Lender in its sole and absolute discretion. .**

**VARIABLE INTEREST RATE.**   The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index").   The Index is not necessarily the lowest rate charged by Lender on its loans.   Lender will tell Borrower the current Index rate upon Borrower's request.   The interest rate change will not occur more often than each Day.   Borrower understands that Lender

may make loans based on other rates as well.  **The Index currently is 7.750% per annum.**  Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point under the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 7.000%.  If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this loan, Lender may amend this loan by designating a substantially similar substitute index.  Lender may also amend and adjust the Margin to accompany the substitute index.  The change to the Margin may be a positive or negative value, or zero.  In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable.  Such an amendment to the terms of this loan will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower.  NOTICE:  Under no circumstances will the interest rate on this loan be less than 7.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.  Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this loan is computed using this method.**

**RECEIPT OF PAYMENTS.**  All payments must be made in U.S. dollars and must be received by Lender at:

Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA  92618

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Pacific Time on a business day, Lender will credit Borrower's payment on the next business day.    on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.    Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender.  **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:   Nano Banc, Irvine Office, 7755 Irvine Center Dr., 3rd Floor, Irvine, CA  92618.**

**LATE CHARGE.**  If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.**  Upon maturity of this loan, whether the scheduled maturity date (if applicable) or due to this loan being accelerated by Lender because of a default under this Agreement (including, without limitation, the failure to pay all amounts owed under this Agreement upon Lender's demand), the interest rate on this loan shall immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin").  The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.  However, in no event will the interest rate applied under this paragraph exceed the maximum interest rate permitted under applicable law.

**DEFAULT.**  Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.**  Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or ability to perform Borrower's obligations under this Agreement or any of the Related Documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**  The dissolution or termination of the Trust, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.**  Lender in good faith believes itself insecure.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity

of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

**LENDER'S RIGHTS.**  Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**  Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay.  Borrower will pay Lender that amount.  This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.  Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.  To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.  (Initial Here ▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓ )**

**GOVERNING LAW.  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.  This Agreement has been accepted by Lender in the State of California.**

**CHOICE OF VENUE.**  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**DISHONORED ITEM FEE.**  Borrower will pay a fee to Lender of $35.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.**  Borrower acknowledges this Agreement is secured by the following collateral described in the security instruments listed herein:

(A) a Commercial Security Agreement dated December 9, 2024 made and executed between Gerald J. Marcil and The Marcil Family Trust, established on May 9, 1997 and Lender on collateral described as:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property; and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

(B)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Arrowhead Stanton Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(C)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Torrance Terrace Investment, LP, a California limited partnership, on the terms and conditions as stated therein.

(D)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Azul Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(E)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Gerald J. Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Woodglen Apts., LLC, a California limited liability company, on the terms and conditions as stated therein.

(F)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil , Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Arrowhead Stanton Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(G)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Torrance Terrace Investment, LP, a California limited partnership, on the terms and conditions as stated therein.

(H)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Azul Apartments, LP, a California limited partnership, on the terms and conditions as stated therein.

(I)  a Pledge and Security Agreement dated December 9, 2024 made and executed by Carol Marcil, Trustee of the Marcil Family Trust established on May 9, 1997, pledging certain collateral pertaining to Woodglen Apts., LLC, a California limited liability company, on the terms and conditions as stated therein.

(J)  a Pledge and Security Agreement made and executed by MOM AS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM AS Investor Group, LLC, a Delaware limited liability company, on the terms and conditions as stated therein.

(K) a Pledge and Security Agreement made and executed by MOM BS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM BS Investor Group, LLC, a Delaware limited liability company, on the terms and conditions as stated therein.

(L) a Pledge and Security Agreement made and executed by MOM CA Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM CA Investor Group, LLC, a Delaware limited liability company, on the terms and conditions as stated therein.

(M) an Assignment of Deposit Account dated April 3, 2025 made and executed between The Marcil Family Trust, established on May 9, 1997 and Lender on collateral described as: Grantor acknowledges and agrees Borrower must maintain a minimum Account balance of $1,000,000.00 in the Account at all times. The Account is hereby pledged as Collateral securing the Indebtedness and remain under Lender's sole and exclusive control. Grantor shall not debit this Account unless all Indebtedness owned by Borrower(s) to Lender has been paid in full. Grantor acknowledges and agrees that all funds in the Account are not eligible for release to the Grantor until all Indebtedness owned by Borrower(s) to Lender has been paid in full, and that all funds in the Account shall be held by Grantor for the benefit of Lender.

(N) A Control Agreement - Deposit Account dated April 3, 2025 made and executed between The Marcil Family Trust, established on May 9, 1997 and Lender on collateral described as: Account number 6002017637 with the Depository Institution, and all amendments, extensions, renewals and replacements of the account (all called the "Account"), and all existing and future interest and other earnings on the Account, and all proceeds.

**LINE OF CREDIT.** This Agreement evidences a non-revolving line of credit. Payments made prior to termination of the line of credit do not entitle Borrower to readvances of the amounts already paid. Advances under this Agreement, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Nano Banc 25220 Hancock Avenue Suite 140 Murrieta, CA 92562.

**MISCELLANEOUS PROVISIONS.** This Agreement is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Agreement on its demand. If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

PRIOR TO SIGNING THIS AGREEMENT, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.   EACH BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

X _____

Gerald J. Marcil, Individually


THE MARCIL FAMILY TRUST, ESTABLISHED ON MAY 9, 1997


By: _____

Gerald J. Marcil, Trustee of The Marcil Family Trust,
established on May 9, 1997

By: _____

Carol L. Marcil, Trustee of The Marcil Family Trust,
established on May 9, 1997

LENDER:


NANO BANC



X _____
Max Prendergast, Senior Vice President

# EXHIBIT D

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $19,184,817.74 | 04-23-2025 | 04-10-2032 | ███████ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Gerald J. Marcil
The Marcil Family Trust, established on May 9, 1997
43D Malaga Cove Plaza
Palos Verdes Estates, CA   90274

**Lender:** Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA   92618
(949) 259-2557

**Principal Amount:  $19,184,817.74**

**Date of Agreement: April 23, 2025**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

A Loan evidenced by a Promissory Note dated December 9, 2024 in the original principal amount of $19,184,817.74 and referencing Loan No. ███████ (Note) and all renewals, modifications/extensions thereof.

**DESCRIPTION OF COLLATERAL.**

Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM AS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM AS Investor Group, LLC on the terms and conditions as stated therein.

(B) a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM BS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM BS Investor Group, LLC on the terms and conditions as stated therein.

(C) a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM CA Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM CA Investor Group, LLC on the terms and conditions as stated therein.

**DESCRIPTION OF CHANGE IN TERMS.**

**The following has been amended as follows:**

**Maturity Date:** The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is hereby extended from December 10, 2025, to April 10, 2032.

**Loan Type:** Non-Revolving Line of Credit to an Unsecured Term Loan.

**Floor Rate:** Increase the floor rate from 7.00% to 7.500%

**Interest Rate Margin:** -.250%

**Rate:** Wall Street Journal Daily Prime Rate minus .250%. The Index currently is 7.500% per annum.

**Amortization:** Fully amortizing the subject facility over seven (7) years. Please reference

**The following collateral has been amended as follows:**

Release of UCC filed on Arrowhead Stanton Apartments, LP, Terrace Investment, LP, Azul Apartments, LP and on Woodglen APTS, LLC.

Release of the Control Agreement - Deposit Account and Assignment of Deposit Account dated December 09, 2024.

**All other terms and conditions remain the same.**

**PROMISE TO PAY.** Gerald J. Marcil; and The Marcil Family Trust, established on   May 9, 1997 ("Borrower") jointly and severally promise to pay to Nano Banc ("Lender"), or order, in lawful money of the United States of America, the principal amount of Nineteen Million One Hundred Eighty-four Thousand Eight Hundred Seventeen & 74/100 Dollars ($19,184,817.74), together with interest on the unpaid principal balance from April 25, 2025, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 83 payments of $294,393.31 each payment and an irregular last payment estimated at $294,393.48. Borrower's first payment is due May 10, 2025, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on April 10, 2032, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to the principal; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 7.500% per annum.** Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.250 percentage points under the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 7.500%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this loan, Lender may amend this loan by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this loan will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this loan be less than 7.500% per annum or more than the maximum rate allowed by applicable law. Whenever changes occur in the interest rate, Lender, at its option, may do one or more of the following: (A) change Borrower's payments by setting a new payment amount calculated by amortizing the outstanding principal balance at the new interest rate over the remaining term of the loan, (B) increase Borrower's payments to cover accruing interest if the interest rate adjustment is an increase, (C) change the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and change Borrower's final payment amount.

**INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.**

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA  92618

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Pacific Time on a business day, Lender will credit Borrower's payment on the next business day.   on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Nano Banc, Irvine Office, 7755 Irvine Center Dr., 3rd Floor Irvine, CA  92618.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon maturity of this loan, whether the scheduled maturity date or due to this loan being accelerated by Lender because of a default under this Agreement, the interest rate on this loan shall immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate applied under this paragraph exceed the maximum interest rate permitted under applicable law.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or ability to perform Borrower's obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of the Trust, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.**   Lender in good faith believes itself insecure.

**Events Affecting Guarantor.**   Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

**LENDER'S RIGHTS.**   Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**   Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay.   Borrower will pay Lender that amount.   This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.   Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.   To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.   (Initial Here ▨▨▨ ▨▨▨ ▨▨▨ )**

**GOVERNING LAW.   This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.   This Agreement has been accepted by Lender in the State of California.**

**CHOICE OF VENUE.**   If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**DISHONORED ITEM FEE.**   Borrower will pay a fee to Lender of $35.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.**   To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).   This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.   However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.   Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.**   Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein:

(A)  a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM AS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM AS Investor Group, LLC on the terms and conditions as stated therein. Collateral described as:

Debtor hereby grants to Secured Party and the assignee (if any) of the Secured Party a security interest in and to all of the following property ("**Collateral**") in which Debtor now has or hereafter acquires any right, title or interest, wheresoever located and whether in the possession of Debtor or any other person, and in all accessions, improvements, additions, substitutions and replacements thereto and thereof, and all proceeds thereof (including but not limited to accounts, inventory, chattel paper, documents, instruments, deposit accounts and general intangibles).

Twenty percent (20%) of any and all **Sale Proceeds** (as defined herein) arising out of and/or relating to the **Real Properties** (as defined herein).

Sale Proceeds.   The term "Sale Proceeds" means (a) any and all dividends, distributions, sales proceeds, profits, gains, revenue, income, fee reimbursement, compensation, remuneration, claim, right, power, privilege and other benefit, of any kind whatsoever, derived from or related to any sale, transfer, liquidation, foreclosure, conveyance, hypothecation, encumbrance and/or disposition of any real estate owned in whole and/or in part by Debtor, including but not limited to any member or equitable interest therein (collectively, a "**Sale**"), of any and/or all of the Real Properties whether vested or unvested, contingent or fixed, legal or equitable, disputed or undisputed, liquidated or unliquidated; and (b) any and all cash proceeds and noncash proceeds received or receivable upon the Sale, exchange, collection or other disposition (whether voluntary or involuntary) of the Real Properties (or any proceeds thereof), including without limitation, any and all money, deposit accounts, accounts, chattel paper, documents, instruments, drafts, goods, inventory, equipment, real property, machinery, fixtures, furnishings, claims, general intangibles, insurance proceeds, and all other tangible and intangible personal property of every kind and description.

Real Properties.   The term "**Real Properties**" shall mean any and all of Debtor's right, title and interest in and to any real property, including but not limited to those properties listed on Exhibit "B" attached hereto and by this reference made a part hereof, inclusive of all buildings, improvements and other structures presently located on the Real Properties, together with all fixtures and equipment attached thereto or incorporated therein, and all rights, benefits, privileges, easements, tenements, hereditaments and appurtenances thereto or appertaining the Real Properties.   It further includes all personal property owned by Debtor, if any, located in or on, and used exclusively in connection with the operation of, the Real Properties and/or any improvements; any and all of Debtor's right, title and interest in and to leases, licenses and occupancy agreements covering all or any portions of the Real Properties or improvements, and including any guaranties thereof and any security deposits thereunder; all management, leasing, service and other agreements affecting the Real Properties, including those relating to the upkeep, repair, maintenance or operation of the Real Properties and improvements thereon; any and all of Debtor's right, title and interest in and to any of the following (i) all assignable warranties and guaranties (including, without limitation, contractor's, architect's and manufacturer's warranties and guaranties held by Debtor and given by third parties with respect to the Real Properties) relating to the condition, operability, ownership, occupancy or operation of the Real Properties and/or the improvements thereon; (ii) all assignable permits, licenses, entitlements, certificates (including certificates of completion

and certificates of occupancy), approvals and authorizations issued by any governmental authority in connection with the Real Properties; (iii) all intellectual property rights, including websites and domain names relating to the Real Properties and transferable names, trademarks, symbols, logos and designs, under which the Real Properties and improvements are operated; and (iv) all surveys, building plans and property records including lease files, in Debtor's possession or control and used by Debtor exclusively in connection with the Real Properties and the improvements.

(B)    a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM BS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM BS Investor Group, LLC on the terms and conditions as stated therein. Collateral described as:

Debtor hereby grants to Secured Party and the assignee (if any) of the Secured Party a security interest in and to all of the following property ("**Collateral**") in which Debtor now has or hereafter acquires any right, title or interest, wheresoever located and whether in the possession of Debtor or any other person, and in all accessions, improvements, additions, substitutions and replacements thereto and thereof, and all proceeds thereof (including but not limited to accounts, inventory, chattel paper, documents, instruments, deposit accounts and general intangibles):

Twenty percent (20%) of any and all **Sale Proceeds** (as defined herein) arising out of and/or relating to the **Real Properties** (as defined herein).

Sale Proceeds.    The term "Sale Proceeds" means (a) any and all dividends, distributions, sales proceeds, profits, gains, revenue, income, fee, reimbursement, compensation, remuneration, claim, right, power, privilege and other benefit, of any kind whatsoever, derived from or related to any sale, transfer, liquidation, foreclosure, conveyance, hypothecation, encumbrance and/or disposition of any real estate owned in whole and/or in part by Debtor, including but not limited to any member or equitable interest therein (collectively, a "**Sale**"), of any and/or all of the Real Properties, whether vested or unvested, contingent or fixed, legal or equitable, disputed or undisputed, liquidated or unliquidated; and (b) any and all cash proceeds and noncash proceeds received or receivable upon the Sale, exchange, collection or other disposition (whether voluntary or involuntary) of the Real Properties (or any proceeds thereof), including without limitation, any and all money, deposit accounts, accounts, chattel paper, documents, instruments, drafts, goods, inventory, equipment, real property, machinery, fixtures, furnishings, claims, general intangibles, insurance proceeds, and all other tangible and intangible personal property of every kind and description.

Real Properties.    The term "**Real Properties**" shall mean any and all of Debtor's right, title and interest in and to any real property, including but not limited to those properties listed on Exhibit "B" attached hereto and by this reference made a part hereof, inclusive of all buildings, improvements and other structures presently located on the Real Properties, together with all fixtures and equipment attached thereto or incorporated therein, and all rights, benefits, privileges, easements, tenements, hereditaments and appurtenances thereto or appertaining the Real Properties. It further includes all personal property owned by Debtor, if any, located in or on, and used exclusively in connection with the operation of, the Real Properties and/or any improvements; any and all of Debtor's right, title and interest in and to leases, licenses and occupancy agreements covering all or any portions of the Real Properties or improvements, and including any guaranties thereof and any security deposits thereunder; all management, leasing, service and other agreements affecting the Real Properties, including those relating to the upkeep, repair, maintenance or operation of the Real Properties and improvements thereon; any and all of Debtor's right, title and interest in and to any of the following (i) all assignable warranties and guaranties (including, without limitation, contractor's, architect's and manufacturer's warranties and guaranties held by Debtor and given by third parties with respect to the Real Properties) relating to the condition, operability, ownership, occupancy or operation of the Real Properties and/or the improvements thereon; (ii) all assignable permits, licenses, entitlements, certificates (including certificates of completion and certificates of occupancy), approvals and authorizations issued by any governmental authority in connection with the Real Properties; (iii) all intellectual property rights, including websites and domain names relating to the Real Properties and transferable names, trademarks, symbols, logos and designs, under which the Real Properties and improvements are operated; and (iv) all surveys, building plans and property records including lease files, in Debtor's possession or control and used by Debtor exclusively in connection with the Real Properties and the improvements.

(C)    a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM CA Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM CA Investor Group, LLC on the terms and conditions as stated therein. Collateral described as:

Debtor hereby grants to Secured Party and the assignee (if any) of the Secured Party a security interest in and to all of the following property ("**Collateral**") in which Debtor now has or hereafter acquires any right, title or interest, wheresoever located and whether in the possession of Debtor or any other person, and in all accessions, improvements, additions, substitutions and replacements thereto and thereof, and all proceeds thereof (including but not limited to accounts, inventory, chattel paper, documents, instruments, deposit accounts and general intangibles):

Twenty percent (20%) of any and all **Sale Proceeds** (as defined herein) arising out of and/or relating to the **Real Properties** (as defined herein).

Sale Proceeds.    The term "Sale Proceeds" means (a) any and all dividends, distributions, sales proceeds, profits, gains, revenue, income, fee, reimbursement, compensation, remuneration, claim, right, power, privilege and other benefit, of any kind whatsoever, derived from or related to any sale, transfer, liquidation, foreclosure, conveyance, hypothecation, encumbrance and/or disposition of any real estate owned in whole and/or in part by Debtor, including but not limited to any member or equitable interest therein (collectively, a "**Sale**"), of any and/or all of the Real Properties, whether vested or unvested, contingent or fixed, legal or equitable, disputed or undisputed, liquidated or unliquidated; and (b) any and all cash proceeds and noncash proceeds received or receivable upon the Sale, exchange, collection or other disposition (whether voluntary or involuntary) of the Real Properties (or any proceeds thereof), including without limitation, any and all money, deposit accounts, accounts, chattel paper, documents, instruments,

drafts, goods, inventory, equipment, real property, machinery, fixtures, furnishings, claims, general intangibles, insurance proceeds, and all other tangible and intangible personal property of every kind and description.

Real Properties. The term "**Real Properties**" shall mean any and all of Debtor's right, title and interest in and to any real property, including but not limited to those properties listed on Exhibit "B" attached hereto and by this reference made a part hereof, inclusive of all buildings, improvements and other structures presently located on the Real Properties, together with all fixtures and equipment attached thereto or incorporated therein, and all rights, benefits, privileges, easements, tenements, hereditaments and appurtenances thereto or appertaining the Real Properties. It further includes all personal property owned by Debtor, if any, located in or on, and used exclusively in connection with the operation of, the Real Properties and/or any improvements; any and all of Debtor's right, title and interest in and to leases, licenses and occupancy agreements covering all or any portions of the Real Properties or improvements, and including any guaranties thereof and any security deposits thereunder; all management, leasing, service and other agreements affecting the Real Properties, including those relating to the upkeep, repair, maintenance or operation of the Real Properties and improvements thereon; any and all of Debtor's right, title and interest in and to any of the following (i) all assignable warranties and guaranties (including without limitation, contractor's, architect's and manufacturer's warranties and guaranties held by Debtor and given by third parties with respect to the Real Properties) relating to the condition, operability, ownership, occupancy or operation of the Real Properties and/or the improvements thereon; (ii) all assignable permits, licenses, entitlements, certificates (including certificates of completion and certificates of occupancy), approvals and authorizations issued by any governmental authority in connection with the Real Properties; (iii) all intellectual property rights, including websites and domain names relating to the Real Properties and transferable names, trademarks, symbols, logos and designs, under which the Real Properties and improvements are operated; and (iv) all surveys, building plans and property records, including lease files, in Debtor's possession or control and used by Debtor exclusively in connection with the Real Properties and the improvements.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**UNCONDITIONALLY CANCELABLE.** Notwithstanding anything to the contrary in this Note, Lender may at its option at any time, and with or without cause, do any of the following to the full extent permitted under applicable law: (i) refuse to make any additional advances, or otherwise extend any credit, in connection with the loan evidenced by this Note; (ii) reduce in any amount the credit line evidenced by this Note (if applicable); and (iii) terminate the loan evidenced by this Note.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Nano Banc 25220 Hancock Avenue Suite 140 Murrieta, CA 92562.

**MISCELLANEOUS PROVISIONS.** If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several

PRIOR TO SIGNING THIS AGREEMENT, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  EACH BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

X _____

Gerald J. Marcil, Individually


THE MARCIL FAMILY TRUST, ESTABLISHED ON   MAY 9, 1997

By: _____

Gerald J. Marcil, Trustee of The Marcil Family Trust,
established on May 9, 1997

By: _____

Carol L. Marcil, Trustee of The Marcil Family Trust,
established on May 9, 1997

LENDER:

NANO BANC

X _____

Max Prendergast, Senior Vice President

# EXHIBIT E

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $19,184,817.74 | 05-22-2025 | 05-10-2032 | ▊ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Gerald J. Marcil
The Marcil Family Trust, established on May 9, 1997
43D Malaga Cove Plaza
Palos Verdes Estates, CA 90274

**Lender:** Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA 92618
(949) 259-2557

---

**Principal Amount: $19,184,817.74**                                    **Date of Agreement: May 22, 2025**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** A Loan evidenced by a Promissory Note dated December 9, 2024 in the original principal amount of $19,184,817.74 and refencing Loan No. ▊ (Note) and all renewals, modifications/extensions thereof.

**DESCRIPTION OF COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM AS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM AS Investor Group, LLC on the terms and conditions as stated therein.

(B) a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM BS Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM BS Investor Group, LLC on the terms and conditions as stated therein.

(C) a Pledge and Security Agreement dated December 9, 2024 made and executed by MOM CA Investor Group, LLC, a Delaware limited liability company pledging certain collateral pertaining to MOM CA Investor Group, LLC on the terms and conditions as stated therein.

(D) Written Consent to Company Action of MOM AS Investor Group LLC, a Delaware limited liability company dated December 9, 2024

(E) Written Consent to Company Action of MOM BS Investor Group LLC, a Delaware limited liability company dated December 9, 2024

(F) Written Consent to Company Action of MOM CA Investor Group LLC, a Delaware limited liability company dated December 9, 2024.

**DESCRIPTION OF CHANGE IN TERMS.**

<u>The Note has been amended as follows:</u>

**Maturity Date:** The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is hereby extended from December 10, 2025, to May 10, 2032.

**Loan Type:** Non-Revolving Line of Credit to an Unsecured Term Loan.

**Floor Rate:** Increase the floor rate from 7.00% to 7.50%

**Interest Rate Margin:** -0.25%

**Rate:** Wall Street Journal Prime Rate minus 0.25%. The Index currently is 7.50% per annum.

**Amortization:** Fully amortizing the subject facility over seven (7) years.

**The following collateral has been amended as follows:**

Release of the UCC filed on Arrowhead Stanton Apartments, LP, Terrace Investment, LP, Azul Apartments, LP and on Woodglen APTS, LLC.

Release of the Control Agreement - Deposit Account and Assignment of Deposit Account dated December 09, 2024.

**All other terms and conditions remain the same.**

**PROMISE TO PAY.** Gerald J. Marcil; and The Marcil Family Trust, established on May 9, 1997 ("Borrower") jointly and severally promise to pay to Nano Banc ("Lender"), or order, in lawful money of the United States of America, the principal amount of Nineteen Million One Hundred Eighty-four Thousand Eight Hundred Seventeen & 74/100 Dollars ($19,184,817.74), together with interest on the unpaid principal balance from May 26, 2025, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 83 payments of $294,359.41 each payment and an irregular last payment estimated at $294,359.48. Borrower's first payment is due June 10, 2025, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on May 10, 2032, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 7.500% per annum. Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.250 percentage points under the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 7.500%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this loan, Lender may amend this loan by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this loan will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this loan be less than 7.500% per annum or more than the maximum rate allowed by applicable law. Whenever changes occur in the interest rate, Lender, at its option, may do one or more of the following: (A) change Borrower's payments by setting a new payment amount calculated by amortizing the outstanding principal balance at the new interest rate over the remaining term of the loan, (B) increase Borrower's payments to cover accruing interest if the interest rate adjustment is an increase, (C) change the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and change Borrower's final payment amount.

| | CHANGE IN TERMS AGREEMENT |
|---|---|
| Loan No: ██████████ | (Continued) |

**Page 2**

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA 92618

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Pacific Time on a business day, Lender will credit Borrower's payment on the next business day.   on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.   Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Nano Banc, Irvine Office, 7755 Irvine Center Dr., 3rd Floor Irvine, CA 92618.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000%** of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon maturity of this loan, whether the scheduled maturity date or due to this loan being accelerated by Lender because of a default under this Agreement, the interest rate on this loan shall immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate applied under this paragraph exceed the maximum interest rate permitted under applicable law.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or ability to perform Borrower's obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of the Trust, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other. (Initial Here ██████████████ )

**GOVERNING LAW.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

## CHANGE IN TERMS AGREEMENT
### (Continued)

| Loan No: ▮▮▮▮▮ | | Page 3 |

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $35.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein:

(A) a Commercial Security Agreement dated May 22, 2025 made and executed between Gerald J. Marcil and The Marcil Family Trust, established on May 9, 1997 and Lender on collateral described as:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**UNCONDITIONALLY CANCELABLE.** Notwithstanding anything to the contrary in this Note, Lender may at its option at any time, and with or without cause, do any of the following to the full extent permitted under applicable law: (i) refuse to make any additional advances, or otherwise extend any credit, in connection with the loan evidenced by this Note; (ii) reduce in any amount the credit line evidenced by this Note (if applicable); and (iii) terminate the loan evidenced by this Note.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Nano Banc 25220 Hancock Avenue Suite 140 Murrieta, CA 92562.

**MISCELLANEOUS PROVISIONS.** If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

**Loan No:** ██████████

## CHANGE IN TERMS AGREEMENT
### (Continued)

Page 4

PRIOR TO SIGNING THIS AGREEMENT, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**BORROWER:**

X _____
Gerald J. Marcil, Individually

**THE MARCIL FAMILY TRUST, ESTABLISHED ON  MAY 9, 1997**

By: _____
Gerald J. Marcil, Trustee of The Marcil Family Trust,
established on  May 9, 1997

By: _____
Carol L. Marcil, Trustee of The Marcil Family Trust,
established on  May 9, 1997

**LENDER:**

**NANO BANC**

X _____
Max Prendergast, Senior Vice President

LaserPro, Ver. 25.1.10.006 Copr. Finastra USA Corporation 1997, 2025.   All Rights Reserved.   - CA  Z:\LaserPro\CFI\LPL\D20C.FC  TR-2009  PR-20

# EXHIBIT F

## BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $19,184,817.74 | 05-22-2025 | 05-10-2032 | ▉▉▉▉ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| Borrower: | Gerald J. Marcil<br>The Marcil Family Trust, established on  May 9, 1997<br>43D Malaga Cove Plaza<br>Palos Verdes Estates, CA  90274 | Lender: | Nano Banc<br>Irvine Office<br>7755 Irvine Center Dr., 3rd Floor<br>Irvine, CA  92618<br>(949) 259-2557 |
|---|---|---|---|

THIS BUSINESS LOAN AGREEMENT dated May 22, 2025, is made and executed between Gerald J. Marcil; and The Marcil Family Trust, established on  May 9, 1997 ("Borrower") and Nano Banc  ("Lender") on the following terms and conditions.  Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement.  Borrower understands and agrees that:  (A)  in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement;  (B)  the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and  (C)  all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of May 22, 2025, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.**  Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.**  Borrower shall provide to Lender the following documents for the Loan:  (1)  the Note;  (2)  Security Agreements granting to Lender security interests in the Collateral;  (3)  financing statements and all other documents perfecting Lender's Security Interests;  (4)  evidence of insurance as required below;  (5)  together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Payment of Fees and Expenses.**  Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.**  The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.**  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**MULTIPLE BORROWERS.**  This Agreement has been executed by multiple obligors who are referred to in this Agreement individually, collectively and interchangeably as "Borrower."  Unless specifically stated to the contrary, the word "Borrower" as used in this Agreement, including without limitation all representations, warranties and covenants, shall include all Borrowers.  Borrower understands and agrees that, with or without notice to any one Borrower, Lender may  (A)  make one or more additional secured or unsecured loans or otherwise extend additional credit with respect to any other Borrower;  (B)  with respect to any other Borrower alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness;  (C)  exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral;  (D)  release, substitute, agree not to sue, or deal with any one or more of Borrower's or any other Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose;  (E)  determine how, when and what application of payments and credits shall be made on any indebtedness;  (F)  apply such security and direct the order or manner of sale of any Collateral, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine;  (G)  sell, transfer, assign or grant participations in all or any part of the Loan;  (H)  exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting;  (I)  settle or compromise any indebtedness; and  (J)  subordinate the payment of all or any part of any of Borrower's indebtedness to Lender to the payment of any liabilities which may be due Lender or others.

**REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Business Activities.**  Gerald J. Marcil maintains an office at 43D Malaga Cove Plaza, Palos Verdes Estates, CA  90274.  Unless Gerald J. Marcil has designated otherwise in writing, the principal office is the office at which Gerald J. Marcil keeps its books and records including its records concerning the Collateral.  Gerald J. Marcil will notify Lender prior to any change in the location of Gerald J. Marcil's principal office address or any change in Gerald J. Marcil's name.  Gerald J. Marcil shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Gerald J. Marcil and Gerald J. Marcil's business activities.

The Marcil Family Trust, established on  May 9, 1997 is a trust which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California.  The Marcil Family Trust, established on  May 9, 1997 is duly authorized to transact business in all other states in which The Marcil Family Trust, established on  May 9, 1997 is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which The Marcil Family Trust, established on  May 9, 1997 is doing business.  Specifically, The Marcil Family Trust, established on  May 9, 1997 is, and at all times shall be, duly qualified as a foreign trust in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition.  The Marcil Family Trust, established on  May 9, 1997 maintains an office at 43D Malaga Cove Plaza, Palos Verdes Estates, CA  90274.  Unless The Marcil Family Trust, established on  May 9, 1997 has designated otherwise in writing, the principal office is the office at which The Marcil Family Trust, established on  May 9, 1997 keeps its books and records including its records concerning the Collateral.  The Marcil Family Trust, established on  May 9, 1997 will notify Lender prior to any change in the location of The Marcil Family Trust, established on May 9, 1997's state of organization or any change in The Marcil Family Trust, established on  May 9, 1997's name.  The Marcil Family Trust, established on  May 9, 1997 shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to The Marcil Family Trust, established on  May 9, 1997 and The Marcil Family Trust, established on  May 9, 1997's business activities.

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: ███████                                                                 Page 2

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents do not conflict with, result in a violation of, or constitute a default under (1) any provision of any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**No Prohibited Activities.** Borrower is not engaged in and none of the Collateral is created by or used in connection with any Prohibited Activities. Borrower shall not make any payments to Lender from funds derived from Prohibited Activities. Borrower agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement. Notwithstanding any provision in this Agreement or any Related Documents to the contrary, no direct or indirect disclosure to Lender and no knowledge of Lender of the existence of any Prohibited Activities shall estop Lender or waive any right of Lender to invoke any remedy under the Agreement or any Related Documents for any Prohibited Activities.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, or an OCBOA acceptable to Lender, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** Borrowers to provide the following:

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: ███████

Page 3

**Financial Statement, Real Estate Schedule, and Schedule of Debts.** No less than once annually and within fifteen (15) days after request, Borrower to provide a Personal Financial Statement ("PFS"), Real Estate Owned Schedule ("REO"), and Schedule of Debts (direct and contingent), in form and content acceptable to Lender. Information provided is to be signed and dated by Borrower.

**Liquid Asset Statements.** Borrower to provide Lender bank, brokerage, or other applicable month end statements no later than thirty (30) days after each December 31, and June 30, annually and no later than fifteen (15) days upon interim request of Lender.

**Borrower Tax Returns.** As soon as available, but in no event later than ten (10) days after filing, Borrower to provide annual tax returns. Tax returns are understood to be federal personal returns (form 1040, 1041, or 1065) with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities (form 1065 and K-1's for partnerships and LLC's, and form 1120S for Sub S Corporations).

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, or an OCBOA acceptable to Lender, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.** Borrowers to comply with the following:

**Debt Service Coverage Ratio.** Borrower(s) to maintain a minimum Personal Debt Service Coverage Ratio ("DSCR") of greater than 1.75:1.00 to be tested annually. DSCR to be defined as follows:

Borrower(s) Cash Flow Available for Debt Service ("CFADS"). Divided by: The sum of I) The contractual debt service of the subject facility, II) All other contractual debt service requirements of the Borrower(s), and III) All debt service requirements of the Borrower(s).

Borrower(s) CFADS is defined: as gross income/receipts/rents less operating expenses, net of non-cash items and interest on debt requirements, and income tax. Borrower(s) holding passive income entities require K-1 statements, or other funds transfer records, of applicable entities documenting cash distributions for inclusion in the NOI total. Borrower(s) federal tax return and/or operating and loan statements will be used to complete the calculation. Funds held by Lender in any applicable Payment Reserve Account shall be added to NOI for this calculation.

**Tangible Net Worth.** In aggregate, Borrower shall to maintain a Tangible Worth of not less than $340,000,000. Tangible Net Worth to be defined as Borrower and Guarantor (collectively) total assets excluding all intangible assets (e.g. goodwill, trademarks, patents, employee advances, shareholder notes receivable, copyrights, organization expenses and similar intangible items) less total liabilities excluding shareholder notes which are formally subordinated to Lender. This requirement is to be maintained at all times, and will be measured as of the end of each fiscal year.

**Net Liquid Assets.** In aggregate, Borrower shall maintain a minimum of $20,000,000 in Net Liquid Assets at all times, to be evaluated each June 30th and December 31st. Net Liquid Assets are defined as cash and marketable NYSE, AMEX, or NASDAQ listed securities net of margin debt in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity. If Guarantor does not maintain account balances with Lender in amounts sufficient to verify compliance with the Net Liquid Assets covenant, then Guarantor shall provide to Lender bank and/or brokerage house statements no later than thirty (30) days after each June 30th and December 31st, or fifteen (15) days after interim requests.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP or an OCBOA acceptable to Lender.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: ██████████                                                                                    Page 4

governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Beneficial Ownership Information.** Comply with all beneficial ownership information reporting requirements of the Corporate Transparency Act and its implementing regulations (collectively the CTA), if applicable to any Borrower. Any Borrower that is or becomes a reporting company as defined in the CTA: (1) has filed, or will file within required timeframes a complete and accurate report of its beneficial ownership information with the Financial Crimes Enforcement Network (FinCEN) as required by the CTA; (2) will update or correct its beneficial ownership information with FinCEN within required timeframes upon any change in its beneficial ownership information; (3) will provide Lender with a copy of its beneficial ownership information report filed with FinCEN upon request; (4) consents to allow Lender to obtain from FinCEN beneficial ownership information filed by Borrower; and (5) will notify Lender in writing of any change in its beneficial ownership information within 30 days of such change.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Change in Ownership.** The Borrower agrees to promptly **notify Lender in writing** at Lender's address shown above (or such other address as Lender may designate from time to time) **prior to any of the below changes.** No change in the Ownership, Name, or state of organization will take effect until after Lender has received and approved the request. Borrower agrees that (a) said property shall not be sold, agreed to be sold, conveyed, transferred, assigned, disposed of, or further encumbered, whether voluntary, involuntary, by operation of law or otherwise, and/or (b) any change twenty-five percent (25%) in the Borrower, any manager of the Borrower, and/or any direct or indirect transfer of membership, partnership or other ownership interest of Borrower, shall constitute a breach. Any violation shall cause the then outstanding principal balance and interest and other sums, if applicable secured by said Deed of Trust, at the sole discretion of Lender, to become immediately due and payable.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including finance leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts receivable, except to Lender.

**Additional Financial Restrictions.** Borrowers to comply with the following:

**Additional Debt.** Apply for and/or accept any additional secured or unsecured debt greater than $500,000 in aggregate (except for ordinary course of business practices of payables/debt due within one (1) year) without prior approval from Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, or (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business.

**Prohibited Activities.** Engage in, or permit the Collateral to be created by or used in connection with, any Prohibited Activities.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: ████████                                                                 Page 5

Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of the Trust, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**INDEMNITY - ENVIRONMENTAL ISSUES .** Borrower shall indemnify, pay and hold harmless the Lender against any loss, liability, cost or expenses incurred in respect to the financing contemplated hereby, the use or the proposed used of the proceeds hereof or any loss incurred as a result of environmental issues. .

**SUPERSEDED BUSINESS LOAN AGREEMENT.** This Agreement (i) supersedes all prior Business Loan Agreements executed by Borrower and Lender, including, but not limited to, that certain Business Loan Agreement dated December 9, 2024 (collectively, the "Prior Instruments"), (ii) constitutes a comprehensive amendment and complete restatement of the Prior Instruments, and (iii) is executed, delivered and accepted in renewal, extension and modification but not satisfaction or payment of the Prior Instruments. Borrower hereby (a) agrees that all liens, security interests and assignments against the collateral securing the indebtedness shall not in any manner be waived, and (b) further reaffirms all agreements, obligations, indebtedness, responsibilities, liens, and priority against the collateral set forth in or grated under that Prior Instruments and therein provided, except as may be restated, renewed, extended and modified by this Agreement.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: ███████████

Page 6

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**Joint and Several Liability.** All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower. This means that each Borrower signing below is responsible for all obligations in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Prohibited Activities.** Notwithstanding anything to the contrary in this Agreement, Borrower shall not be entitled to receive any notice of or right to cure an Event of Default related to any Prohibited Activities.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury. To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party. (Initial Here ████████ ████████ ████████ )**

**Indemnity.** Borrower agrees to defend, protect, indemnify, and hold Lender harmless from and against all liabilities, claims, demands, actions, causes of action, damages, costs and expenses (including but not limited to reasonable legal fees and disbursements) arising out of, resulting from, or in any way connected with Borrower's use of the Property and any occurrence thereon, including but not limited to, any bodily injury or death occurring on or about the Property from whatever cause. Upon demand by Lender, Borrower shall defend any action or proceeding brought against Lender with counsel selected by Lender, or Lender may elect to conduct its own defense at the expense of Borrower. The provisions of this section shall survive the termination of this Agreement and the repayment of the Loan.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: ███████                                                                                    Page 7

**Borrower.** The word "Borrower" means Gerald J. Marcil; and The Marcil Family Trust, established on  May 9, 1997 and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.  The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Nano Banc, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated May 22, 2025 and executed by Borrower in the principal amount of $19,184,817.74, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**OCBOA.** The term "OCBOA" means Other Comprehensive Basis of Accounting, as designated by Lender in writing as an acceptable alternative to GAAP.

**Permitted Liens.** The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender; (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and  (6)  those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Prohibited Activities.** The words "Prohibited Activities" mean any activity relating to the use, sale, possession, cultivation, manufacture, storage, distribution, or marketing of cannabis, marijuana, or marijuana-based products which constitutes in any manner a violation of any applicable federal, state, or local law or regulation, regardless of whether applicable conflicting law permits the same.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: █████████                                                                Page 8

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MAY 22, 2025.

BORROWER:

X _____
Gerald J. Marcil, Individually

THE MARCIL FAMILY TRUST, ESTABLISHED ON  MAY 9, 1997

By: _____
Gerald J. Marcil, Trustee of The Marcil Family Trust,
established on  May 9, 1997

By: _____
Carol L. Marcil, Trustee of The Marcil Family Trust,
established on  May 9, 1997

LENDER:

NANO BANC

By: _____
Max Prendergast, Senior Vice President

LaserPro, Ver. 25.1.10.006 Copr. Finastra USA Corporation 1997, 2025.   All Rights Reserved.   - CA  Z:\LaserPro\CFI\LPL\C40.FC  TR-2009  PR-20

# EXHIBIT G

## LOAN AMENDMENT

This Loan Amendment (the "**Amendment**") is entered into as of September 12, 2025 (the "**Effective Date**") by Nano Banc, a California corporation ("**Lender**") and Gerald J. Marcil, an individual ("**Marcil**"), and the Marcil Family Trust, established on May 9, 1997 (the "**Trust**", and together with Marcil, collectively, "**Borrower**"). Borrower is sometimes referred to individually as a "**Loan Party**" and collectively as the "**Loan Parties**". Lender and the Loan Parties are sometimes individually referred to as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A.      Lender has made a Loan to Borrower in the stated maximum principal commitment amount of $19,184,817.74, Loan No. 7000399600 (the "**Loan**") pursuant to, inter alia, (i) that certain Business Loan Agreement dated as of December 9, 2024 (the "**12/9/24 Loan Agreement**") and (ii) that certain Promissory Note dated as of even date therewith (as amended, restated and otherwise modified from time to time, and as may be amended by this Amendment, the "**Note**").

B.      The Loan was amended on April 3, 2025 pursuant to, inter alia, a Change in Terms Agreement and again on May 22, 2025 pursuant to, inter alia, a new Business Loan Agreement, a Change In Terms Agreement, and a Commercial Security Agreement (collectively, the "**5/22/25 Modification Documents**").

C.      Certain of the below defined Loan Documents grant Lender security interests in and to certain property as collateral for the Loan (as any of them may be amended, restated and otherwise modified from time to time, and as may be amended by this Amendment, collectively, the "**Security Documents**"), which Security Documents include that above referenced May 22, 2025 Commercial Security Agreement. The property which is the subject of the Security Documents, including any additional property granted to Lender as security for the Loan pursuant to the below defined Amendment Documents, is referred to as the "**Collateral**".

D.      The 12/9/24 Loan Agreement, the Note, the Security Documents, as modified by the 5/22/25 Modification Documents, and any other documents executed by any of the Loan Parties or their respective affiliates in connection with, evidencing or otherwise supporting the Loan, as any of them may be amended, restated and otherwise modified from time to time, and as may be amended by this Amendment, are collectively referred to as the "**Loan Documents**".

E.      The existing Maturity Date pursuant to the Loan Documents was May 10, 2032 (the "**Maturity Date**"). Borrower failed to make certain required payments as and when required under the Loan Documents for the period of June 10, 2025 through August 31, 2025 in the total amount of $1,177,437.64 (of which $421,266.62 constitutes accrued but unpaid interest through August 31, 2025 ("**Past Due Interest Amount**")), which failure to pay gave rise to an Event of Default (as defined in the Loan Documents) under the Loan Documents (the "**Identified Defaults**"). As a result of the Identified Defaults, Borrower has incurred default interest and late fees and Lender has incurred additional costs and expenses, including late charges of $44,153.91 and estimated legal fees and costs of $42,620.49, which default interest, late fees, costs and expenses continue to accrue as a result of the Identified Defaults (the "**Accrued Default Charges**"). In addition, as a result of such Identified Defaults, the Loan has been accelerated and is presently due and payable in full.

-1-

F.      The Loan Parties have requested that Lender waive the Identified Defaults and Lender has agreed to do so on the terms and conditions set forth below subject, however, to the satisfaction of the Amendment Conditions (as defined below).


## AGREEMENT

Based on the foregoing recitals, the accuracy of which are hereby acknowledged by each Party hereto, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party hereto, the Parties hereby agree as follows:

1.      **Amendment of Loan Documents**. Subject to satisfaction of the Amendment Conditions in accordance with Section 2 below, the Loan Documents are hereby amended as of the Effective Date as follows:

a.      Interest Rate. The interest rate under the Loan Documents of 7.5% per annum is hereby amended and reduced to 6% per annum.

b.      Monthly Loan Payments. The Loan Documents are hereby amended to provide that for the next eighteen (18) months (commencing effective August 31, 2025 and payable as of September 10, 2025 through the March 10, 2027 payment date), Borrower shall not be required to make monthly payments of interest and principal but instead shall be required to make monthly payments of interest only at the interest rate of 6% per annum, with each such payment to be paid on or before the tenth (10th) day of each month. Commencing on April 10, 2027 and continuing each month thereafter until the Maturity Date at which time the Loan shall be due and payable in full, Borrower shall be required to make monthly payments of interest and principal based on an amortization schedule which fully amortizes the Loan such that principal is paid in full as of the Maturity Date. For avoidance of doubt, each such payment shall be paid on or before the tenth (10th) day of each month and, in calculating that amortization schedule, the Past Due Interest Amount and the Accrued Default Charges shall not be included. The estimated payment due for September 10, 2025 is $100,498.25 for the thirty-one (31) days of August based on 6.0% interest-only.

c.      Deferred Amounts.

(i)      Past Due Interest Amount. The Past Due Interest Amount is hereby deemed deferred, with the total amount thereof to be added to the outstanding principal balance of the Loan as of the Maturity Date or immediately upon the occurrence of an Event of Default, and shall be due and payable in full on the Maturity Date or otherwise payable in full immediately upon the occurrence of an Event of Default.

(ii)      Accrued Default Charges; Deferral and Conditional Waiver. The Accrued Default Charges which have accrued prior to the Effective Date shall also be deemed deferred, with the total amount thereof to be added to the outstanding principal balance of the Loan as of the Maturity Date or immediately upon the occurrence of an Event of Default, and shall be due and payable in full on the Maturity Date or otherwise payable in full immediately upon the occurrence of an Event of Default. Provided that, and notwithstanding the foregoing, so long as no Event of Default occurs prior to the repayment in full of the Loan, the Accrued Default Charges shall be deemed waived, shall not be included in the required payoff amount, and Borrower shall not be required to pay such

-2-

*Marcil Loan*
*Loan Amendment*

Accrued Default Charges in connection with the repayment in full of the Loan.

d.  Event of Default. Notwithstanding anything to the contrary set forth in the Loan Documents, and in addition to the Events of Default set forth in the Loan Documents, the failure to pay the Required Monthly Payments as and when required each month, or the failure to pay the Loan in full on the Maturity Date, shall automatically, and without any notice to any Loan Party or any action by Lender, constitute an immediate Event of Default. Upon the occurrence of an Event of Default under the Loan Documents, in addition to Lender's other rights and remedies under the Loan Documents, the Loan shall deemed automatically accelerated and shall become immediately due and payable in full, all without any notice to any Loan Party or any action by Lender.

2.  **Conditions Precedent to this Amendment**. This Amendment shall become effective as of the Effective Date upon Lender's determination that each of the following conditions precedent have been satisfied (collectively, the "**Amendment Conditions**"):

a.  Pledge of Ownership Interests. Borrower shall have executed and delivered, and caused any other parties thereto, to execute and deliver to Lender a Pledge and Security Agreement dated as of the Effective Date (the "**Pledge Agreement**") pursuant to which the equity holders of (i) Arrowhead Stanton Apartments, LP, a California limited partnership, and (ii) Monterra Investment LP, a California limited partnership (collectively, the "**Companies**") will have pledged all of their respective ownership, rights, title and interests in and to the Companies (the "**Pledged Collateral**") as additional collateral for the Loan, all as further described in the Pledge Agreement. The Pledged Collateral shall constitute, and shall be included in the definition of, "Collateral", and the Pledge Agreement shall constitute, and shall be included in the definition of, "Loan Document".

b.  Execution and Delivery of the Loan Documents. This Amendment shall have been executed by all parties hereto and the Pledge Agreement shall be fully executed by all required parties thereto (the Amendment and the aforementioned documents, together with any other documents required by Lender with respect to this Amendment, collectively, the "**Amendment Documents**"). The Amendment Documents shall constitute, and be included in the definition of, "Loan Documents".

c.  Delivery of Executed Amendment Documents. Borrower shall have delivered, or cause to be delivered, the fully executed Amendment Documents to Lender (with delivery to be of the executed original, wet-inked signatures of each applicable Loan Party with respect to each Amendment Document unless Lender has agreed in writing that another method of signature delivery is acceptable to it).

d.  Payment of the September Required Payment. Borrower shall have paid to Lender, in immediately available funds, the September 10, 2025 loan payment required to be paid pursuant to Section 1(b) of this Amendment.

e.  Representations True and Correct. The representations and warranties set forth in the Loan Documents, including those set forth in this Amendment or as otherwise modified by this Amendment, continue to be true, correct and complete in all material respects as of the Effective Date (provided that, as to those representations and warranties that were made as of a certain date, they shall be true and correct in all material respects as of that date).

f.  No Default or Event of Default. Except for the Identified Defaults, no default or Event of Default, shall have occurred and be continuing.

-3-

g.    Authorizations and Opinions.  Borrower shall have delivered, or cause to be delivered, such resolutions, certificates, consents and opinions as Lender may reasonably require in order to confirm that each of the Loan Parties are duly authorized to execute, deliver and perform the Amendment Documents, that the individuals executing the Amendment Documents on behalf of the Loan Parties are authorized to do so and that every entity and individual required to approve, consent to and/or authorize the Amendment Documents and the transactions contemplated hereby have provided such approval, consent and/or authorization, with each in form and content acceptable to Lender.

Execution and delivery of this Amendment to Lender by the Loan Parties shall constitute the representation, warranty, and confirmation by the Loan Parties that each of the foregoing Amendment Conditions which they are required to satisfy have been satisfied. This Amendment shall be deemed effective as of the Effective Date upon Lender's delivery of a fully executed copy of this Amendment to the Loan Parties (which delivery may be by email to the email addresses of the Loan Parties' respective representatives), and such delivery shall constitute confirmation by the Lender that it has determined that the Amendment Conditions have been satisfied. Promptly after this Amendment becoming effective, Lender shall dismiss all pending litigation with respect to the Loan.

3.    **Waiver of Existing Defaults**.  Subject to the satisfaction of the Amendment Conditions, upon the effectiveness of this Amendment, the Identified Defaults are hereby deemed waived. In addition, any late fees or default interest which has otherwise accrued or has otherwise become due and payable prior to the Effective Date shall be deemed waived and Borrower shall no longer be obligated therefor. The foregoing waivers are expressly limited to the Identified Defaults, late charges and default interest waived pursuant to this Section and do not apply to any other fees, costs, expenses or charges, or any other Events of Default, or any facts or circumstances which, with the notice and/or the passage of time would constitute an Event of Default under the Loan Documents (as amended hereby), with all rights and remedies of Lender with respect thereto being hereby reserved in their entirety

4.    **Authorization to File Financing Statements**.  The Pledge Agreement authorizes Lender to file certain UCC-1 Financing Statements to perfect Lender's security interests in and to the Pledged Collateral (the "**Financing Statements**").  Lender agrees that it shall not file those Financing Statements unless and until an Event of Default has occurred, at which time Lender is authorized, without notice to or the consent of any Loan Party or any other person who is a party to the Pledge Agreement, to file the Financing Statements with the appropriate Secretary of State Office.

5.    **Representations and Warranties**. Each Loan Party represents and warrants to Lender, as of the Effective Date: (a) the representations, warranties, certifications and agreements contained in the Loan Documents are true, complete and accurate in all material respects as of the Effective Date (except to the extent any such representation and warranty is made as of a specified date, in which case such representation and warranty shall have been true, correct and complete as of such specified date); (b) after giving effect to this Amendment, no Event of Default exists; (c) to such Loan Party's knowledge, Lender has performed all of its obligations under the Loan Documents and such Loan Party does not have any claims, defenses or offset rights based on any actions or failures to act by Lender; (d) no voluntary actions or involuntary actions are pending against such Loan Party under the bankruptcy or insolvency laws of the United States or any state thereof; (e) such Loan Party continues to be validly existing under the laws of the state of its formation, in good standing therein; (f) each Loan Party, and any other person required to execute the Pledge Agreement, including each individual signing on behalf of any such Loan Party or Person, has been fully authorized to do so and to deliver and perform such Amendment Documents, with all such actions having been duly authorized by all requisite company governance actions; (g) the Trust is duly formed and existing, constitutes a revocable trust and the sole trustees of the Trust are Marcil and Carol L. Marcil, with each of them having the full power to bind the Trust and to execute, deliver and

perform the Loan Documents (including the Amendment Documents); and (h) the execution, delivery and performance of the Amendment Documents by such Loan Parties and persons do not require the approval or consent of any other person, any governmental agency or any authority having jurisdiction over such Loan Party or any of the Collateral except for consents or approvals that have been obtained.

6.  **Ratification of Loan Documents and Collateral.** Each Loan Party hereby acknowledges. agrees, represents, ratifies and confirms to Lender that, as of the Effective Date: (a) each of Loan Documents to which it is a party, as such Loan Documents may have been modified by the Amendment Documents. continue to be valid, in full force and effect and enforceable against such Loan Party in accordance with its terms, and such Loan Party remains obligated thereunder, all without any right of offset, counter-claim or defense (other than the defense of actual prior payment or performance thereof pursuant to the Loan Documents); (b) the security interests of Lender in and to the Collateral continue in full force and effect with respect to such Collateral, with such security interests continuing to be in first priority lien therein and are duly perfected (except as to the Pledged Collateral which perfection shall be occur upon the filing of the Financing Statements); and (c) any right to make any claim or assert any defense which would be inconsistent with or contrary to the foregoing statements is hereby unconditionally and irrevocably waived.

7.  **Full Release of Lender.** Each Loan Party, by its execution of this Amendment, on its own behalf and on behalf of its officers, directors, managers, employees, owners, shareholders, partners, joint venturers, insurers, agents, representatives, attorneys, family members and any descendants thereof, all affiliates related thereto, and all persons acting by, through, under, or in concert with any of foregoing persons, hereby unconditionally, irrevocably, fully and finally releases Lender and its subsidiaries, parent companies, affiliates, predecessors, successors and assigns, and all affiliates thereof, and all of their respective officers, directors, employees, managers, trustees, owners, shareholders, partners. joint venturers, insurers, agents, representatives, attorneys, and all persons acting by, through, under, or in concert with any of the foregoing from, and irrevocably and unconditionally waives any claims, rights or remedies with respect to, any and all claims, demands, obligations, liabilities, indebtednesses, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, suits, judgments, executions, debts, rights of setoff, sums of money, accounts, compensations. contracts, controversies, promises, damages, costs, losses and expenses, of every type, kind, nature. description or character, and irrespective of how, why, or by reason of what facts, whether known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, direct or indirect, at contract, tort, at law in equity or otherwise, or arising out of a violation of law or regulations or otherwise, including without limitation, arising directly or indirectly from the Loan, any of the Loan Documents, the negotiation for and execution of the Loan Documents, the administration of the Loan Documents and/or the exercise of any rights and remedies under any of the Loan Documents (the "**Released Claims**"), to the extent any such Released Claims arose prior to, presently exist or may exist, or otherwise could arise in the future based on facts and circumstances which existed as of or prior to the date of this Amendment. It is the intention of each Loan Party that the above release of the Released Claims shall be effective as a full and final release and waiver of each and every matter specifically and generally referred to above, with each Loan Party acknowledging and representing to Lender that it has been advised by independent legal counsel with respect to the agreements contained herein and all applicable laws with respect thereto, including, to the extent California law is deemed to apply to any Loan Party, the provisions of California Civil Code Section 1542, which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." Each Loan Party, being aware of any and all of its statutory rights and protections that may exist under applicable law, expressly waives on its own behalf and on behalf of those for which it is giving the release, any and all rights either may have thereunder, as well as under any other statute or common law principle of similar effect, with respect to any of the matters released herein.

-5-

This release shall act as a release and waiver of all included claims, rights and causes of action, whether such claims are currently known, unknown, foreseen or unforeseen and regardless of any present lack of knowledge as to such claims. Each Loan Party understands and acknowledges the significance and consequence of this waiver of California Civil Code Section 1542, and hereby assumes full responsibility for any injuries, damages, losses, or liabilities being released and waived herein.

8.   **Governing Law; Venue; Jury Waiver and Judicial Reference**.

   a.   Governing Law. This Agreement and the Loan Documents shall be construed in accordance with and governed by the federal laws to which Lender may be subject and otherwise pursuant to the internal laws (without regard to conflict of law provisions thereof) of the State of California.

   b.   Venue. To the fullest extent permitted by applicable law, in the event any judicial action or proceeding is to be brought with respect to the Loan or any Claim (as defined below), the Parties hereby irrevocably and unconditionally submits, for such Party and such Party's assets, to the exclusive jurisdiction of any Court (as defined below) sitting in either Orange County, California; provided that, to the extent deemed necessary or appropriate by Lender with respect to the enforcement and collection of the Loan as against any Loan Party, any pledgor under the Pledge Agreement or any Collateral, such other jurisdiction as Lender may elect, in each case, including any appellate courts from any such jurisdiction,. Each of the Parties hereto hereby irrevocably and unconditionally agrees that all such Claims may be heard and determined in such Court. Each of the Parties hereto agrees that a final judgment as to any Claim shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Loan Party hereby waives any right to file, commence or otherwise remove any Claim to any other jurisdiction, whether another state or federal court. Notwithstanding the foregoing, nothing contained herein shall restrict the right of any Party to commence or bring any Claim in a bankruptcy proceeding under Title 11 of the United States Code. To the fullest extent permitted by applicable law, each Loan Party hereby irrevocably and unconditionally waives, any objection which it may now or hereafter have to the laying of venue of any Claim in any Court residing in Orange County, California, with each Loan Party hereby irrevocably waiving, to the fullest extent permitted by applicable laws, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such Court.

   c.   JURY WAIVER. EACH PARTY HERETO HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY CONTROVERSY, DISPUTE OR CLAIM, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE LOAN, THE AMENDMENT DOCUMENTS, THE OTHER LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY AND HEREBY, ANY ACTIONS OR FAILURE TO ACT BY ANY PARTY WITH RESPECT HERETO OR THERETO (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, EACH A "**CLAIM**"). FOR AVOIDANCE OF DOUBT AND WITHOUT LIMITING THE FOREGOING, THE PARTIES AGREE THAT THE DEFINITION OF "CLAIM" AS USED HEREIN INCLUDES BUT IS NOT LIMITED TO, MATTERS ARISING FROM OR RELATING TO ANY ACCOUNTS, AN APPLICATION FOR OR DENIAL OF CREDIT, ANY ADVANCE, ANY WARRANTIES AND REPRESENTATIONS MADE BY A PARTY, THE ADEQUACY OF A PARTY'S DISCLOSURES, ENFORCEMENT OF ANY AND ALL OF THE OBLIGATIONS A PARTY MAY HAVE TO ANOTHER PARTY, COMPLIANCE WITH ANY APPLICABLE LAWS, THE APPROVAL, CONSENT OR ACCEPTANCE, OR THE LACK OF SAME BY LENDER WITH RESPECT TO THE LOAN OR THE LOAN DOCUMENTS, THE

-6-

OCCURRENCE OF OR ANY DISPUTE WITH RESPECT TO THE OCCURRENCE OF ANY MATERIAL ADVERSE CHANGE, UNMATURED EVENT OF DEFAULT OR EVENT OF DEFAULT, INCLUDING WITHOUT LIMITATION DISPUTES BASED ON OR ARISING FROM ANY ALLEGED TORT OR MATTERS INVOLVING THE EMPLOYEES, OFFICERS, AGENTS, AFFILIATES, OR ASSIGNS OF A PARTY HERETO.   EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

d.    Judicial Reference. In the event any Claim is filed in a court of the state of California (the "**Court**") and the waivers set forth in Section 2 are not enforceable in such action or proceeding, the Parties hereto agree as follows:

(i)    Claims Heard by Referee in Reference Proceeding. With the exception of the matters specified in clause (ix) below, any and all Claims shall be heard by a referee and resolved by a reference proceeding pursuant to California Code of Civil Procedure (the "**CCP**") Sections 638 through 645.1.

(ii)    Referee Qualifications and Selection.   The referee shall be a retired California state court judge or justice. The Parties shall not seek to appoint a referee that may be disqualified pursuant to CCP Section 641 or 641.2 without the prior written consent of all Parties. If the Parties are unable to agree upon a referee within ten (10) calendar days after one Party serves a written notice of intent for judicial reference upon the other Party or Parties, then the referee will be selected by the Court in accordance with CCP Section 640(b).

(iii)    Court Reporter; Costs. All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except when any Party so requests, a court reporter will be used and the referee will be provided a courtesy copy of the transcript. The Party making such request shall have the obligation to arrange for and pay costs of the court reporter, provided that such costs, along with the referee's costs, shall ultimately be borne by the Party who does not prevail, as determined by the referee.

(iv)    Reference Rules and Procedure; Binding Effect of Referee's Decision. The referee shall conduct the proceedings in accordance with the CCP, the Rules of Court, and California Evidence Code, except as otherwise specifically agreed by the Parties and approved by the referee. The referee may require one or more prehearing conferences. The Parties hereto shall be entitled to discovery, and the referee shall oversee discovery in accordance with the Rules of Discovery and may enforce all discovery orders in the same manner as any trial court judge in proceedings at law in the state of California. The referee shall apply the rules of evidence applicable to proceedings at law in the state of California and shall determine all issues in accordance with applicable state and federal law. The referee shall be empowered to enter equitable as well as legal relief and rule on any motion which would be authorized in a trial, including motions for default judgment or summary judgment. The referee shall render a written statement of decision. The referee's statement of decision shall set forth findings of fact and conclusions of law. The decision of the referee shall be entered as a judgment in the court in accordance with the provisions of CCP Sections 644 and 645. The decision of the referee shall be appealable to the same

-7-

*Marcil Loan*
*Loan Amendment*

extent and in the same manner that such decision would be appealable if rendered by a judge of the superior court.

(v)    Referee Jury Waiver. The Parties recognize and agree that all claims resolved in a reference proceeding pursuant hereto will be decided by a referee and not by a jury.

(vi)    Fees and Costs During Reference Proceeding; Prevailing Party. During the pendency of any Claim which is submitted to judicial reference in accordance with this Agreement, each of the Parties to such Claim shall bear equal shares of the fees charged and costs incurred by the referee in performing the services described in this Agreement. The compensation of the referee shall not exceed the prevailing rate for like services. The prevailing Party shall be entitled to reasonable court costs and legal fees, including customary attorney fees, expert witness fees, paralegal fees, the fees of the referee, and other reasonable costs and disbursements charged to such Party by its counsel and the fees set forth in Section 3.3 above, in such amount as is determined by the referee.

(vii)    Third Parties. If any other Person not a Party becomes a party to with respect to any Claim (such as but not limited to a credit reporting agency, merchant accepting a credit card, junior lienholder or title company, contractor, subcontractor or assignee), each Party hereto agrees to consent to including that third party in judicial reference proceeding for prosecuting, defending and/or resolving the Claim with that party.

(viii)    REFERENCE AGREEMENT. THIS AGREEMENT CONSTITUTES A "REFERENCE AGREEMENT" BETWEEN OR AMONG THE PARTIES WITHIN THE MEANING OF AND FOR PURPOSES OF CCP SECTION 638.

(ix)    Self-Help Remedies. Nothing in this Agreement shall be deemed to apply to or limit the right of Lender (a) to exercise self-help remedies, (including, without limitation, setoff), (b) to foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, (c) to obtain from a court provisional or ancillary remedies (including, without limitation, injunctive relief, a temporary restraining order, a writ of possession, a writ of attachment, prejudgment attachment, a protective order or the appointment of a receiver) or (d) to pursue rights against a Party in a third-party proceeding in any action brought against Lender (including actions in bankruptcy court). Lender may exercise the rights set forth in the foregoing clauses (a) through (d), inclusive, before, during or after the pendency of any judicial reference proceeding. Neither the exercise of self-help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies nor the opposition to any such provisional remedies shall constitute a waiver of the right of any Party, including, but not limited to, the claimant in any such action, to require submission to judicial reference the merits of the Claim occasioning resort to such remedies. No provision in the Loan Documents regarding submission to jurisdiction and/or venue in any court is intended or shall be construed to be in derogation of the provisions in this Agreement or any other Loan Document.

(x)    Multiple Claims. If a Claim includes multiple claims, some of which are found not subject to this Agreement, the Parties shall, to the extent permitted under Applicable Law, stay the proceedings of the Claims or part or parts thereof not subject to this Agreement until all other Claims or parts thereof are resolved in accordance with this Agreement. If there are Claims by or against multiple parties, some of which are not

-8-

subject to this Agreement, the Parties shall, to the extent permitted by Applicable Law, sever the Claims subject to this Agreement and resolve them in accordance with this Agreement.

9.    **Miscellaneous.**

a.    Waivers. Each Loan Party hereto hereby waives, to the maximum extent permitted under applicable law, (i) the right to litigate in court or arbitrate any Claim as a class action, either as a member of a class or as a class representative, or to act as a private attorney general and (ii) any right such Loan Party may have against Lender to any special, exemplary, punitive or consequential damages other than, or in addition to, actual damages, regarding any Claim.

b.    Further Assurances. Each Loan Party covenants and agrees with Lender that it will execute, deliver, and provide to Lender such additional agreements, documents, and instruments as reasonably required by Lender to effectuate the intent of the Parties as described in herein or otherwise correct any scrivener errors therein.

c.    Entire Agreement, Change, Discharge, Termination, or Waiver. The Loan Documents, as modified this Amendment, and as otherwise amended, restated, or modified, contain the entire understanding and agreement of the Parties hereto with respect to the subject matter thereto and hereto, and supersede all prior representations, warranties, agreements, arrangements and understandings. No Loan Document may be further changed, discharged, supplemented, terminated, or waived except in writing signed by Lender and the Loan Party a party thereto. To the extent there are any inconsistencies between the Loan Documents and this Amendment, this Amendment shall control.

d.    Binding Effect. The Loan Documents as modified by this Amendment are binding upon and inure to the benefit of the Parties and their respective successors and assigns to the extent any such assignment is permitted under the Loan Documents.

*[Remainder of Page Intentionally Blank – Signature Pages Follow]*

*617572957*

*Marcil Loan
Loan Amendment*

IN WITNESS WHEREOF, the undersigned have entered into this Amendment as of the Effective Date.

LENDER:

NANO BANC,
a California corporation

By:

Name: Daniel Patrick

Title: SVP

[*Signatures Continue on Following Pages*]

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the Effective Date.

**BORROWER:**

_____

Gerald J. Marcil, individually and as Authorized Trustee of, and on behalf of, the Marcil Family Trust established May 9, 1997

_____

Carol L. Marcil, Authorized Trustee of, and on behalf of, the Marcil Family Trust established May 9, 1997

[*End of Signatures*]

617572957

*Marcil Loan*
*Loan Amendment*

## SPOUSAL CONSENT

The undersigned ("**Spouse**"), being the spouse of Gerald J. Marcil ("**Marcil**"), individually and on behalf of the community property estate of Spouse and Marcil, having read and understood the Amendment to which this Spousal Consent is attached hereby consents to Marcil's execution, delivery and performance of the Loan Documents, including the Amendment Documents, and acknowledges that, by virtue of the marital estate, Spouse may acquire an interest in certain in certain property of Marcil which constitutes community property or Trust property, including the Pledged Collateral (the "**Property**"). Being fully apprised of the foregoing, Spouse does hereby forever agree, unconditionally and irrevocably:

1.    Subordinate and subject any rights, titles, or interests of Spouse in and to the Property, together with replacements and additions thereto, to Lender's security interests in and to the Property, and Lender's rights and remedies with respect thereto;

2.    Consent to all terms and conditions of, as well as all obligations of Marcil and the Trust arising under, the Loan Documents, and agree that any and all such obligations may be satisfied out of or applied against any property or other interest Spouse owns or may own at any time, now and forever;

3.    Subordinate all rights, titles, and interest in the Property that Spouse may have in and to the Property, to the rights, title and interests of Lender therein and thereto and covenant and agree not to assert, by suit or otherwise, any claim or right Spouse may have or hereafter acquire in any Property or as against Marcil, or against Lender;

4.    Acknowledge that Lender is relying on this Consent in agreeing to the Amendment Documents and accepting the Collateral as security for the Loan;

5.    Acknowledges that this Consent satisfies any and all requirements and conditions set forth in the organizational documents of the Companies with respect to the transfer of the Collateral to Lender as additional security for the Loan, with Spouse waiving any claim to the contrary, with the Spouse acknowledging and agreeing that Spouse has authorized the execution, delivery and performance of the Amendment Documents, and the granting of security interests therein in accordance with therewith.

6.    Agree that Lender and Borrower may agree to modify the Loan from time to time without notice to or the consent of Spouse and such modification shall not affect, invalidate or otherwise impair this Consent, with this Consent continuing to be valid and enforceable notwithstanding;

8.    Agree not to take any action or make any claim that would hinder, delay, interfere with or frustrate the payment and performance of the Loan Parties under the Loan Documents or by any other person who is a party to the Pledge Agreement, or otherwise hinder, delay, interfere with or frustrate the exercise by Lender of its rights and remedies under the Loan Documents, including as against any of the Property.

9.    Agree, consent to and authorize all actions taken by Marcil, whether as the trustee of the Trust or otherwise on behalf of any Loan Party, any Pledgor or any affiliate thereof, including Woodglen, (whether as a manager, member or otherwise), with respect to the execution, delivery, consummation and performance of Amendment Documents, including this Agreement and the pledge of the Pledged Collateral (as defined in the Pledge Agreement) pursuant to the Pledge Agreement.

10.    Agree that this Consent and the undersigned are subject to, and bound by the governing law, jury waiver, judicial reference and venue provisions set forth in the Amendment.

IN WITNESS WHEREOF, Spouse has executed this Consent as of the date of the Amendment to which this Consent is attached.

CAROL L. MARCI, individually and as a Trustee of the Marcil Family Trust established May 9, 1997

# PLEDGE AND SECURITY AGREEMENT

Dated as of September 12, 2025

By

## PLEDGORS:

GERALD J. MARCIL, THE MARCIL FAMILY TRUST, established on May 9, 1997, and WOODGLEN APTS., LLC, a California limited liability company

## LENDER AND SECURED PARTY:

NANO BANC, a California corporation

*Marcil Loan*
*Pledge Agreement*

## PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (this "**Agreement**") entered into as of September 12, 2025 by THE MARCIL FAMILY TRUST, established on May 9, 1997 ("**Trust**"), Gerald J. Marcil, individually and as an authorized trustee of the Trust ("**Marcil**"), Carol L. Marcil, as an authorized trustee of the Trust, and Woodglen Apts., LLC, a California limited liability company ("**Woodland**" and with the Trust, Marcil and Carol L. Marcil, individually and collectively, "**Pledgor**" or "**Pledgors**") to and in favor of NANO BANC, a California corporation ("**Lender**"). The address of Pledgors is 43D Malaga Cove Plaza, Palos Verdes Estates, CA 90274.

### RECITALS

A.      Lender has made a Loan to the Trust and Marcil in the stated maximum principal commitment amount of \$19,184,817.74, Loan No. 7000399600 (the "**Loan**"). Concurrently herewith, Lender, Marcil and the Trust (as the obligors thereunder, collectively, "**Borrower**") are entering into that certain Loan Amendment dated as of even date herewith (the "**Amendment**"). All initial capitalized terms not otherwise defined herein shall mean as defined in the Amendment.

B.      Monterra Investment LP, a California limited partnership ("**Monterra**") is a limited partnership formed under the laws of the State of California, the business and affairs of which are governed by an Agreement of Limited Partnership (the "**Monterra Partnership Agreement**"). As of the date hereof, collectively, the Pledgors hold 100% of the limited partnership interests and the general partnership interests in and to Monterra and there are no other partners or other direct interest holders in Monterra, with the Pledgors constituting all of the partners of, and direct interest holders in, Monterra.

C.      Arrowhead Stanton Apartments, LP, a California limited partnership ("**Arrowhead**") is a limited partnership formed under the laws of the State of California, the business and affairs of which are governed by an Agreement of Limited Partnership (the "**Arrowhead Partnership Agreement**"). As of the date hereof, collectively, the Pledgors hold 100% of the limited partnership interests and the general partnership interests in and to Arrowhead and there are no other partners or other direct interest holders in Arrowhead, with the Pledgors constituting all of the partners of, and direct interest holders in, Arrowhead. Monterra and Arrowhead are individually and collectively referred to as the "**Company**", with the singular meaning the plural and the plural thereof including the singular. The Monterra Partnership Agreement and the Arrowhead Partnership Agreement are individually and collectively referred to as the "**Partnership Agreement**", with the singular meaning the plural and the plural thereof including the singular.

D.      As a condition precedent to entering into the Amendment on the terms and conditions set forth therein, Lender requires, and Pledgors are willing to, enter into this Agreement on the terms and conditions set forth below.

*61757383*                                            2                                    *Marcil Loan*
                                                                                      *Pledge Agreement*

## AGREEMENT

NOW, THEREFORE, based on the foregoing recitals, the accuracy of which are hereby acknowledged by Pledgors, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Pledgors, Pledgors hereby agree as follows:

1.     **Defined Terms**. In addition to the defined terms set forth elsewhere herein and in the Amendment, as used in this Agreement, the following terms have the meanings set forth in or incorporated by reference below:

"**Code**" means the Uniform Commercial Code from time to time in effect in the State of California.

"**Liens**" shall mean any and all liens or encumbrances, whether voluntarily or involuntarily created by agreement, contract or instrument, or by operation of law.

"**Obligations**" means all of the payment and performance obligations and liabilities of Borrower with respect to the Loan, all as set forth in the Loan Documents (as amended by the Amendment).

"**Partnership Interests**" means any and all of the partnership and equity interests held by Pledgors in each of the Companies, including all claims, powers, privileges, benefits, economic interests and rights, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by each of the Companies pursuant to and in accordance with the Partnership Agreement.

"**Person**" means a natural person, a partnership, a joint venture, an unincorporated association, a limited liability company, a corporation, a trust, any other legal entity, or any governmental agency, department or other authority.

"**Proceeds**" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the Code.

"**Pledged Collateral**" has the meaning ascribed to such term in Section 2 of this Agreement.

"**Pledgor**" or "**Pledgors**" has the meaning ascribed to such term in the introductory paragraph.

"**Permitted Ownership Liens**" means the Liens and other rights in favor of Lender created by this Agreement.

The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.  The word "including" when used in this Agreement shall be deemed to be mean and include "but not limited to."

2.     **Pledge; Grant of Security Interest**. As additional collateral for the Loan, and the payment and performance of all of the Obligations of Borrower under the Loan Documents, as and when such

3

*Marcil Loan*
*Pledge Agreement*

Obligations are required to be paid or performed (whether at the stated maturity, by acceleration or otherwise), Pledgor hereby pledges, assigns and grants to Lender a first priority security interest in all of their respective rights, titles, interests, privileges, claims and remedies with respect to the following, whether now owned or existing or hereafter acquired or arising (collectively, the "**Pledged Collateral**"):

2.1   All of the Partnership Interests of Pledgors;

2.2   All securities, security certificates, moneys or property representing the Partnership Interests, or representing dividends, distributions or interest on any of the Partnership Interests, or representing a distribution in respect of any of the Partnership Interests, or resulting from a split-up, revision, reclassification or other like change of any of the Partnership Interests or otherwise received in respect of or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, any of the Partnership Interests;

2.3   All proceeds, loss payments and premium refunds which may become payable with respect to any policy of insurance payable by reason of loss or damage to any of the Partnership Interests and any other Pledged Collateral;

2.4   all "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the Code) constituting or relating to the foregoing; and

2.5   all Proceeds of any of the foregoing property of Pledgor.

3.   **Representations and Warranties**. Each Pledgor represents and warrants as of the date hereof that:

3.1   No authorization, consent of or notice to or filing with any other Person (including any member, partner or creditor of Pledgor) that has not been obtained, is required (a) in connection with the execution, delivery, performance, validity or enforceability of this Agreement including the assignment and transfer by Pledgor of any of the Pledged Collateral to Lender or, to Pledgor's knowledge, the subsequent transfer thereof by Lender pursuant to the terms hereof; or (b) for the exercise by Lender of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement (except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally and except as may be required by laws affecting the exercise of remedies in respect of collateral generally);

3.2   Except for the Partnership Agreement, there are no documents which evidence or govern the Pledged Collateral and the rights, title, interests and remedies of Pledgor with respect thereto;

3.3   The Partnership Interests in each case constitute all the issued and outstanding ownership, economic, financial and management interests of Pledgor and, except for the Pledged Collateral, Pledgor has no other rights, titles, interests in or to, nor claims against, the Company;

3.4   There currently exist no certificates, instruments or writings representing the Partnership Interests;

3.5   The Partnership Interests are not subject to Article 8 of the UCC;

4

3.6     Pledgor has not assigned or sold any of the Pledged Collateral and Pledgor is the record and beneficial owner of, and has good title to, the Pledged Collateral, free and clear of any and all Liens, pledges, or options in favor of, or claims of, any other Person, except the Permitted Ownership Liens;

3.7     Upon the filing of the UCC-1 financing statement referred to in Section 9 with the California Secretary of State, the Liens in and to the Pledged Collateral granted pursuant to this Agreement will constitute a valid, perfected, first priority Lien in and to the Pledged Collateral, enforceable as such against all creditors of Pledgor and any Persons purporting to purchase any or otherwise obtain any rights in and to the Pledged Collateral;

3.8     The principal place of business and office of Pledgors and each Company is as set forth in the initial paragraph of this Agreement;

3.9     The correct legal names of each of the Pledgors is, and at all times has been, as set forth in the introductory paragraph to this Agreement, is the same as identified in the books and records of the Company, there are no other ownership, equity, economic or financial interests in and to the Company other than the Partnership Interests and the Pledged Collateral constitutes all of the ownership, equity, economic or financial interests in and to the Company held by Pledgors;

3.10    Woodglen is, and at all times has been, organized exclusively under the laws of the State of California;

3.11    Marcil is a California resident and the Trust was duly formed in California and constitutes a revocable trust created under the laws of the State of California;

3.12    The Company is, and at all times has been, organized exclusively under the laws of the State of California; and

3.13    Marcil is a member of Woodglen and is the sole manager of Woodglen. Carol L. Marcil is also a member of Woodglen. Marcil and Carol L. Marcil are the only members of Woodglen and are authorized to execute this Pledge Agreement on behalf of Woodglen, with Woodglen being bound hereby upon such execution.

4.      **Covenants.** Each Pledgor covenants and agrees with Lender, from and after the date of this Agreement until that date upon which repayment in full of the Obligations has occurred, as follows:

4.1     Without the prior written consent of Lender, except for the Permitted Ownership Liens, Pledgor shall not, directly or indirectly (a) vote to enable, or take any other action to permit, the Company to issue any additional limited partnership interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any limited partnership interests in the Company, (b) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Collateral, or (c) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Pledged Collateral, or any interest therein. Pledgor will not create, incur or permit to exist any Lien or claim on or to the Pledged Collateral (other than the Permitted Ownership Liens), will defend, at its sole cost and expense, the Pledged Collateral against any Lien or claim thereon or thereto (other than the Permitted Ownership Liens), and will take all such other action as is necessary to remove, any such Lien or claim on or to the Pledged Collateral, and will defend the first in priority collateral rights, titles and security interests of Lender in, to and under the Pledged Collateral against any and all

claims and demands of any other Persons whomsoever (other than claims or demands asserted by Lender) with respect thereto, each at Pledgors' sole cost and expense.

4.2     At any time and from time to time, upon the written request of Lender, and at the sole expense of Pledgors, Pledgors shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as Lender may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including filing UCC financing or continuation statements; provided that the obligations of Pledgor hereunder shall not be increased and any of the rights of Pledgors hereunder shall not be decreased by such documents and instruments. Subject to the limitations set forth in the Amendment with respect thereto, Pledgors hereby authorize Lender to file any such financing statement or continuation statement without the signature of Pledgor to the extent permitted by law. If any amount payable under or in connection with any of the Pledged Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such note, instrument or chattel paper shall be promptly delivered to Lender, duly endorsed in a manner reasonably satisfactory to Lender, to be held as Pledged Collateral pursuant to this Agreement.

4.3     Pledgors shall not, unless (a) they shall have given at least ten (10) days' prior written notice to such effect to Lender and (b) all action as Lender may reasonably request to protect and perfect the liens and security interests intended to be created hereunder with respect to the Partnership Interests shall have been taken pursuant to above Section 4.2, (i) change the location of their chief executive office or principal place of business from that specified in this Agreement, (ii) change their name, identity or structure, or (iii) convert to another type of entity, reorganize or reincorporate under the laws of another jurisdiction.

4.4     Pledgor shall pay, and save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Pledged Collateral or in connection with any of the transactions contemplated by this Agreement.

4.5     Pledgor shall not cause or permit any Pledged Collateral to be represented or evidenced by any certificates, instruments or writings without the prior written consent of Lender.

4.6     Pledgor shall not cause or permit any Pledged Collateral to be subject to Article 8 of the UCC without the prior written consent of Lender.

4.7     At any time an Event of Default has occurred and is continuing, if Pledgor, as a result of its ownership of the related Partnership Interests or any of the other Pledged Collateral, is or becomes entitled to receive, or shall receive, (a) any funds, Distributions or Proceeds on account of any of the Pledged Collateral, (b) any stock, partnership or limited partnership certificates, as applicable (including any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), and (c) option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any of the Partnership Interests, or otherwise in respect thereof, Pledgor shall accept the same as Lender's agent, hold the same in trust for Lender and deliver the same forthwith (but no later than within five (5) days) to Lender in the exact form received, duly endorsed by Pledgor to Lender, if required, together with an undated stock, limited partnership or partnership power covering such certificate duly executed in blank to be held by Lender hereunder as additional security for the Obligations. Any sums paid upon or in respect of the Partnership Interests upon the

61757383                                              6                                    *Marcil Loan*
                                                                                          *Pledge Agreement*

liquidation or dissolution of the Company shall be paid over to Lender to be held by it hereunder as additional security for the Obligations and distributed in accordance with the provisions of the Loan Documents, and in case any distribution of capital shall be made on or in respect of the Partnership Interests or any property shall be distributed upon or with respect to the Partnership Interests pursuant to the recapitalization or reclassification of the capital of the Company or pursuant to the reorganization thereof, the property so distributed shall be delivered to Lender to be held by it, subject to the terms hereof, as additional security for the Obligations and distributed in accordance with the provisions of the Loan Documents. If any sums of money or property so paid or distributed in respect of the Pledged Collateral shall be received by Pledgor, Pledgor shall deliver the same forthwith but not later than within five (5) days to Lender and, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of Pledgor, as additional security for the Obligations.

5 **Distributions; Cash Dividends; Voting Rights**. So long as no Event of Default exists, the Company may make distributions to Pledgors in the ordinary course of operations; provided that (a) in the event of any capital event with respect to any of the assets of the Company, including any sale of any asset or the refinancing of any asset, the Company shall not distribute any of the proceeds thereof to Pledgors, whether as a distribution or otherwise, but instead shall deliver such proceeds to Lender and (b) at any time an Event of Default has occurred and is continuing, the Company shall not make any distribution, dividend or other payment to any Pledgor but shall, instead, deliver such amounts to Lender. Any amounts received by Lender pursuant to this Section shall be applied to the Obligations by Lender, with such application to be applied first to any then accrued but unpaid costs, charges and expenses then owing to Lender, then to the past due amounts which were deferred pursuant to the Amendment, and, then to the then outstanding principal balance of the Loan. No Pledgor shall exercise all management, voting and other consensual rights and limited partnership rights and interests with respect to the Partnership Interests, exercise any and all other rights with respect to the Partnership Interests, or take, or fail to take, any other action, which would result in (1) a violation of any of the covenants set forth in this Agreement, (2) a failure of any representation and warranty set forth herein, (3) an impairment of the Pledged Collateral, or (4) the interference, impairment or frustration of any rights and remedies of Lender with respect to the Pledged Collateral.

6 **Rights and Remedies of Lender**.

6.1 At any time an Event of Default has occurred and is continuing, (a) Lender shall have the right to receive any and all Distributions to which Pledgors are entitled, together with any other income, cash dividends, proceeds or other property received or paid in respect of the Partnership Interests and the other Pledged Collateral, to receive and apply all such amounts received to the Obligations, in such order and priority as Lender may elect except as otherwise provided below); (b) all such Partnership Interests shall, at Lender's option, be registered in the name of Lender or its nominee (if not already so registered); (c) Lender or its nominee may thereafter exercise all of the rights and remedies of Pledgor with respect to the Pledged Collateral pursuant to the Partnership Agreement and/or applicable law, including all rights and remedies of a secured party under the Code, including conducting of a private sale as set forth below in Section 7, and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership of Pledgors pertaining to the Pledged Collateral as if Lender were the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right); (d) Lender may make any reasonable compromise or reasonable settlement deemed desirable with respect to any of the Pledged Collateral and may extend the time of payment,

arrange for payment in installments, or otherwise modify the terms of, any of the Pledged Collateral; and (e) Lender in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Pledged Collateral, but in each case, shall be under no obligation to do so. Without limiting the generality of the foregoing, upon the occurrence and during the continuance of an Event of Default, Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except as required by law or otherwise required hereby or by any other Loan Document) to or upon Pledgor, the Company, or any other Person (all and each of which demands, presentments, protests, advertisements and notices, or other defenses, are hereby waived to the extent permitted under applicable law), may in such circumstances forthwith collect, receive, appropriate and realize upon the Pledged Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Pledged Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best in its sole discretion, for cash or on credit or for future delivery, all without any assumption of any credit risk. Lender shall have the right, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be adjourned without further notice. Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Pledged Collateral so sold, free of any right or equity of redemption of Pledgor, which right or equity of redemption is hereby waived or released. Lender shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Pledged Collateral or in any way relating to the Pledged Collateral or the rights of Lender hereunder, including attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Lender may elect (except as otherwise provided herein), and only after such application and after the payment by Lender of any other amount required by any provision of law, including Sections 9-610 and 9-615 of the Code, shall Lender be required to account for the surplus of such Proceeds, if any, to Pledgor. To the extent permitted by applicable law, Pledgor waives all claims, damages and demands it may acquire against Lender arising out of the exercise by Lender of any of its rights hereunder, except for any claims, damages and demands it may have against Lender arising from the breach of any Loan Document (as finally determined by a court of competent jurisdiction), or the willful misconduct or gross negligence of Lender or its affiliates, any agents, employees, officers, directors, shareholders or other representatives of the foregoing. If any notice of a proposed sale or other disposition of Pledged Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least forty-five (45) days before such sale or other disposition.

6.2     The rights and remedies of Lender under this Agreement shall not be conditioned or contingent upon the pursuit by Lender of any right or remedy against Pledgor or against any other Person which may be or become liable in respect of all or any part of the Obligations or against any other security therefor, guarantee thereof or right of offset with respect thereto. Lender shall not be liable for any failure to demand, collect or realize upon all or any part of the Pledged Collateral or for any delay in doing so, nor shall it be under any obligation to sell or otherwise dispose of any Pledged Collateral upon the request of Pledgor or any other Person or to take any other action whatsoever with regard to the Pledged Collateral or any part thereof.

61757383                                            8                                    *Marcil Loan*
                                                                                         *Pledge Agreement*

6.3     The powers conferred on Lender hereunder are solely to protect Lender's interest in the Pledged Collateral and shall not impose any duty upon Lender to exercise any such powers. Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees shall be responsible to Pledgor for any act or failure to act hereunder, except for its or their breach of any Loan Document (as finally determined by a court of competent jurisdiction), gross negligence or willful misconduct.

6.4     The rights, powers, privileges and remedies of Lender under this Agreement are cumulative and shall be in addition to all rights, powers, privileges and remedies available to Lender at law or in equity. All such rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of Lender hereunder.

7       **Private Sales**.

7.1     Pledgor recognizes that Lender may be unable to effect a public sale of any or all of the Pledged Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the Company or Pledgor to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the Company or Pledgor would agree to do so. Pledgor further shall use its commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Partnership Interests pursuant to this Section 7 valid and binding and in compliance with any and all other requirements of applicable law. Pledgor further agrees that a breach of any of the covenants contained in this Section 7 will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 7 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and/or is continuing under the Loan Documents.

7.2     Lender shall not incur any liability as a result of the sale of any Pledged Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Pledged Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Pledgor hereby waives any claims against Lender arising by reason of the fact that the price at which any of the Pledged Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if Lender accepts the first offer received and does not offer any Pledged Collateral to more than one offeree, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

7.3     The Code states that Lender is able to purchase the Partnership Interests only if they are sold at a public sale. Lender has advised Pledgor that SEC staff personnel have issued various no-action letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the Code, yet not public for purposes of Section 4(2) of the Securities Act of 1933. The Code permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Article 9. Pursuant to the Code, Pledgor specifically agrees (a) that it shall not raise any objection to Lender's purchase of the Pledged Collateral (through bidding on the obligations or otherwise) and (b) that a foreclosure sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the Code; (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Partnership Interests under the Securities Laws, even if Pledgor or the Company agrees to pay all costs of the registration process; and (iii) shall be considered to be commercially reasonable notwithstanding that Lender purchases the Partnership Interests at such a sale.

7.4     Pledgor agrees that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any of the Pledged Collateral sold by Lender pursuant to this Agreement. Lender, may, in its sole discretion, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers. Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

7.4.1     Lender conducts the foreclosure sale in the State of Delaware;

7.4.2     The foreclosure sale is conducted in accordance with the laws of the State of California;

7.4.3     Not less than forty-five (45) days in advance of the foreclosure sale, Lender notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale;

7.4.4     The foreclosure sale is conducted by an auctioneer licensed in the State of California and is conducted in front of a California State Court having jurisdiction over the Pledged Collateral on any business day between the hours of 9 a.m. and 5 p.m. Eastern Time;

7.4.5     The notice of the date, time and location of the foreclosure sale is published in The New York Times or The Wall Street Journal (or if The New York Times and The Wall Street Journal are no longer publishing, such other newspaper widely circulated in Chicago, Illinois) for seven (7) consecutive days prior to the date of the foreclosure sale, and;

7.4.6     Lender sends notification of the foreclosure sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the State of California conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

8      **Limitation on Duties Regarding Pledged Collateral**. Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Pledged Collateral in its possession, under Section 9-207 of the Code or otherwise, shall be to deal with it in the same manner as Lender deals with similar securities and property for its own account. Neither Lender nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Pledged Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Pledged Collateral upon the request of Pledgor or otherwise.  Pledgor also authorizes Lender, at any time and from time to time following and during the continuance of an Event of Default, to execute, in connection with the sale provided for in Section 6 or 7, any endorsements, assignments or other instruments of conveyance or transfer as are required with respect to the Pledged Collateral.

9      **Financing Statements; Other Documents**. Pledgor hereby authorizes Lender to file UCC-1 financing statements with respect to the Pledged Collateral. Pledgor agrees to deliver any other document or instrument which Lender may reasonably request with respect to the Pledged Collateral for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted; provided that such other document or instrument does not increase Pledgor's obligations nor decrease Pledgor's rights hereunder. Without limiting the generality of the foregoing, Pledgor hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name Pledgor as debtor and Lender as secured party and that cover the Pledged Collateral. Pledgor also hereby ratifies the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof.

10     **Attorney-in-Fact**. Without limiting any rights or powers granted by this Agreement to Lender, upon the occurrence and during the continuance of an Event of Default, Lender is hereby appointed, which appointment as attorney-in-fact is irrevocable and coupled with an interest, the attorney-in-fact of Pledgors for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which Lender may reasonably deem necessary or advisable to accomplish the purposes hereof including:

10.1    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Pledged Collateral;

10.2    to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with Section 10.1;

10.3    to file any claims or take any action or institute any proceedings that Lender may deem necessary or reasonably desirable for the collection of any of the Pledged Collateral or otherwise to enforce the rights of Lender, with respect to any of the Pledged Collateral; and

10.4    to execute, in connection with the sale provided for in Sections 6 or 7, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Pledged Collateral.

If requested by Lender, Pledgors shall ratify and confirm any such sale or transfer by executing and delivering to Lender at Pledgors' expense all proper and reasonable deeds, bills of sale, instruments of assignment, conveyance of transfer and releases as may be designated in any such request. Following the repayment in full of the Obligations, Lender shall, at the sole cost and expense of Pledgors, execute such documentation as is reasonable and customary to evidence the termination of the power to act as attorney-in-fact for Pledgors.

11   **Miscellaneous**.

11.1   Severability. Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.2   Headings. The headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

11.3   No Waiver; Cumulative Remedies. Lender shall not by any act (except by a written instrument pursuant to Section 11.4), delay, indulge, omit or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Lender would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers or privileges provided by law.

11.4   Irrevocable Authorization and Instruction to the Company. Pledgors hereby authorize and instruct the Company to comply with any instruction received by it from Lender in writing that (a) states that an Event of Default has occurred and is continuing and (b) is otherwise in accordance with the terms of this Agreement.  The Company shall be entitled to rely on and comply with any such instructions from Lender, without regard to any other or further instructions or demands from Pledgor.

11.5   Additional Waivers. Notwithstanding anything herein to the contrary, Pledgor hereby absolutely, unconditionally, knowingly, and expressly waives, to the fullest extent permitted by law:

11.5.1   Any right it may have to revoke this Agreement as to future indebtedness;

11.5.2   (a) notice of acceptance hereof; (b) notice of any loans or other financial accommodations made or extended under the Loan Documents or the creation or existence of any Pledged Collateral; (c) notice of the amount of the Obligations; (d) notice of any adverse change in the financial condition of the Pledgor or of any other fact that might increase such Pledgor's risk hereunder; (e) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (f) in its capacity as Pledgor hereunder, notice of any default or Event of Default, except as may be expressly required under the Loan Documents; and (g) all other notices and demands to which Pledgor, in its capacity as Pledgor hereunder, might otherwise be entitled (except to the extent required hereunder or in any other Loan Document;

11.5.3   its right, if any, to require Lender to institute suit against, or to exhaust any rights and remedies which Lender has or may have against, any third party, or against any

collateral provided by any third party; and Pledgor further waives any defense arising by reason of any disability or other defense or by reason of the cessation from any cause whatsoever of the liability of the any third party in respect thereof;

11.5.4    (a) any rights to assert against Lender any defense (legal or equitable), set-off, counterclaim (excluding mandatory counterclaims), or claim which Pledgor may now or at any time hereafter have against any party liable to Lender; (b) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Pledged Collateral or any security therefor; and (c) any defense Pledgor has to performance hereunder (excluding actual performance), and any right Pledgor has to be exonerated, arising by reason of: (i) the alteration by Lender of the Pledged Collateral; or (ii) the acceptance by Lender of anything in partial satisfaction of the Obligations; and

11.5.5    any defense arising by reason of or deriving from (a) any claim or defense based upon an election of remedies by Lender; or (b) any election by Lender under the Bankruptcy Code, to limit the amount of, or any collateral securing, its claim against Pledgor.

11.6    Attorney's Fees. In addition to and without limitation of any right to their fees and costs as set forth in any other Loan Document, Lender shall be obligated to pay to Lender within ten (10) days of demand therefor, all of Lender's reasonable costs and expenses actually incurred by them in connection with the exercise of any of its rights and remedies under this Agreement, including reasonable attorneys' and costs.

11.7    Demand to Perform; Default Rate. If Pledgor fails to perform or comply with any of its agreements contained herein for more than ten (10) days following written notice of such failure to Pledgor and Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of Lender incurred in connection with such performance or compliance, together with interest at the default rate of interest set forth in the Loan Documents if such expenses are not paid within ten (10) days of demand, shall be payable by Pledgor to Lender within ten (10) days of demand and shall constitute obligations secured hereby.

11.8    Release and Termination of Security Interests. Upon repayment in full of the Obligations, Lender's rights under this Agreement shall automatically terminate, and, at the request of Pledgor and at Pledgor's sole cost and expense, Lender shall promptly execute and deliver to Pledgor UCC-3 termination statements and other documents and agreements to release Lender's Lien on the Pledged Collateral, to terminate this Agreement and all of Lender's rights under this Agreement, including any power of attorney granted to Lender pursuant to this Agreement, and all other Loan Documents and deliver any and all certificates evidencing the Partnership Interests and any powers relating thereto to Pledgors.

11.9    JURY WAIVER; GENERAL TERMS. This Agreement constitutes a Loan Document. Pledgor acknowledges and agrees that this Agreement is subject to, governed by and to be interpreted and enforced pursuant to the Amendment to which Pledgor is a party, which agreement, among other things, includes valid, enforceable and fully effective provisions to which Pledgor is subject, including the governing law provisions, jurisdiction, venue provisions, the jury waiver provisions and the waivers. Pledgor further acknowledges and agrees, with full knowledge and understanding, that it is irrevocably and unconditionally subject to and bound by thereto and

thereby, and that any actions or Claims (as that term is defined in the Amendment) which may be brought with respect to the Loan, this Agreement, the other Loan Documents or any other matters expressly subject thereto shall be governed thereby.

11.10   Limitation on Liability.  Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement shall be satisfied, if at all, out of Lender's interest in and to the Pledged Collateral only.  No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, any other asset or property of Lender or the asset or property of any of Lender's shareholders, directors, officers, employees, agents or representatives, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

*[Remainder of Page Intentionally Blank – Signature Pages Follow]*

**IN WITNESS WHEREOF,** the undersigned Pledgors have executed this Agreement as of the date first above written.

**PLEDGORS:**

_____
Gerald J. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family
Trust established May 9, 1997

_____
Carol L. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family
Trust established May 9, 1997

**WOODGLEN APTS., LLC,**
a California limited liability company
Its General Partner

By:_____
Gerald J. Marcil, Managing Member

By:_____
Carol L. Marcil, Member

By:_____
Gerald J. Marcil, individually and as
Authorized Trustee of, and on behalf of,
the Marcil Family Trust established May 9,
1997, a Limited Partner

By:_____
Carol L. Marcil, individually and as
Authorized Trustee of, and on behalf of,
the Marcil Family Trust established May 9,
1997, a Limited Partner

*[Company Acknowledgment on Following Page]*

## COMPANY CONSENT AND ACKNOWLEDGEMENT

Arrowhead Stanton Apartments, LP, a California limited partnership, Torrance Terrace Investment, LP, a California limited partnership, Azul Apartments, LP, a California limited partnership and Monterra Investment LP, a California limited partnership (individually and collectively, the "**Company**"), with full knowledge and understanding of the Pledge and Security Agreement to which this Company Consent and Acknowledgement is attached (the "**Agreement**", with all defined terms therein being applicable hereto), hereby consents, agrees, acknowledges and represents to Lender as follows:

1.      Consent and Acknowledgement.  Each Company hereby consents, acknowledges and agrees to (i) Pledgors entering into the Agreement and pledging, assigning and granting to Lender a first in priority security interest in and to the Pledged Collateral pursuant to the Agreement as collateral for the Borrower's Obligations and (ii) the exercise of Lender's rights and remedies thereunder pursuant to the terms of the Agreement. Each Company further agrees that at all times prior to repayment in full of the Obligations: (a) each Company shall note the security interests pledged, assigned and granted by the Agreement in any books and records of the Company pertaining to the Pledged Collateral; and (b) Lender shall have the right, during normal business hours and upon prior reasonable notice to the Company, to inspect and copy the books and records of the Company pertaining to the Pledged Collateral.

2.      Representations, Covenants, etc.  Each Company acknowledges, agrees and confirms to Lender that the representations and warranties set forth in the Agreement are true and correct and the Company agrees to comply with terms and conditions set forth therein applicable to it and shall not take any action, or consent to any action by any Pledgor, which is inconsistent with, or in violation of, the Agreement. In furtherance thereof, and without any limitation thereto, each Company represents, warrants and covenants that (i) the Pledgors are the legal and beneficial owners of 100% of the limited partnership interests and the general partnership interests of the Company; (ii) no other legal or beneficial ownership interests exist or have been issued with respect to the Company; and (iii) the Company shall not, without the prior written consent of Lender, (A) issue any additional certificates to evidence any interest in the Company or (B) elect, permit or otherwise cause to have any of the Partnership Interests treated as securities under Article 8 of the Uniform Commercial Code. Without the prior written consent of Lender (without any obligation to provide any such consent, each Company agrees that it will not grant or suffer to exist any Lien upon or with respect to any of the assets of the Company other than the existing Liens currently in place with respect to such assets. Each Company agrees that, by executing this Company Consent, the Company is subject to and bound by the jury waiver, judicial reference and venue provisions set forth in the Amendment (with such provisions being deemed incorporated herein as though set forth in full) with respect to the Agreement and this Company Consent and all Claims (as that term is defined in the Amendment) with respect thereto. In the event the Lender commences any action to enforce its rights and remedies, or otherwise defend its security interests, rights and remedies, under the Agreement, Lender shall be entitled to its costs and expenses incurred in connection with any such action, including its reasonable attorneys' fees and costs.

*[Signature Page on Following Page]*

**IN WITNESS WHEREOF**, the undersigned Company have executed foregoing Company Consent as of the date first set for above.

COMPANY:

**ARROWHEAD STANTON APARTMENTS, LP,**
a California limited partnership

By:  Woodglen Apts., LLC,
a California limited liability company
Its General Partner

By: _____
Gerald J. Marcil, Managing Member

By: _____
Carol L. Marcil, Member

By: _____
Gerald J. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family Trust
established May 9, 1997, a Limited Partner

By: _____
Carol L. Marcil, individually and as Authorized
Trustee, and on behalf of, of the Marcil Family Trust
established May 9, 1997, a Limited Partner

*[Company Signatures Continued on Next Page]*

*617573831*

COMPANY CONSENT
SIGNATURE PAGE

*Marcil Loan
Pledge Agreement*

**IN WITNESS WHEREOF**, the undersigned Company have executed foregoing Company Consent as of the date first set for above.

COMPANY:                          **MONTERRA INVESTMENT LP,**
                                  a California limited partnership

                                  By:  Woodglen Apts., LLC,
                                       a California limited liability company
                                       Its General Partner

                                  By: _____
                                       Gerald J. Marcil, Managing Member

                                  By: _____
                                       Carol L. Marcil, Member

                                  By: _____
                                       Gerald J. Marcil, individually and as Authorized
                                       Trustee of, and on behalf of, the Marcil Family Trust
                                       established May 9, 1997, a Limited Partner

                                  By: _____
                                       Carol L. Marcil, individually and as Authorized
                                       Trustee of, and on behalf of, the Marcil Family Trust
                                       established May 9, 1997, a Limited Partner

617573831                         COMPANY CONSENT                        *Marcil Loan*
                                  SIGNATURE PAGE                          *Pledge Agreement*

# EXHIBIT H

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $8,500,000.00 | 03-01-2019 | 02-28-2020 | ▓▓▓▓▓▓ | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Pacifica Garden APTS., LP
43 Malaga Cove Plaza, Ste D
Palos Verdes, CA  90274

**Lender:**  Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA  92618
(844) 626-0262

---

**Principal Amount: $8,500,000.00**                    **Date of Note:  March 1, 2019**

**PROMISE TO PAY.** Pacifica Garden APTS., LP ("Borrower") promises to pay to Nano Banc ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Million Five Hundred Thousand & 00/100 Dollars ($8,500,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on February 28, 2020. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning April 10, 2019, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**TERM-OUT OPTION.** Assuming the Borrower has handled all credit obligations as agreed with no late payments, and after the extension, Lender shall provide a ten-year term-out option.  To exercise the option, the terms shall be:

>Lender receives at least ninety (90) days written notice from the Borrower of its intention to strike the term-out option.

>No continuing or existing events of default at the time of the notice of the term-out, and at the term-out.

>No material adverse change in the financial capacity of the Borrower and Guarantor.

>The Debt Coverage Ratio (the "DCR") shall be 1.20x, using the term-out rate and fifteen-year amortization.

>At the time of the term-out, the rate shall be a variable rate of Wall Street Journal Prime, with a 5.25% rate floor and a fifteen-year amortization period.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 5.500% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point under the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.500%. NOTICE:  Under no circumstances will the interest rate on this Note be less than 4.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.   Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Nano Banc, Irvine Office, 7700 Irvine Center Dr., Suite 700, Irvine, CA  92618.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency

## PROMISSORY NOTE
### (Continued)

Loan No: ███████                                                                                    Page 2

---

of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change In Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: inventory, chattel paper, accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas described in a Commercial Security Agreement dated March 1, 2019.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Gerald J. Marcil.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**EXTENSION OPTION.** Assuming the Borrower has handled all credit obligations as agreed with no late payments, Lender shall provide two 364-day extension options.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Nano Banc 25220 Hancock Avenue Suite 140 Murrieta, CA 92562.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PROMISSORY NOTE**
**(Continued)**

Loan No: ███████████                                                                Page 3

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:


PACIFICA GARDEN APTS., LP


WOODGLEN APTS., LLC, General Partner of Pacifica Garden APTS., LP

By: _____
     Gerald Marcil, Manager of Woodglen APTS., LLC

LaserPro, Ver. 18.1.10.007  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - CA  Z:\HARLAND\CFI\LPL\D20.FC  TR-1194  PR-6

# EXHIBIT I

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $8,500,000.00 | 03-01-2019 | 02-28-2020 | ▓▓▓▓▓ | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Pacifica Garden APTS., LP
43 Malaga Cove Plaza, Ste D
Palos Verdes, CA 90274

**Lender:** Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

THIS BUSINESS LOAN AGREEMENT dated March 1, 2019, is made and executed between Pacifica Garden APTS., LP ("Borrower") and Nano Banc ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of March 1, 2019, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Gerald J. Marcil.**

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 43 Malaga Cove Plaza, Ste D, Palos Verdes, CA 90274. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: ███████                                              Page 2

relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.**

**Borrower:**

**Company's Annual Statements.** As soon as available, but in no event later than one hundred twenty (120) days after each calendar year end, or upon request, balance sheet and income statement for the year ended, in form and content acceptable to Lender.

**Business Tax Returns.** As soon as available, but in no event later than October 31st, or fifteen (15) days after filing, whichever occurs first, annual tax returns. Tax returns are understood to be federal and other governmental tax returns with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities.

**Guarantor:**

**Personal Financial Statements and Real Estate Schedule.** As soon as available, but in no event later than one hundred eighty (180) days after each calendar year end, or upon request, personal financial statement and Real Estate Schedule ("REO"), in form and content acceptable to Lender. REO to include all properties owned either directly or as an investor in partnerships, including total debt, debt service and Guarantor's share of debt for each property.

**Tax Returns.** As soon as available, but in no event later than October 31st, or fifteen (15) days after filing, whichever occurs first, annual tax returns. Tax returns are understood to be federal and other governmental tax returns with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities.

**Bank and/or Brokerage House Statements.** If Guarantor does not maintain account balances with Lender in amounts sufficient to verify the $15,000,000 Net Liquid Assets covenant, then as soon as available, but in no event later than thirty (30) days after each June 30th and December 31st, Guarantor shall provide to the Lender bank and/or brokerage house statements to document Guarantor's Net Liquid Assets.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: ██████████                                                                              Page 3

---

**Profitability.** Borrower to remain profitable on an annual basis of at least $1,500,000 after adding back depreciation and amortization.

**Debt-to-Worth.** In aggregate, Borrower to maintain a ratio of Debt/Worth not in excess of .75 to 1.00. The ratio "Debt/Worth" means Borrower's Total Liabilities divided by Borrower's Tangible Net Worth. This leverage ratio should be maintained at all times and may be evaluated at any time.

**Tangible Net Worth.** Maintain a minimum Tangible Net Worth of not less than $15,000,000 amongst Borrower and $250,000,000 amongst Guarantor.

**Liquidity.** Guarantor to maintain a minimum of $15,000,000 in unencumbered Net Liquid Assets at all times. Net Liquid Assets are defined as cash and margin-free marketable NYSE, AMEX or NASDAQ listed securities in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Gerald Marcil | 25.000% of all Indebtedness or $2,125,000.00, whichever is less |
| Marcil Family Trust | 25.000% of all Indebtedness or $2,125,000.00, whichever is less |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements,

## BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: ▮▮▮▮▮▮▮                                                                    Page 4

assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.**  (1)  Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases,  (2)  sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or  (3)  sell with recourse any of Borrower's accounts, except to Lender.

**Additional Financial Restrictions.**

**Negative Pledge.** Borrower shall agree not to accept any additional secured debt and agrees not to hypothecate any interest in the real property located at 2801 N Bristol St, Santa Ana, CA 92706.

**Unsecured Debt.** Borrower shall agree not to accept any additional unsecured debt of $50,000 in aggregate, without prior written approval from Lender.

**Continuity of Operations.**  (1)  Engage in any business activities substantially different than those in which Borrower is presently engaged,  (2)  cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or  (3)  make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.**  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2)  purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

## BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: ███████████                                                                          Page 5

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**INDEMNITY.** Borrower shall indemnify, pay and hold harmless the Lender against any loss, liability, cost or expenses incurred in respect to the financing contemplated hereby, the use or the proposed used of the proceeds hereof or any loss incurred as a result of environmental issues.

**DEPOSIT RELATIONSHIP.** Borrower to maintain all operating accounts with Lender and establish automatic withdrawal of monthly payments from one of said accounts.

**EXPENSES.** Borrower agrees to reimburse Lender for expenses incurred in connection with any due diligence and out of pocket expenses. These expenses include without limitation appraisal and appraisal review costs, environmental and review costs, credit reports, lien searches, title insurance and documentation costs.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.**

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: ▮▮▮▮▮▮▮                                                                                    Page 6

subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Pacifica Garden APTS., LP and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Nano Banc, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated March 1, 2019 and executed by Pacifica Garden APTS., LP in the principal amount of $8,500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute

| | **BUSINESS LOAN AGREEMENT** | |
|---|---|---|
| Loan No: ███████ | (Continued) | Page 7 |

an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MARCH 1, 2019.**

**BORROWER:**

**PACIFICA GARDEN APTS., LP**

**WOODGLEN APTS., LLC, General Partner of Pacifica Garden APTS., LP**

By: _____
Gerald Marcil, Manager of Woodglen APTS., LLC

**LENDER:**

**NANO BANC**

By: _____
Chris Martello, Vice President

# EXHIBIT J



*HLP0590*

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $8,500,000.00 | 02-28-2020 | 06-28-2020 | [redacted] | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Pacifica Garden APTS., LP
43 Malaga Cove Plaza, Ste D
Palos Verdes, CA 90274

**Lender:** Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

**Principal Amount: $8,500,000.00** **Date of Agreement: February 28, 2020**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

A Line of Credit evidenced by a Promissory Note dated March 1, 2019, in the original principal amount of $8,500,000.00 and referencing Loan No. [redacted](Note) and all renewals, modifications/extensions thereof.

**DESCRIPTION OF COLLATERAL.**

Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: inventory, chattel paper, accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas, as further described in a Commercial Security Agreement dated March 1, 2019.

**DESCRIPTION OF CHANGE IN TERMS.**

**The Promissory Note has been amended as follows:**

The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is hereby extended from February 28, 2020 to June 28, 2020.

All other terms and conditions remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**PACIFICA GARDEN APTS., LP**

**WOODGLEN APTS., LLC, General Partner of Pacifica Garden APTS., LP**

By: ______________________
Gerald Marcil, Manager of Woodglen APTS., LLC

LaserPro, Ver. 19.3.0.036 Copr. Finastra USA Corporation 1997, 2020. All Rights Reserved. - CA Z:\LaserPro\CFI\LPL\D20C.FC TR-1354 PR-6

# EXHIBIT K



*HLP0590*

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $8,500,000.00 | 06-27-2021 | 06-27-2024 | | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Pacifica Garden APTS., LP
43 Malaga Cove Plaza, Ste D
Palos Verdes, CA  90274

**Lender:**  Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA  92618
(844) 626-0262

---

**Principal Amount: $8,500,000.00**　　　　　　　　　　**Date of Agreement:  June 27, 2021**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

A Line of Credit evidenced by a Promissory Note dated March 1, 2019, in the original principal amount of $8,500,000.00 and referencing Loan No. █████████ (Note) and all renewals, modifications/extensions thereof.

**DESCRIPTION OF COLLATERAL.**

Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: inventory, chattel paper, accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas, as further described in a Commercial Security Agreement dated March 1, 2019.

**DESCRIPTION OF CHANGE IN TERMS.**

**The Promissory Note has been amended as follows:**

The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is hereby extended from June 27, 2021 to June 27, 2024.

**The following extension option is hereby removed:**

Assuming the Borrower has handled all credit obligations as agreed with no late payments, Lender shall provide two 364-day extension options.

**The following Term-Out Option has been amended to read as follows:**

Assuming the Borrower has handled all credit obligations as agreed with no thirty (30) day late payments, Lender shall provide a seven (7) year Term-Out Option. To exercise the option, the terms shall be:

>Lender receives at least ninety (90) days written notice from the Borrower of its intention to strike Term-Out Option;
>No continuing or existing events of default at the time of the notice of term-out, and at the term-out;
>No Material adverse change in the financial capacity of the Borrower and Guarantor;
>At the time of the term-out, the rate shall be a variable rate of Wall Street Journal Prime, with a 4.00% floor; and
>The Global Debt Coverage Ratio (the "DCR") shall be 1.30x, using the term-out rate and seven (7) year amortization schedule. Principal plus interest to be due monthly. DCR shall be calculated using the Borrower's operating statements, the annual income less operating expenses including taxes and insurance would equate to the Net Operating Income. The Net Operating Income divided by the existing debt service and the Lender Debt Service would equate to the DCR for this term-out provision.

**The Business Loan Agreement has been amended as follows:**

**The following reporting requirement has been amended to read as follows:**

**Bank and/or Brokerage House Statements.** If the Borrower and Guarantor do not maintain account balances with Lender in amounts sufficient to verify the $15,000,000.00 Net Liquid Assets covenant, then as soon as available, but in no event later than sixty (60) days after each June 30th and December 31st, Borrower and Guarantor shall provide to Lender bank and/or brokerage house statements to document Borrower's Net Liquid Assets.

**The following financial covenants have been amended to read as follows:**

**Profitability.** Borrower to remain profitable on an annual basis of at least $3,945,000.00 EBITDA. EBITDA to be tested at calendar year-end based on Borrower's operating statements or most recent Federal tax returns.

**Debt-to-Worth.** Borrower to maintain a ratio of Debt/Worth not in excess of 1.30:1.00. The ratio "Debt/Worth" means Borrower's Total Liabilities divided by Borrower's Tangible Net Worth. This leverage ratio should be maintained at all times and may be evaluated at any time.

**Tangible Net Worth.** Maintain a minimum Tangible Net Worth of not less than $250,000,000.00 in aggregate amongst Borrower and Guarantor.

**Liquidity.** In aggregate, Borrower/Guarantor shall maintain a minimum of $15,000,000.00 in unencumbered Net Liquid Assets at all times. Net Liquid Assets are defined as cash and margin-free marketable NYSE, AMEX or NASDAQ listed securities in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Liquidity held in business entities solely owned by the Borrower and cash value of life insurance policy to be acceptable in terms of liquidity.

All other terms and conditions remain the same.

**PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 27, 2024. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 10, 2021, with all subsequent interest payments to be due on the same day of each month after that.**

**VARIABLE INTEREST RATE.**  The interest rate on this loan is subject to change from time to time based on changes in an independent index

## CHANGE IN TERMS AGREEMENT
### (Continued)

| Loan No: ███████ | | Page 2 |

---

which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.250% per annum.** Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point under the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.000%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this loan, Lender may amend this loan by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this loan will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this loan be less than 4.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**OUT OF DEBT.** After the initial draw, Borrower shall maintain a zero ($0.00) balance on the line of credit for a minimum of thirty (30) consecutive days during each line year.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

PACIFICA GARDEN APTS., LP

WOODGLEN APTS., LLC, General Partner of Pacifica Garden APTS., LP

By: _____
Gerald Marcil, Manager of Woodglen APTS., LLC

LaserPro, Ver. 20.1.0.034  Copr. Finastra USA Corporation 1997, 2021.  All Rights Reserved.  - CA  Z:\LaserPro\CFI\LPL\D20C.FC  TR-1594  PR-6

# EXHIBIT L

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $8,542,500.00 | 09-20-2024 | 10-01-2027 | ███████ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Pacifica Garden APTS., LP a California limited partnership
520 Newport Center Drive, Suite 480
Newport Beach, CA  92660

**Lender:**  Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA  92618
(844) 626-0262

**Principal Amount:  $8,542,500.00**                                        **Date of Note:  September 20, 2024**

**PROMISE TO PAY.**  Pacifica Garden APTS., LP a California limited partnership ("Borrower") promises to pay to Nano Banc ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Million Five Hundred Forty-two Thousand Five Hundred & 00/100 Dollars ($8,542,500.00), together with interest on the unpaid principal balance from September 20, 2024, until paid in full.

**PAYMENT.**  Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph:  2 monthly consecutive interest payments, beginning October 10, 2024, with interest calculated on the unpaid principal balances using an interest rate based on the SOFR 30-Day Average, as administered by the CME Group Benchmark Administration Limited or a successor administrator of the SOFR Term Reference Rate selected by Lender in its sole discretion, as of the last business day of the month (currently 5.350%), plus a margin of 3.910 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 9.260%; 34 monthly consecutive principal and interest payments in the initial estimated amount of $138,570.80 each, beginning December 10, 2024, with interest calculated on the unpaid principal balances using an interest rate based on the SOFR 30-Day Average, as administered by the CME Group Benchmark Administration Limited or a successor administrator of the SOFR Term Reference Rate selected by Lender in its sole discretion, as of the last business day of the month (currently 5.350%), plus a margin of 3.910 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 9.260%; and one principal and interest payment of $5,790,661.58 on October 1, 2027, with interest calculated on the unpaid principal balances using an interest rate based on the SOFR 30-Day Average, as administered by the CME Group Benchmark Administration Limited or a successor administrator of the SOFR Term Reference Rate selected by Lender in its sole discretion, as of the last business day of the month (currently 5.350%), plus a margin of 3.910 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 9.260%.  This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the SOFR 30-Day Average, as administered by the CME Group Benchmark Administration Limited or a successor administrator of the SOFR Term Reference Rate selected by Lender in its sole discretion, as of the last business day of the month (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If Lender determines, in its sole discretion, that the Index for this Note has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust any margin corresponding to the Index being substituted to accompany the substitute index.  Margins corresponding to the Index are described in the "Payments" section.  The change to the margin may be a positive or negative value, or zero.  In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable.  Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each Month.  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 5.350% per annum.**  The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section.  Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE:  Under no circumstances will the interest rate on this Note be less than 9.250% per annum or more than the maximum rate allowed by applicable law.  Whenever changes occur in the interest rate, Lender, at its option, may do one or more of the following:  (A)  change the amounts of Borrower's payments to maintain the original amortization schedule,  (B)  increase Borrower's payments to cover accruing interest if the interest rate adjustment is an increase,  (C)  change the number of Borrower's payments, and  (D)  continue Borrower's payments at the same amount and change Borrower's final payment amount.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.

**PREPAYMENT.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.  Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will

remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:   Nano Banc, Irvine Office, 7755 Irvine Center Dr., 3rd Floor, Irvine, CA   92618.**

**LATE CHARGE.**   If a payment is 10 days or more late, Borrower will be charged **5.000%** of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.**   Upon default, the total sum due under this Note will continue to accrue interest at the interest rate under this Note.

**DEFAULT.**   Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**   Borrower fails to make any payment when due under this Note.

**Other Defaults.**   Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**   Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.**   Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.**   The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.   This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.   However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**   Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.**   Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change In Ownership.**   The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.**   A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**CHANGE IN OWNERSHIP.** The Borrower agrees to promptly notify **Lender in writing** at Lender's address shown above (or such other address as Lender may designate from time to time) **prior to any of the below changes.** No change in the Ownership, Name, or state of organization will take effect until after Lender has received and approved the request. Borrower agrees that (a) said property shall not be sold, agreed to be sold, conveyed, transferred, assigned, disposed of, or further encumbered, whether voluntary, involuntary, by operation of law or otherwise, and/or (b) any change twenty-five percent (25%) in the Borrower, any manager of the Borrower, and/or any direct or indirect transfer of membership, partnership or other ownership interest of Borrower, shall constitute a breach. Any violation shall cause the then outstanding principal balance and interest and other sums, if applicable secured by said Deed of Trust, at the sole discretion of Lender, to become immediately due and payable.

**LENDER'S RIGHTS.**   Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**   Lender may hire or pay someone else to help collect this Note if Borrower does not pay.   Borrower will pay Lender that amount.   This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.   Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.   This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.   This Note has been accepted by Lender in the State of California.**

**DISHONORED ITEM FEE.**   Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.**   This loan is unsecured.

**PRIOR NOTE.** The Promissory Note restates and replaces Promissory Note #7000259500 dated March 1, 2019 from Borrower to Lender, in the original stated credit limit of $8,500,000.00.

**SUCCESSOR INTERESTS.**   The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.**   Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Nano Banc 25220 Hancock Avenue Suite 140 Murrieta, CA 92562.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

PACIFICA GARDEN APTS., LP A CALIFORNIA LIMITED PARTNERSHIP

By: _____

Authorized Signer for Pacifica Garden APTS., LP a
California limited partnership

# EXHIBIT M

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $8,542,500.00 | 09-20-2024 | 10-01-2027 | ██████ | | | MP1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Pacifica Garden APTS., LP a California limited partnership
520 Newport Center Drive, Suite 480
Newport Beach, CA  92660

**Lender:** Nano Banc
Irvine Office
7755 Irvine Center Dr., 3rd Floor
Irvine, CA  92618
(844) 626-0262

THIS BUSINESS LOAN AGREEMENT dated September 20, 2024, is made and executed between Pacifica Garden APTS., LP a California limited partnership ("Borrower") and Nano Banc  ("Lender") on the following terms and conditions.  Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement.  Borrower understands and agrees that:  (A)  in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement;  (B)  the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and  (C)  all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of September 20, 2024, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until October 1, 2027.

**CONDITIONS PRECEDENT TO EACH ADVANCE.**  Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.**  Borrower shall provide to Lender the following documents for the Loan:  (1)  the Note;  (2)  guaranties;  (3)  together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.**  Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents.  In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.**  Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.**  The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.**  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.**  Borrower is a limited partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California.  Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business.  Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition.  Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage.  Borrower maintains an office at 43 Malaga Cove Plaza Suite D, Palos Verdes, CA  90274.  Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral.  Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name.  Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.**  Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower.  Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.**  Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under  (1)  any provision of  (a)  Borrower's articles or agreements of partnership, or  (b)  any agreement or other instrument binding upon Borrower or  (2)  any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.**  Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender.  Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.**  This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will

constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, or an OCBOA acceptable to Lender, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** The Borrower must provide the following:

**Company's Financial Statements.** As soon as available, but in no event later than forty-five (45) days after each December 31st and June 30th, or fifteen (15) days after interim requests, Borrower to provide a balance sheet and income statement for the period ended, in form and content acceptable to Lender.

**Rent Roll.** As soon as available, but in no event later than forty-five (45) days after each December 31st and June 30th, or fifteen (15) days after interim requests, Borrower to provide a current rent roll on the Collateral Property, in form and content acceptable to Lender.

**Business Tax Returns.** As soon as available, but in no event later than ten (10) days after filing, Borrower to provide annual tax returns. Tax returns are understood to be federal and other governmental tax returns with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities.

Guarantors to provide the following:

**Personal Financial Statement, Real Estate Schedule, and Schedule of Debts.** No less than once annually and within fifteen (15) days after request, Guarantor to provide a Personal Financial Statement ("PFS"), Real Estate Owned Schedule ("REO"), and Schedule of Debts (direct and contingent), in form and content acceptable to Lender. Information provided is to be signed and dated by Guarantor.

**Liquid Asset Statements:** Guarantor to provide Lender bank, brokerage, or other applicable month end statements no later than thirty (30) days after each December 31, and June 30, annually and no later than fifteen (15) days upon interim request of Lender.

**Personal Tax Returns.** As soon as available, but in no event later than ten (10) days after filing, Guarantor to provide annual tax returns. Tax returns are understood to be federal personal returns (form 1040, 1041, or 1065) with all schedules, and federal tax returns for any and all entities

reported on the tax returns or for related entities (form 1065 and K-1's for partnerships and LLC's, and form 1120S for Sub S Corporations).

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, or an OCBOA acceptable to Lender, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.**   Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**   Borrower to comply with the following:

**Debt Service Coverage Ratio.**   Borrower(s) to maintain a minimum Debt Service Coverage Ratio ("DSCR") of greater than 1.25:1.00 to be tested annually. DSCR to be defined as follows:   Actual trailing twelve month, or annualized, Net Operating Income ("NOI") of the Borrower(s) Divided by the sum of I) The contractual debt service of the subject facility, and II) All other contractual debt service of the Borrower(s).   NOI is defined as gross income/receipts/rents less operating expenses, net of non-cash items and interest on debt requirements, and income tax. Borrower's federal tax return and/or operating and loan statements will be used to complete the calculation. Funds held by Lender in any applicable Payment Reserve Account, under Banc control and securing the subject facility, shall be added to NOI for this calculation.

Borrower and Guarantors to comply with the following:

**Tangible Net Worth.** Borrower and Guarantor collectively to maintain a Tangible Worth of not less than $100,000,000.   Tangible Net Worth to be defined as Borrower and Guarantor (collectively) total assets excluding all intangible assets (e.g. goodwill, trademarks, patents, employee advances, shareholder notes receivable, copyrights, organization expenses and similar intangible items) less total liabilities excluding shareholder notes which are formally subordinated to Lender. This requirement is to be maintained at all times and will be measured as of the end of each fiscal year.

**Global Debt Service Coverage Ratio.** Borrower(s) and Guarantor(s) to maintain a minimum Global Debt Service Coverage Ratio ("GDSCR") of greater than 1.85:1.00, to be tested annually. GDSCR to be defined as follows:
The sum of I) Trailing twelve month, or annualized, Net Operating Income ("NOI") of the Borrower(s), and II) Guarantor(s) Cash Flow Available for Debt Service ("CFADS"). Divided by: The sum of I) The contractual debt service of the subject facility, II) All other contractual debt service requirements of the Borrower(s), and III) All debt service requirements of the Guarantor(s).   NOI is defined: as gross income/receipts/rents less operating expenses, net of non-cash items and interest on debt requirements, and income tax. Borrower(s holding passive income entities require K-1 statements, or other funds transfer records, of applicable entities documenting cash distributions for inclusion in the NOI total. Guarantor(s) CFADS is defined: as gross income/receipts/rents less operating expenses, net of non-cash items and interest on debt requirements, and income tax. Guarantor(s) holding passive income entities require K-1 statements, or other funds transfer records, of applicable entities documenting cash distributions for inclusion in the NOI total. Borrower(s) and Guarantor(s) federal tax return and/or operating and loan statements will be used to complete the calculation. Funds held by Lender in any applicable Payment Reserve Account shall be added to NOI for this calculation

Guarantors to comply with the following:

**Net Liquid Assets.** Guarantor to maintain Net Liquid Assets of not less than $10,000,000.   Based on month end statements, Net Liquid Assets are defined as cash and marketable NYSE, AMEX, or NASDAQ listed securities net of margin debt in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity.   This requirement is to be maintained at all times, and will be measured semiannually (as of December 31 and June 30).   If account balances held with Lender are insufficient to assess compliance with the Net Liquid Assets covenant, than Borrower/Guarantor shall provide to Lender applicable statements at the frequency defined in the reporting requirements of the Business Loan Agreement (BLA).

**Insurance.**   Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender.   Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.   Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.   In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.**   Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:   (1)   the name of the insurer;   (2)   the risks insured;   (3)   the amount of the policy;   (4)   the properties insured;   (5)   the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and   (6)   the expiration date of the policy.   In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.   The cost of such appraisal shall be paid by Borrower.

**Guaranties.**   Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

> **Names of Guarantors**
>
> Gerald J. Marcil
>
> The Marcil Family Trust dated May 9, 1997

**Other Agreements.**   Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.**   Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.**   Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties,

income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP or an OCBOA acceptable to Lender.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Beneficial Ownership Information.** Comply with all beneficial ownership information reporting requirements of the Corporate Transparency Act and its implementing regulations (collectively the CTA), if applicable to that Borrower. Any Borrower that is or becomes a reporting company as defined in the CTA: (1) has filed, or will file within required timeframes a complete and accurate report of its beneficial ownership information with the Financial Crimes Enforcement Network (FinCEN) as required by the CTA; (2) will update or correct its beneficial ownership information with FinCEN within required timeframes upon any change in its beneficial ownership information; (3) will provide Lender with a copy of its beneficial ownership information report filed with FinCEN upon request; and (4) will notify Lender in writing of any change in its beneficial ownership information within 30 days of such change.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Change in Ownership.** The Borrower agrees to promptly **notify Lender in writing** at Lender's address shown above (or such other address as Lender may designate from time to time) **prior to any of the below changes**. No change in the Ownership, Name, or state of organization will take effect until after Lender has received and approved the request. Borrower agrees that (a) said property shall not be sold, agreed to be sold, conveyed, transferred, assigned, disposed of, or further encumbered, whether voluntary, involuntary, by operation of law or otherwise, and/or (b) any change twenty-five percent (25%) in the Borrower, any manager of the Borrower, and/or any direct or indirect transfer of membership, partnership or other ownership interest of Borrower, shall constitute a breach. Any violation shall cause the then outstanding principal balance and interest and other sums, if applicable secured by said Deed of Trust, at the sole discretion of Lender, to become immediately due and payable.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including finance leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts receivable, except to Lender.

**Additional Financial Restrictions.** Borrower to comply with the following:

**Assignment.** Hypothecate or transfer any interest in the Collateral Property.

**Additional Debt.** Apply for and/or accept any additional secured or unsecured debt greater than $250,000 in aggregate debt (except for ordinary course of business practices of payables/debt due within one (1) year) without prior approval from Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related

Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

INDEMNITY - ENVIRONMENTAL ISSUES . Borrower shall indemnify, pay and hold harmless the Lender against any loss, liability, cost or expenses incurred in respect to the financing contemplated hereby, the use or the proposed used of the proceeds hereof or any loss incurred as a result of environmental issues. .

MISCELLANEOUS PROVISIONS.  The following miscellaneous provisions are a part of this Agreement:

**Amendments.**  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.**  Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender.  Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters.  Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.  Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests.  Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan.  Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.  This Agreement has been accepted by Lender in the State of California.**

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.**  Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement.  Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.  Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.**  To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates.  Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.**  All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.  Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Pacifica Garden APTS., LP a California limited partnership and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Nano Banc, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated September 20, 2024 and executed by Pacifica Garden APTS., LP a California limited partnership in the principal amount of $8,542,500.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**OCBOA.** The term "OCBOA" means Other Comprehensive Basis of Accounting, as designated by Lender in writing as an acceptable alternative to GAAP.

**Permitted Liens.** The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender;  (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by

the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS.   THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 20, 2024.

BORROWER:


PACIFICA GARDEN APTS., LP A CALIFORNIA LIMITED PARTNERSHIP




By: _____

Authorized Signer for Pacifica Garden APTS., LP a
California limited partnership

LENDER:


NANO BANC


By: _____
Max Prendergast, Vice President

# EXHIBIT N

## LOAN AMENDMENT

This Loan Amendment (the "**Amendment**") is entered into as of September 12, 2025 (the "**Effective Date**") by Nano Banc, a California corporation ("**Lender**"), PACIFICA GARDEN APTS., LP, a California limited liability company ("**Borrower**"), Gerald J. Marcil, an individual ("**Marcil**"), and the Marcil Family Trust, established on May 9, 1997 (the "**Trust**", and together with Marcil, collectively, "**Guarantors**"). Borrower and Guarantors are sometimes referred to individually as a "**Loan Party**" and collectively as the "**Loan Parties**". Lender and the Loan Parties are sometimes individually referred to as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A.      Lender made a Loan to Borrower in the stated maximum principal commitment amount of $8,500,000.00, Loan No. 7000259500 (the "**Original Loan**") on or about March 1, 2019 pursuant to, inter alia, Business Loan Agreement (the "**Original Loan Agreement**") and a Promissory Note (the "**Original Note**"), which Original Loan was amended by that certain Change In Terms Agreement dated as of February 28, 2020 and then further amended by that certain Change In Terms Agreement dated as of June 27, 2021 (collectively, with the Original Loan Agreement, the Original Note and the other documents entered into with respect thereto, the "**Original Loan Documents**").

B.      The Original Loan amount was increased to $8,542,500.00 on September 20, 2024 (the "**Loan**") and the terms and conditions of the Original Loan Documents were amended and otherwise restated pursuant to, inter alia, (i) that certain Business Loan Agreement dated as of September 20, 2024 (as amended, restated and otherwise modified from time to time, and as may be amended by this Amendment, the "**Loan Agreement**") and (ii) that certain Promissory Note dated as of even date therewith (as amended, restated and otherwise modified from time to time, and as may be amended by this Amendment, the "**Note**").

C.      In support of the Loan, Guarantors have executed certain guaranties in favor of Lender, including (i) that certain Commercial Guaranty dated as of September 20, 2024 executed by the Trust in favor of Lender and (ii) that certain Commercial Guaranty dated as of September 20, 2024 executed by Marcil in favor of Lender (with all such guaranties, as any of them may have been amended, restated and otherwise modified from time to time, and as may be amended by this Amendment, collectively the "**Guaranties**"). The Original Loan Documents, the Loan Agreement, the Note, the Guaranties, and any other documents executed by any of the Loan Parties or their respective affiliates  in connection with, evidencing or otherwise supporting the Loan, as any of them may be amended, restated and otherwise modified from time to time, and as may be amended by this Amendment, are collectively referred to as the "**Loan Documents**").

D.      The Maturity Date pursuant to the Loan Documents is October 1, 2027 (the "**Maturity Date**"). Borrower failed to make certain required payments as and when required under the Loan Documents for the period of June 10, 2025 through September 10, 2025 in the total amount of $554,283.20 (of which $252,752.94 constitutes accrued but unpaid interest through August 31, 2025 ("**Past Due Interest Amount**")), which failure to pay gave rise to an Event of Default (as defined in the Loan Documents) under the Loan Documents (the "**Identified Defaults**"). As a result of the Identified Defaults, Borrower has incurred default interest and late fees and Lender has incurred additional costs and expenses, including late charges of $70,962.78 and estimated legal fees and costs of $30,000.00, which default interest, late fees, costs and expenses continue to accrue as a result of the Identified Defaults (the "**Accrued Default Charges**"). In addition, as a result of such Identified Defaults, the Loan has been accelerated and is presently due and payable in full.

-1-

E.      The Loan Parties have requested that Lender waive the Identified Defaults and Lender has agreed to do so on the terms and conditions set forth below subject, however, to the satisfaction of the Amendment Conditions (as defined below).

## AGREEMENT

Based on the foregoing recitals, the accuracy of which are hereby acknowledged by each Party hereto, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party hereto, the Parties hereby agree as follows:

1.      **Amendment of Loan Documents**. Subject to satisfaction of the Amendment Conditions in accordance with Section 2 below, the Loan Documents are hereby amended as of the Effective Date as follows:

a.      Interest Rate. The interest rate under the Loan Documents of 9.25% per annum is hereby amended and reduced to 6% per annum.

b.      Monthly Loan Payments. The Loan Documents are hereby amended to provide that, commencing effective August 1, 2025 and payable September 10, 2025 and continuing on each monthly payment thereafter through the Maturity Date of October 1, 2027, Borrower shall not be required to make monthly payments of interest and principal but instead shall be required to make monthly payments of interest only at the interest rate of 6% per annum, with each such payment to be paid on or before the tenth (10th) day of each month. For avoidance of doubt, the Loan shall be due and payable in full on the Maturity Date. The estimated payment due for September 10, 2025 is $41,832.44 for the thirty-one (31) days of August based on 6.0% interest-only.

c.      Deferred Amounts.

(i)      Past Due Interest Amount. The Past Due Interest Amount is hereby deemed deferred, with the total amount thereof to be added to the outstanding principal balance of the Loan as of the Maturity Date or immediately upon the occurrence of an Event of Default, and shall be due and payable in full on the Maturity Date or otherwise payable in full immediately upon the occurrence of an Event of Default.

(ii)      Accrued Default Charges; Deferral and Conditional Waiver. The Accrued Default Charges which have accrued prior to the Effective Date shall also be deemed deferred, with the total amount thereof to be added to the outstanding principal balance of the Loan as of the Maturity Date or immediately upon the occurrence of an Event of Default, and shall be due and payable in full on the Maturity Date or otherwise payable in full immediately upon the occurrence of an Event of Default. Provided that, and notwithstanding the foregoing, so long as no Event of Default occurs prior to the repayment in full of the Loan, the Accrued Default Charges shall be deemed waived, shall not be included in the required payoff amount, and Borrower shall not be required to pay such Accrued Default Charges in connection with the repayment in full of the Loan.

d.      Event of Default. Notwithstanding anything to the contrary set forth in the Loan Documents, and in addition to the Events of Default set forth in the Loan Documents, the failure to pay the Required Monthly Payments as and when required each month, or the failure to pay the Loan in full on the Maturity Date, shall automatically, and without any notice to any Loan Party or any action by Lender, constitute an immediate Event of Default. Upon the occurrence of an Event

-2-

617582465

*Pacifica Gardens Loan*
*Loan Amendment*

of Default under the Loan Documents, in addition to Lender's other rights and remedies under the Loan Documents, the Loan shall deemed automatically accelerated and shall become immediately due and payable in full, all without any notice to any Loan Party or any action by Lender.

2.    **Conditions Precedent to this Amendment**. This Amendment shall become effective as of the Effective Date upon Lender's determination that each of the following conditions precedent have been satisfied (collectively, the "**Amendment Conditions**"):

a.    Pledge of Ownership Interests. Borrower shall have executed and delivered, and caused any other parties thereto, to execute and deliver to Lender a Pledge and Security Agreement dated as of the Effective Date (the "**Pledge Agreement**") pursuant to which all of the equity holders in Borrower will have pledged all of their respective ownership, rights, title and interests in and to Borrower (the "**Pledged Collateral**") as collateral for the Loan, all as further described in the Pledge Agreement. The Pledged Collateral, together with any other collateral for the Loan is hereby referred to as the "**Collateral**"). The Pledge Agreement shall constitute, and shall be included in the definition of, "Loan Document".

b.    Execution and Delivery of the Loan Documents. This Amendment shall have been executed by all parties hereto and the Pledge Agreement shall be fully executed by all required parties thereto (the Amendment and the aforementioned documents, together with any other documents required by Lender with respect to this Amendment, collectively, the "**Amendment Documents**"). The Amendment Documents shall constitute, and be included in the definition of, "Loan Documents".

c.    Delivery of Executed Amendment Documents. Borrower shall have delivered, or cause to be delivered, the fully executed Amendment Documents to Lender (with delivery to be of the executed original, wet-inked signatures of each applicable Loan Party with respect to each Amendment Document unless Lender has agreed in writing that another method of signature delivery is acceptable to it).

d.    Payment of the September Required Payment. Borrower shall have paid to Lender, in immediately available funds, the September 10, 2025 loan payment required to be paid pursuant to Section 1(b) of this Amendment.

e.    Representations True and Correct. The representations and warranties set forth in the Loan Documents, including those set forth in this Amendment or as otherwise modified by this Amendment, continue to be true, correct and complete in all material respects as of the Effective Date (provided that, as to those representations and warranties that were made as of a certain date, they shall be true and correct in all material respects as of that date).

f.    No Default or Event of Default. Except for the Identified Defaults, no default or Event of Default, shall have occurred and be continuing.

g.    Authorizations and Opinions. Borrower shall have delivered, or cause to be delivered, such resolutions, certificates, consents and opinions as Lender may reasonably require in order to confirm that each of the Loan Parties are duly authorized to execute, deliver and perform the Amendment Documents, that the individuals executing the Amendment Documents on behalf of the Loan Parties are authorized to do so and that every entity and individual required to approve, consent to and/or authorize the Amendment Documents and the transactions contemplated hereby have provided such approval, consent and/or authorization, with each in form and content acceptable to Lender.

-3-

Execution and delivery of this Amendment to Lender by the Loan Parties shall constitute the representation, warranty, and confirmation by the Loan Parties that each of the foregoing Amendment Conditions which they are required to satisfy have been satisfied. This Amendment shall be deemed effective as of the Effective Date upon Lender's delivery of a fully executed copy of this Amendment to the Loan Parties (which delivery may be by email to the email addresses of the Loan Parties' respective representatives), and such delivery shall constitute confirmation by the Lender that it has determined that the Amendment Conditions have been satisfied.  Promptly after this Amendment becoming effective, Lender shall dismiss all pending litigation with respect to the Loan.

3.    **Waiver of Existing Defaults**. Subject to the satisfaction of the Amendment Conditions, upon the effectiveness of this Amendment, the Identified Defaults are hereby deemed waived. In addition, any late fees or default interest which has otherwise accrued or has otherwise become due and payable prior to the Effective Date shall be deemed waived and Borrower shall no longer be obligated therefor. The foregoing waivers are expressly limited to the Identified Defaults, late charges and default interest waived pursuant to this Section and do not apply to any other fees, costs, expenses or charges, or any other Events of Default, or any facts or circumstances which, with the notice and/or the passage of time would constitute an Event of Default under the Loan Documents (as amended hereby), with all rights and remedies of Lender with respect thereto being hereby reserved in their entirety

4.    **Authorization to File Financing Statements**. The Pledge Agreement authorizes Lender to file certain UCC-1 Financing Statements to perfect Lender's security interests in and to the Pledged Collateral (the "**Financing Statements**"). Lender agrees that it shall not file those Financing Statements unless and until an Event of Default has occurred, at which time Lender is authorized, without notice to or the consent of any Loan Party or any other person who is a party to the Pledge Agreement, to file the Financing Statements with the appropriate Secretary of State Office.

5.    **Representations and Warranties**. Each Loan Party represents and warrants to Lender, as of the Effective Date: (a) the representations, warranties, certifications and agreements contained in the Loan Documents are true, complete and accurate in all material respects as of the Effective Date (except to the extent any such representation and warranty is made as of a specified date, in which case such representation and warranty shall have been true, correct and complete as of such specified date); (b) after giving effect to this Amendment, no Event of Default exists; (c) to such Loan Party's knowledge, Lender has performed all of its obligations under the Loan Documents and such Loan Party does not have any claims, defenses or offset rights based on any actions or failures to act by Lender; (d) no voluntary actions or involuntary actions are pending against such Loan Party under the bankruptcy or insolvency laws of the United States or any state thereof; (e) such Loan Party continues to be validly existing under the laws of the state of its formation, in good standing therein; (f) each Loan Party, and any other person required to execute the Pledge Agreement, including each individual signing on behalf of any such Loan Party or Person, has been fully authorized to do so and to deliver and perform such Amendment Documents, with all such actions having been duly authorized by all requisite company governance actions; (g) Borrower is duly formed, validly existing and in good standing under the laws of the State of California, with each of the individuals executing the Amendment Documents having the full power to bind Borrower and to execute, deliver and perform the Loan Documents (including the Amendment Documents); (h) the Trust is duly formed and existing, constitutes a revocable trust and the sole trustees of the Trust are Gerald J. Marcil and Carol L. Marcil, with each of them having the full power to bind the Trust and to execute, deliver and perform the Loan Documents (including the Amendment Documents); and (i) the execution, delivery and performance of the Amendment Documents by such Loan Parties and persons do not require the approval or consent of any other person, any governmental agency or any authority having jurisdiction over such Loan Party or any of the Collateral except for consents or approvals that have been obtained.

6.    **Ratification of Loan Documents and Collateral**. Each Loan Party hereby acknowledges,

agrees, represents, ratifies and confirms to Lender that, as of the Effective Date: (a) each of Loan Documents to which it is a party, as such Loan Documents may have been modified by the Amendment Documents, continue to be valid, in full force and effect and enforceable against such Loan Party in accordance with its terms, and such Loan Party remains obligated thereunder, all without any right of offset, counter-claim or defense (other than the defense of actual prior payment or performance thereof pursuant to the Loan Documents); (b) the security interests of Lender in and to the Collateral continue in full force and effect with respect to such Collateral, with such security interests continuing to be in first priority lien therein and are duly perfected (except as to the Pledged Collateral which perfection shall be occur upon the filing of the Financing Statements); (d) the Guaranties are valid and enforceable against Guarantors, with Guarantors being obligated thereunder in accordance with their respective terms (for avoidance of doubt, with such obligations being the guaranty of all of the obligations of Borrower under the Loan Documents); and (d) any right to make any claim or assert any defense which would be inconsistent with or contrary to the foregoing statements is hereby unconditionally and irrevocably waived.

7.    **Full Release of Lender**. Each Loan Party, by its execution of this Amendment, on its own behalf and on behalf of its officers, directors, managers, employees, owners, shareholders, partners, joint venturers, insurers, agents, representatives, attorneys, family members and any descendants thereof, all affiliates related thereto, and all persons acting by, through, under, or in concert with any of foregoing persons, hereby unconditionally, irrevocably, fully and finally releases Lender and its subsidiaries, parent companies, affiliates, predecessors, successors and assigns, and all affiliates thereof, and all of their respective officers, directors, employees, managers, trustees, owners, shareholders, partners, joint venturers, insurers, agents, representatives, attorneys, and all persons acting by, through, under, or in concert with any of the foregoing from, and irrevocably and unconditionally waives any claims, rights or remedies with respect to, any and all claims, demands, obligations, liabilities, indebtednesses, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, suits, judgments, executions, debts, rights of setoff, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses, of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, direct or indirect, at contract, tort, at law in equity or otherwise, or arising out of a violation of law or regulations or otherwise, including without limitation, arising directly or indirectly from the Loan, any of the Loan Documents, the negotiation for and execution of the Loan Documents, the administration of the Loan Documents and/or the exercise of any rights and remedies under any of the Loan Documents (the "**Released Claims**"), to the extent any such Released Claims arose prior to, presently exist or may exist, or otherwise could arise in the future based on facts and circumstances which existed as of or prior to the date of this Amendment. It is the intention of each Loan Party that the above release of the Released Claims shall be effective as a full and final release and waiver of each and every matter specifically and generally referred to above, with each Loan Party acknowledging and representing to Lender that it has been advised by independent legal counsel with respect to the agreements contained herein and all applicable laws with respect thereto, including, to the extent California law is deemed to apply to any Loan Party, the provisions of California Civil Code Section 1542, which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." Each Loan Party, being aware of any and all of its statutory rights and protections that may exist under applicable law, expressly waives on its own behalf and on behalf of those for which it is giving the release, any and all rights either may have thereunder, as well as under any other statute or common law principle of similar effect, with respect to any of the matters released herein. This release shall act as a release and waiver of all included claims, rights and causes of action, whether such claims are currently known, unknown, foreseen or unforeseen and regardless of any present lack of knowledge as to such claims. Each Loan Party understands and acknowledges the significance and

617582465

*Pacifica Gardens Loan*
*Loan Amendment*

consequence of this waiver of California Civil Code Section 1542, and hereby assumes full responsibility for any injuries, damages, losses, or liabilities being released and waived herein.

8.    **Governing Law; Venue; Jury Waiver and Judicial Reference**.

a.    Governing Law. This Agreement and the Loan Documents shall be construed in accordance with and governed by the federal laws to which Lender may be subject and otherwise pursuant to the internal laws (without regard to conflict of law provisions thereof) of the State of California.

b.    Venue. To the fullest extent permitted by applicable law, in the event any judicial action or proceeding is to be brought with respect to the Loan or any Claim (as defined below), the Parties hereby irrevocably and unconditionally submits, for such Party and such Party's assets, to the exclusive jurisdiction of any Court (as defined below) sitting in either Orange County, California; provided that, to the extent deemed necessary or appropriate by Lender with respect to the enforcement and collection of the Loan as against any Loan Party, any pledgor under the Pledge Agreement or any Collateral, such other jurisdiction as Lender may elect, in each case, including any appellate courts from any such jurisdiction,. Each of the Parties hereto hereby irrevocably and unconditionally agrees that all such Claims may be heard and determined in such Court. Each of the Parties hereto agrees that a final judgment as to any Claim shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Loan Party hereby waives any right to file, commence or otherwise remove any Claim to any other jurisdiction, whether another state or federal court. Notwithstanding the foregoing, nothing contained herein shall restrict the right of any Party to commence or bring any Claim in a bankruptcy proceeding under Title 11 of the United States Code. To the fullest extent permitted by applicable law, each Loan Party hereby irrevocably and unconditionally waives, any objection which it may now or hereafter have to the laying of venue of any Claim in any Court residing in Orange County, California, with each Loan Party hereby irrevocably waiving, to the fullest extent permitted by applicable laws, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such Court.

c.    JURY WAIVER. EACH PARTY HERETO HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY CONTROVERSY, DISPUTE OR CLAIM, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE LOAN, THE AMENDMENT DOCUMENTS, THE OTHER LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY AND HEREBY, ANY ACTIONS OR FAILURE TO ACT BY ANY PARTY WITH RESPECT HERETO OR THERETO (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, EACH A "**CLAIM**"). FOR AVOIDANCE OF DOUBT AND WITHOUT LIMITING THE FOREGOING, THE PARTIES AGREE THAT THE DEFINITION OF "CLAIM" AS USED HEREIN INCLUDES BUT IS NOT LIMITED TO, MATTERS ARISING FROM OR RELATING TO ANY ACCOUNTS, AN APPLICATION FOR OR DENIAL OF CREDIT, ANY ADVANCE, ANY WARRANTIES AND REPRESENTATIONS MADE BY A PARTY, THE ADEQUACY OF A PARTY'S DISCLOSURES, ENFORCEMENT OF ANY AND ALL OF THE OBLIGATIONS A PARTY MAY HAVE TO ANOTHER PARTY, COMPLIANCE WITH ANY APPLICABLE LAWS, THE APPROVAL, CONSENT OR ACCEPTANCE, OR THE LACK OF SAME BY LENDER WITH RESPECT TO THE LOAN OR THE LOAN DOCUMENTS, THE OCCURRENCE OF OR ANY DISPUTE WITH RESPECT TO THE OCCURRENCE OF ANY MATERIAL ADVERSE CHANGE, UNMATURED EVENT OF DEFAULT OR EVENT OF DEFAULT, INCLUDING WITHOUT LIMITATION DISPUTES BASED ON OR ARISING

-6-

FROM ANY ALLEGED TORT OR MATTERS INVOLVING THE EMPLOYEES, OFFICERS, AGENTS, AFFILIATES, OR ASSIGNS OF A PARTY HERETO.    EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

d.    Judicial Reference.  In the event any Claim is filed in a court of the state of California (the "**Court**") and the waivers set forth in Section 2 are not enforceable in such action or proceeding, the Parties hereto agree as follows:

(i)    Claims Heard by Referee in Reference Proceeding.  With the exception of the matters specified in clause (ix) below, any and all Claims shall be heard by a referee and resolved by a reference proceeding pursuant to California Code of Civil Procedure (the "**CCP**") Sections 638 through 645.1.

(ii)    Referee Qualifications and Selection.    The referee shall be a retired California state court judge or justice.  The Parties shall not seek to appoint a referee that may be disqualified pursuant to CCP Section 641 or 641.2 without the prior written consent of all Parties.  If the Parties are unable to agree upon a referee within ten (10) calendar days after one Party serves a written notice of intent for judicial reference upon the other Party or Parties, then the referee will be selected by the Court in accordance with CCP Section 640(b).

(iii)    Court Reporter; Costs.  All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except when any Party so requests, a court reporter will be used and the referee will be provided a courtesy copy of the transcript.  The Party making such request shall have the obligation to arrange for and pay costs of the court reporter, provided that such costs, along with the referee's costs, shall ultimately be borne by the Party who does not prevail, as determined by the referee.

(iv)    Reference Rules and Procedure; Binding Effect of Referee's Decision. The referee shall conduct the proceedings in accordance with the CCP, the Rules of Court, and California Evidence Code, except as otherwise specifically agreed by the Parties and approved by the referee.  The referee may require one or more prehearing conferences. The Parties hereto shall be entitled to discovery, and the referee shall oversee discovery in accordance with the Rules of Discovery and may enforce all discovery orders in the same manner as any trial court judge in proceedings at law in the state of California.  The referee shall apply the rules of evidence applicable to proceedings at law in the state of California and shall determine all issues in accordance with applicable state and federal law.  The referee shall be empowered to enter equitable as well as legal relief and rule on any motion which would be authorized in a trial, including motions for default judgment or summary judgment.  The referee shall render a written statement of decision.  The referee's statement of decision shall set forth findings of fact and conclusions of law.  The decision of the referee shall be entered as a judgment in the court in accordance with the provisions of CCP Sections 644 and 645.  The decision of the referee shall be appealable to the same extent and in the same manner that such decision would be appealable if rendered by a judge of the superior court.

-7-

(v)     Referee Jury Waiver.  The Parties recognize and agree that all claims resolved in a reference proceeding pursuant hereto will be decided by a referee and not by a jury.

(vi)     Fees and Costs During Reference Proceeding; Prevailing Party.  During the pendency of any Claim which is submitted to judicial reference in accordance with this Agreement, each of the Parties to such Claim shall bear equal shares of the fees charged and costs incurred by the referee in performing the services described in this Agreement. The compensation of the referee shall not exceed the prevailing rate for like services.  The prevailing Party shall be entitled to reasonable court costs and legal fees, including customary attorney fees, expert witness fees, paralegal fees, the fees of the referee, and other reasonable costs and disbursements charged to such Party by its counsel and the fees set forth in Section 3.3 above, in such amount as is determined by the referee.

(vii)     Third Parties.  If any other Person not a Party becomes a party to with respect to any Claim (such as but not limited to a credit reporting agency, merchant accepting a credit card, junior lienholder or title company, contractor, subcontractor or assignee), each Party hereto agrees to consent to including that third party in judicial reference proceeding for prosecuting, defending and/or resolving the Claim with that party.

(viii)     REFERENCE AGREEMENT.  THIS AGREEMENT CONSTITUTES A "REFERENCE AGREEMENT" BETWEEN OR AMONG THE PARTIES WITHIN THE MEANING OF AND FOR PURPOSES OF CCP SECTION 638.

(ix)     Self-Help Remedies.  Nothing in this Agreement shall be deemed to apply to or limit the right of Lender (a) to exercise self-help remedies, (including, without limitation, setoff), (b) to foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, (c) to obtain from a court provisional or ancillary remedies (including, without limitation, injunctive relief, a temporary restraining order, a writ of possession, a writ of attachment, prejudgment attachment, a protective order or the appointment of a receiver) or (d) to pursue rights against a Party in a third-party proceeding in any action brought against Lender (including actions in bankruptcy court).  Lender may exercise the rights set forth in the foregoing clauses (a) through (d), inclusive, before, during or after the pendency of any judicial reference proceeding.  Neither the exercise of self-help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies nor the opposition to any such provisional remedies shall constitute a waiver of the right of any Party, including, but not limited to, the claimant in any such action, to require submission to judicial reference the merits of the Claim occasioning resort to such remedies.  No provision in the Loan Documents regarding submission to jurisdiction and/or venue in any court is intended or shall be construed to be in derogation of the provisions in this Agreement or any other Loan Document.

(x)     Multiple Claims.  If a Claim includes multiple claims, some of which are found not subject to this Agreement, the Parties shall, to the extent permitted under Applicable Law, stay the proceedings of the Claims or part or parts thereof not subject to this Agreement until all other Claims or parts thereof are resolved in accordance with this Agreement.  If there are Claims by or against multiple parties, some of which are not subject to this Agreement, the Parties shall, to the extent permitted by Applicable Law, sever the Claims subject to this Agreement and resolve them in accordance with this Agreement.

-8-

617582463

*Pacifica Gardens Loan*
*Loan Amendment*

9.    **Miscellaneous.**

a.    <u>Waivers</u>. Each Loan Party hereto hereby waives, to the maximum extent permitted under applicable law, (i) the right to litigate in court or arbitrate any Claim as a class action, either as a member of a class or as a class representative, or to act as a private attorney general and (ii) any right such Loan Party may have against Lender to any special, exemplary, punitive or consequential damages other than, or in addition to, actual damages, regarding any Claim.

b.    <u>Further Assurances</u>. Each Loan Party covenants and agrees with Lender that it will execute, deliver, and provide to Lender such additional agreements, documents, and instruments as reasonably required by Lender to effectuate the intent of the Parties as described in herein or otherwise correct any scrivener errors therein.

c.    <u>Entire Agreement, Change, Discharge, Termination, or Waiver</u>. The Loan Documents, as modified this Amendment, and as otherwise amended, restated, or modified, contain the entire understanding and agreement of the Parties hereto with respect to the subject matter thereto and hereto, and supersede all prior representations, warranties, agreements, arrangements and understandings. No Loan Document may be further changed, discharged, supplemented, terminated, or waived except in writing signed by Lender and the Loan Party a party thereto. To the extent there are any inconsistencies between the Loan Documents and this Amendment, this Amendment shall control.

d.    <u>Binding Effect</u>. The Loan Documents as modified by this Amendment are binding upon and inure to the benefit of the Parties and their respective successors and assigns to the extent any such assignment is permitted under the Loan Documents.

*[Remainder of Page Intentionally Blank – Signature Pages Follow]*

IN WITNESS WHEREOF, the undersigned have entered into this Amendment as of the Effective Date.

LENDER:                              NANO BANC,
                                     a California corporation

                                     By: _____
                                     Name: _____
                                     Title: _____SVP_____

[*Signatures Continue on Following Pages*]

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the Effective Date.

BORROWER:        **PACIFICA GARDEN APTS., LP,**
a California limited partnership

By:    Woodglen Apts., LLC,
a California limited liability company
Its General Partner

By: _____
Gerald J. Marcil, Managing Member

By: _____
Carol L. Marcil, Member

By: _____
Gerald J. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family Trust
established May 9, 1997, a Limited Partner

By: _____
Carol L. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family Trust
established May 9, 1997, a Limited Partner

*[Signatures Continue on Following Page]*

617582465

*Pacifica Gardens Loan
Loan Amendment*

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the Effective Date.

GUARANTORS:

_____
Gerald J. Marcil, individually and as
Authorized Trustee of, and on behalf of, the
Marcil Family Trust established May 9, 1997

_____
Carol L. Marcil, as Authorized Trustee of, and
on behalf of, the Marcil Family Trust
established May 9, 1997

S-3

*Pacifica Gardens Loan*
*Loan Amendment*

*617582465*

## SPOUSAL CONSENT

The undersigned ("**Spouse**"), being the spouse of Gerald J. Marcil ("**Marcil**"), individually and on behalf of the community property estate of Spouse and Marcil, having read and understood the Amendment to which this Spousal Consent is attached hereby consents to Marcil's execution, delivery and performance of the Loan Documents, including the Amendment Documents, and acknowledges that, by virtue of the marital estate, Spouse may acquire an interest in certain in certain property of Marcil which constitutes community property or Trust property, including the Pledged Collateral (the "**Property**"). Being fully apprised of the foregoing, Spouse does hereby forever agree, unconditionally and irrevocably:

1.      Subordinate and subject any rights, titles, or interests of Spouse in and to the Property, together with replacements and additions thereto, to Lender's security interests in and to the Property, and Lender's rights and remedies with respect thereto;

2.      Consent to all terms and conditions of, as well as all obligations of Marcil and the Trust arising under, the Loan Documents, and agree that any and all such obligations may be satisfied out of or applied against any property or other interest Spouse owns or may own at any time, now and forever;

3.      Subordinate all rights, titles, and interest in the Property that Spouse may have in and to the Property, to the rights, title and interests of Lender therein and thereto and covenant and agree not to assert, by suit or otherwise, any claim or right Spouse may have or hereafter acquire in any Property or as against Marcil, or against Lender;

4.      Acknowledge that Lender is relying on this Consent in agreeing to the Amendment Documents and accepting the Collateral as security for the Loan;

5.      Acknowledges that this Consent satisfies any and all requirements and conditions set forth in the organizational documents of the Companies with respect to the transfer of the Collateral to Lender as additional security for the Loan, with Spouse waiving any claim to the contrary, with the Spouse acknowledging and agreeing that Spouse has authorized the execution, delivery and performance of the Amendment Documents, and the granting of security interests therein in accordance with therewith.

6.      Agree that Lender and Borrower may agree to modify the Loan from time to time without notice to or the consent of Spouse and such modification shall not affect, invalidate or otherwise impair this Consent, with this Consent continuing to be valid and enforceable notwithstanding;

8.      Agree not to take any action or make any claim that would hinder, delay, interfere with or frustrate the payment and performance of the Loan Parties under the Loan Documents or by any other person who is a party to the Pledge Agreement, or otherwise hinder, delay, interfere with or frustrate the exercise by Lender of its rights and remedies under the Loan Documents, including as against any of the Property.

9.      Agree, consent to and authorize all actions taken by Marcil, whether as the trustee of the Trust or otherwise on behalf of any Loan Party, any Pledgor or any affiliate thereof, including Woodglen, (whether as a manager, member or otherwise), with respect to the execution, delivery, consummation and performance of Amendment Documents, including this Agreement and the pledge of the Pledged Collateral (as defined in the Pledge Agreement) pursuant to the Pledge Agreement.

10.     Agree that this Consent and the undersigned are subject to, and bound by the governing law, jury waiver, judicial reference and venue provisions set forth in the Amendment.

IN WITNESS WHEREOF, Spouse has executed this Consent as of the date of the Amendment to which this Consent is attached.

_____
CAROL L. MARCI, individually and as a Trustee of
the Marcil Family Trust established May 9, 1997

# PLEDGE AND SECURITY AGREEMENT

Dated as of September 12, 2025

By

## PLEDGORS:

THE MARCIL FAMILY TRUST, established on May 9, 1997, and
WOODGLEN APTS., LLC, a California limited liability company

## LENDER AND SECURED PARTY:

NANO BANC, a California corporation

*617582480*

*Pacifica Gardens Loan*
*Pledge Agreement*

## PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (this "**Agreement**") entered into as of September 12, 2025 by THE MARCIL FAMILY TRUST, established on May 9, 1997 ("**Trust**") and Woodglen Apts., LLC, a California limited liability company ("**Woodland**" and with the Trust, individually and collectively, "**Pledgor**" or "**Pledgors**") to and in favor of NANO BANC, a California corporation ("**Lender**"). The address of Pledgors is 43D Malaga Cove Plaza, Palos Verdes Estates, CA 90274.

### RECITALS

A.    Lender has made a Loan to PACIFICA GARDEN APTS., LP, a California limited liability company ("**Borrower**" or the "**Company**") in the stated maximum principal commitment amount of $8,542,500.00, Loan No. 7000259500 (the "**Loan**"). Concurrently herewith, Lender, Borrower and the Guarantors of the Loan are entering into that certain Loan Amendment dated as of even date herewith (the "**Amendment**"). All initial capitalized terms not otherwise defined herein shall mean as defined in the Amendment.

B.    Borrower is a limited partnership formed under the laws of the State of California, the business and affairs of which are governed by an Agreement of Limited Partnership (the "**Partnership Agreement**"). As of the date hereof, collectively, the Pledgors hold 100% of the limited partnership interests and the general partnership interests in and to Borrower and there are no other partners or other direct interest holders in Borrower, with the Pledgors constituting all of the partners of, and direct interest holders in, Borrower.

C.    As a condition precedent to entering into the Amendment on the terms and conditions set forth therein, Lender requires, and Pledgors are willing to, enter into this Agreement on the terms and conditions set forth below.

### AGREEMENT

NOW, THEREFORE, based on the foregoing recitals, the accuracy of which are hereby acknowledged by Pledgors, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Pledgors, Pledgors hereby agree as follows:

1.    **Defined Terms**. In addition to the defined terms set forth elsewhere herein and in the Amendment, as used in this Agreement, the following terms have the meanings set forth in or incorporated by reference below:

"**Code**" means the Uniform Commercial Code from time to time in effect in the State of California.

"**Liens**" shall mean any and all liens or encumbrances, whether voluntarily or involuntarily created by agreement, contract or instrument, or by operation of law.

"**Obligations**" means all of the payment and performance obligations and liabilities of Borrower with respect to the Loan, all as set forth in the Loan Documents (as amended by the Amendment).

*617582480*                                          2                          *Pacific Gardens Loan*
*Pledge Agreement*

"**Partnership Interests**" means any and all of the partnership and equity interests held by Pledgors in the Company, including all claims, powers, privileges, benefits, economic interests and rights, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by the Company pursuant to and in accordance with the Partnership Agreement.

"**Person**" means a natural person, a partnership, a joint venture, an unincorporated association, a limited liability company, a corporation, a trust, any other legal entity, or any governmental agency, department or other authority.

"**Proceeds**" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the Code.

"**Pledged Collateral**" has the meaning ascribed to such term in Section 2 of this Agreement.

"**Pledgor**" or "**Pledgors**" has the meaning ascribed to such term in the introductory paragraph.

"**Permitted Ownership Liens**" means the Liens and other rights in favor of Lender created by this Agreement.

The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified. The word "including" when used in this Agreement shall be deemed to be mean and include "but not limited to."

2.      **Pledge; Grant of Security Interest**. As additional collateral for the Loan, and the payment and performance of all of the Obligations of Borrower under the Loan Documents, as and when such Obligations are required to be paid or performed (whether at the stated maturity, by acceleration or otherwise), Pledgor hereby pledges, assigns and grants to Lender a first priority security interest in all of their respective rights, titles, interests, privileges, claims and remedies with respect to the following, whether now owned or existing or hereafter acquired or arising (collectively, the "**Pledged Collateral**"):

2.1     All of the Partnership Interests of Pledgors;

2.2     All securities, security certificates, moneys or property representing the Partnership Interests, or representing dividends, distributions or interest on any of the Partnership Interests, or representing a distribution in respect of any of the Partnership Interests, or resulting from a split-up, revision, reclassification or other like change of any of the Partnership Interests or otherwise received in respect of or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, any of the Partnership Interests;

2.3     All proceeds, loss payments and premium refunds which may become payable with respect to any policy of insurance payable by reason of loss or damage to any of the Partnership Interests and any other Pledged Collateral;

2.4     all "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the Code) constituting or relating to the foregoing; and

2.5    all Proceeds of any of the foregoing property of Pledgor.

3.    **Representations and Warranties**. Each Pledgor represents and warrants as of the date hereof that:

3.1    No authorization, consent of or notice to or filing with any other Person (including any member, partner or creditor of Pledgor) that has not been obtained, is required (a) in connection with the execution, delivery, performance, validity or enforceability of this Agreement including the assignment and transfer by Pledgor of any of the Pledged Collateral to Lender or, to Pledgor's knowledge, the subsequent transfer thereof by Lender pursuant to the terms hereof; or (b) for the exercise by Lender of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement (except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally and except as may be required by laws affecting the exercise of remedies in respect of collateral generally);

3.2    Except for the Partnership Agreement, there are no documents which evidence or govern the Pledged Collateral and the rights, title, interests and remedies of Pledgor with respect thereto;

3.3    The Partnership Interests in each case constitute all the issued and outstanding ownership, economic, financial and management interests of Pledgor and, except for the Pledged Collateral, Pledgor has no other rights, titles, interests in or to, nor claims against, the Company;

3.4    There currently exist no certificates, instruments or writings representing the Partnership Interests;

3.5    The Partnership Interests are not subject to Article 8 of the UCC;

3.6    Pledgor has not assigned or sold any of the Pledged Collateral and Pledgor is the record and beneficial owner of, and has good title to, the Pledged Collateral, free and clear of any and all Liens, pledges, or options in favor of, or claims of, any other Person, except the Permitted Ownership Liens;

3.7    Upon the filing of the UCC-1 financing statement referred to in Section 9 with the California Secretary of State, the Liens in and to the Pledged Collateral granted pursuant to this Agreement will constitute a valid, perfected, first priority Lien in and to the Pledged Collateral, enforceable as such against all creditors of Pledgor and any Persons purporting to purchase any or otherwise obtain any rights in and to the Pledged Collateral;

3.8    The principal place of business and office of Pledgors and the Company is as set forth in the initial paragraph of this Agreement;

3.9    The correct legal names of each of the Pledgors is, and at all times has been, as set forth in the introductory paragraph to this Agreement, is the same as identified in the books and records of the Company, there are no other ownership, equity, economic or financial interests in and to the Company other than the Partnership Interests and the Pledged Collateral constitutes all of the ownership, equity, economic or financial interests in and to the Company held by Pledgors;

3.10    Woodglen is, and at all times has been, organized exclusively under the laws of the State of California;

3.11    Marcil is a California resident and the Trust was duly formed in California and constitutes a revocable trust created under the laws of the State of California;

3.12    The Company is, and at all times has been, organized exclusively under the laws of the State of California; and

3.13    Marcil is a member of Woodglen and is the sole manager of Woodglen. Carol L. Marcil is also a member of Woodglen. Marcil and Carol L. Marcil are the only members of Woodglen and are authorized to execute this Pledge Agreement on behalf of Woodglen, with Woodglen being bound hereby upon such execution.

4.    **Covenants**. Each Pledgor covenants and agrees with Lender, from and after the date of this Agreement until that date upon which repayment in full of the Obligations has occurred, as follows:

4.1    Without the prior written consent of Lender, except for the Permitted Ownership Liens, Pledgor shall not, directly or indirectly (a) vote to enable, or take any other action to permit, the Company to issue any additional limited partnership interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any limited partnership interests in the Company, (b) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Collateral, or (c) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Pledged Collateral, or any interest therein. Pledgor will not create, incur or permit to exist any Lien or claim on or to the Pledged Collateral (other than the Permitted Ownership Liens), will defend, at its sole cost and expense, the Pledged Collateral against any Lien or claim thereon or thereto (other than the Permitted Ownership Liens), and will take all such other action as is necessary to remove, any such Lien or claim on or to the Pledged Collateral, and will defend the first in priority collateral rights, titles and security interests of Lender in, to and under the Pledged Collateral against any and all claims and demands of any other Persons whomsoever (other than claims or demands asserted by Lender) with respect thereto, each at Pledgors' sole cost and expense.

4.2    At any time and from time to time, upon the written request of Lender, and at the sole expense of Pledgors, Pledgors shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as Lender may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including filing UCC financing or continuation statements; provided that the obligations of Pledgor hereunder shall not be increased and any of the rights of Pledgors hereunder shall not be decreased by such documents and instruments. Subject to the limitations set forth in the Amendment with respect thereto, Pledgors hereby authorize Lender to file any such financing statement or continuation statement without the signature of Pledgor to the extent permitted by law. If any amount payable under or in connection with any of the Pledged Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such note, instrument or chattel paper shall be promptly delivered to Lender, duly endorsed in a manner reasonably satisfactory to Lender, to be held as Pledged Collateral pursuant to this Agreement.

4.3    Pledgors shall not, unless (a) they shall have given at least ten (10) days' prior written notice to such effect to Lender and (b) all action as Lender may reasonably request to protect

and perfect the liens and security interests intended to be created hereunder with respect to the Partnership Interests shall have been taken pursuant to above Section 4.2, (i) change the location of their chief executive office or principal place of business from that specified in this Agreement, (ii) change their name, identity or structure, or (iii) convert to another type of entity, reorganize or reincorporate under the laws of another jurisdiction.

4.4    Pledgor shall pay, and save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Pledged Collateral or in connection with any of the transactions contemplated by this Agreement.

4.5    Pledgor shall not cause or permit any Pledged Collateral to be represented or evidenced by any certificates, instruments or writings without the prior written consent of Lender.

4.6    Pledgor shall not cause or permit any Pledged Collateral to be subject to Article 8 of the UCC without the prior written consent of Lender.

4.7    At any time an Event of Default has occurred and is continuing, if Pledgor, as a result of its ownership of the related Partnership Interests or any of the other Pledged Collateral, is or becomes entitled to receive, or shall receive, (a) any funds, Distributions or Proceeds on account of any of the Pledged Collateral, (b) any stock, partnership or limited partnership certificates, as applicable (including any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), and (c) option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any of the Partnership Interests, or otherwise in respect thereof, Pledgor shall accept the same as Lender's agent, hold the same in trust for Lender and deliver the same forthwith (but no later than within five (5) days) to Lender in the exact form received, duly endorsed by Pledgor to Lender, if required, together with an undated stock, limited partnership or partnership power covering such certificate duly executed in blank to be held by Lender hereunder as additional security for the Obligations. Any sums paid upon or in respect of the Partnership Interests upon the liquidation or dissolution of the Company shall be paid over to Lender to be held by it hereunder as additional security for the Obligations and distributed in accordance with the provisions of the Loan Documents, and in case any distribution of capital shall be made on or in respect of the Partnership Interests or any property shall be distributed upon or with respect to the Partnership Interests pursuant to the recapitalization or reclassification of the capital of the Company or pursuant to the reorganization thereof, the property so distributed shall be delivered to Lender to be held by it, subject to the terms hereof, as additional security for the Obligations and distributed in accordance with the provisions of the Loan Documents. If any sums of money or property so paid or distributed in respect of the Pledged Collateral shall be received by Pledgor, Pledgor shall deliver the same forthwith but not later than within five (5) days to Lender and, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of Pledgor, as additional security for the Obligations.

5    **Distributions; Cash Dividends; Voting Rights**. So long as no Event of Default exists, the Company may make distributions to Pledgors in the ordinary course of operations; provided that (a) in the event of any capital event with respect to any of the assets of the Company, including any sale of any asset or the refinancing of any asset, the Company shall not distribute any of the proceeds thereof to Pledgors, whether as a distribution or otherwise, but instead shall deliver such proceeds to Lender and (b) at any time an Event of Default has occurred and is continuing, the Company shall not make any distribution, dividend or other payment to any Pledgor but shall, instead, deliver such amounts to Lender. Any amounts received

by Lender pursuant to this Section shall be applied to the Obligations by Lender, with such application to be applied first to any then accrued but unpaid costs, charges and expenses then owing to Lender, then to the past due amounts which were deferred pursuant to the Amendment, and, then to the then outstanding principal balance of the Loan. No Pledgor shall exercise all management, voting and other consensual rights and limited partnership rights and interests with respect to the Partnership Interests, exercise any and all other rights with respect to the Partnership Interests, or take, or fail to take, any other action, which would result in (1) a violation of any of the covenants set forth in this Agreement, (2) a failure of any representation and warranty set forth herein, (3) an impairment of the Pledged Collateral, or (4) the interference, impairment or frustration of any rights and remedies of Lender with respect to the Pledged Collateral.

6      **Rights and Remedies of Lender**.

6.1      At any time an Event of Default has occurred and is continuing, (a) Lender shall have the right to receive any and all Distributions to which Pledgors are entitled, together with any other income, cash dividends, proceeds or other property received or paid in respect of the Partnership Interests and the other Pledged Collateral, to receive and apply all such amounts received to the Obligations, in such order and priority as Lender may elect except as otherwise provided below); (b) all such Partnership Interests shall, at Lender's option, be registered in the name of Lender or its nominee (if not already so registered); (c) Lender or its nominee may thereafter exercise all of the rights and remedies of Pledgor with respect to the Pledged Collateral pursuant to the Partnership Agreement and/or applicable law, including all rights and remedies of a secured party under the Code, including conducting of a private sale as set forth below in Section 7, and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership of Pledgors pertaining to the Pledged Collateral as if Lender were the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right); (d) Lender may make any reasonable compromise or reasonable settlement deemed desirable with respect to any of the Pledged Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Pledged Collateral; and (e) Lender in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Pledged Collateral, but in each case, shall be under no obligation to do so. Without limiting the generality of the foregoing, upon the occurrence and during the continuance of an Event of Default, Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except as required by law or otherwise required hereby or by any other Loan Document) to or upon Pledgor, the Company, or any other Person (all and each of which demands, presentments, protests, advertisements and notices, or other defenses, are hereby waived to the extent permitted under applicable law), may in such circumstances forthwith collect, receive, appropriate and realize upon the Pledged Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Pledged Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best in its sole discretion, for cash or on credit or for future delivery, all without any assumption of any credit risk. Lender shall have the right, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be

adjourned without further notice. Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Pledged Collateral so sold, free of any right or equity of redemption of Pledgor, which right or equity of redemption is hereby waived or released. Lender shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Pledged Collateral or in any way relating to the Pledged Collateral or the rights of Lender hereunder, including attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Lender may elect (except as otherwise provided herein), and only after such application and after the payment by Lender of any other amount required by any provision of law, including Sections 9-610 and 9-615 of the Code, shall Lender be required to account for the surplus of such Proceeds, if any, to Pledgor. To the extent permitted by applicable law, Pledgor waives all claims, damages and demands it may acquire against Lender arising out of the exercise by Lender of any of its rights hereunder, except for any claims, damages and demands it may have against Lender arising from the breach of any Loan Document (as finally determined by a court of competent jurisdiction), or the willful misconduct or gross negligence of Lender or its affiliates, any agents, employees, officers, directors, shareholders or other representatives of the foregoing. If any notice of a proposed sale or other disposition of Pledged Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least forty-five (45) days before such sale or other disposition.

6.2     The rights and remedies of Lender under this Agreement shall not be conditioned or contingent upon the pursuit by Lender of any right or remedy against Pledgor or against any other Person which may be or become liable in respect of all or any part of the Obligations or against any other security therefor, guarantee thereof or right of offset with respect thereto. Lender shall not be liable for any failure to demand, collect or realize upon all or any part of the Pledged Collateral or for any delay in doing so, nor shall it be under any obligation to sell or otherwise dispose of any Pledged Collateral upon the request of Pledgor or any other Person or to take any other action whatsoever with regard to the Pledged Collateral or any part thereof.

6.3     The powers conferred on Lender hereunder are solely to protect Lender's interest in the Pledged Collateral and shall not impose any duty upon Lender to exercise any such powers. Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees shall be responsible to Pledgor for any act or failure to act hereunder, except for its or their breach of any Loan Document (as finally determined by a court of competent jurisdiction), gross negligence or willful misconduct.

6.4     The rights, powers, privileges and remedies of Lender under this Agreement are cumulative and shall be in addition to all rights, powers, privileges and remedies available to Lender at law or in equity. All such rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of Lender hereunder.

7     **Private Sales**.

7.1     Pledgor recognizes that Lender may be unable to effect a public sale of any or all of the Pledged Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a

view to the distribution or resale thereof. Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the Company or Pledgor to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the Company or Pledgor would agree to do so. Pledgor further shall use its commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Partnership Interests pursuant to this Section 7 valid and binding and in compliance with any and all other requirements of applicable law. Pledgor further agrees that a breach of any of the covenants contained in this Section 7 will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 7 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and/or is continuing under the Loan Documents.

7.2    Lender shall not incur any liability as a result of the sale of any Pledged Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Pledged Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Pledgor hereby waives any claims against Lender arising by reason of the fact that the price at which any of the Pledged Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if Lender accepts the first offer received and does not offer any Pledged Collateral to more than one offeree, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

7.3    The Code states that Lender is able to purchase the Partnership Interests only if they are sold at a public sale. Lender has advised Pledgor that SEC staff personnel have issued various no-action letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the Code, yet not public for purposes of Section 4(2) of the Securities Act of 1933. The Code permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Article 9. Pursuant to the Code, Pledgor specifically agrees (a) that it shall not raise any objection to Lender's purchase of the Pledged Collateral (through bidding on the obligations or otherwise) and (b) that a foreclosure sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the Code; (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Partnership Interests under the Securities Laws, even if Pledgor or the Company agrees to pay all costs of the registration process; and (iii) shall be considered to be commercially reasonable notwithstanding that Lender purchases the Partnership Interests at such a sale.

7.4    Pledgor agrees that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any of the Pledged Collateral sold by Lender pursuant to this Agreement. Lender, may, in its sole discretion, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers. Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered

commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

> 7.4.1    Lender conducts the foreclosure sale in the State of Delaware;

> 7.4.2    The foreclosure sale is conducted in accordance with the laws of the State of California;

> 7.4.3    Not less than forty-five (45) days in advance of the foreclosure sale, Lender notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale;

> 7.4.4    The foreclosure sale is conducted by an auctioneer licensed in the State of California and is conducted in front of a California State Court having jurisdiction over the Pledged Collateral on any business day between the hours of 9 a.m. and 5 p.m. Eastern Time;

> 7.4.5    The notice of the date, time and location of the foreclosure sale is published in The New York Times or The Wall Street Journal (or if The New York Times and The Wall Street Journal are no longer publishing, such other newspaper widely circulated in Chicago, Illinois) for seven (7) consecutive days prior to the date of the foreclosure sale, and;

> 7.4.6    Lender sends notification of the foreclosure sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the State of California conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

8    **Limitation on Duties Regarding Pledged Collateral**. Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Pledged Collateral in its possession, under Section 9-207 of the Code or otherwise, shall be to deal with it in the same manner as Lender deals with similar securities and property for its own account. Neither Lender nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Pledged Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Pledged Collateral upon the request of Pledgor or otherwise. Pledgor also authorizes Lender, at any time and from time to time following and during the continuance of an Event of Default, to execute, in connection with the sale provided for in Section 6 or 7, any endorsements, assignments or other instruments of conveyance or transfer as are required with respect to the Pledged Collateral.

9    **Financing Statements; Other Documents**. Pledgor hereby authorizes Lender to file UCC-1 financing statements with respect to the Pledged Collateral. Pledgor agrees to deliver any other document or instrument which Lender may reasonably request with respect to the Pledged Collateral for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted; provided that such other document or instrument does not increase Pledgor's obligations nor decrease Pledgor's rights hereunder. Without limiting the generality of the foregoing, Pledgor hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name Pledgor as debtor and Lender as secured party and that cover the Pledged Collateral. Pledgor also hereby ratifies the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof.

617582480                                                        10                                            *Pacific Gardens Loan*
*Pledge Agreement*

10      **Attorney-in-Fact**. Without limiting any rights or powers granted by this Agreement to Lender, upon the occurrence and during the continuance of an Event of Default, Lender is hereby appointed, which appointment as attorney-in-fact is irrevocable and coupled with an interest, the attorney-in-fact of Pledgors for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which Lender may reasonably deem necessary or advisable to accomplish the purposes hereof including:

10.1    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Pledged Collateral;

10.2    to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with Section 10.1;

10.3    to file any claims or take any action or institute any proceedings that Lender may deem necessary or reasonably desirable for the collection of any of the Pledged Collateral or otherwise to enforce the rights of Lender, with respect to any of the Pledged Collateral; and

10.4    to execute, in connection with the sale provided for in Sections 6 or 7, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Pledged Collateral.

If requested by Lender, Pledgors shall ratify and confirm any such sale or transfer by executing and delivering to Lender at Pledgors' expense all proper and reasonable deeds, bills of sale, instruments of assignment, conveyance of transfer and releases as may be designated in any such request. Following the repayment in full of the Obligations, Lender shall, at the sole cost and expense of Pledgors, execute such documentation as is reasonable and customary to evidence the termination of the power to act as attorney-in-fact for Pledgors.

11      **Miscellaneous**.

11.1    Severability. Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.2    Headings. The headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

11.3    No Waiver; Cumulative Remedies. Lender shall not by any act (except by a written instrument pursuant to Section 11.4), delay, indulge, omit or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy

which Lender would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers or privileges provided by law.

11.4     Irrevocable Authorization and Instruction to the Company. Pledgors hereby authorize and instruct the Company to comply with any instruction received by it from Lender in writing that (a) states that an Event of Default has occurred and is continuing and (b) is otherwise in accordance with the terms of this Agreement. The Company shall be entitled to rely on and comply with any such instructions from Lender, without regard to any other or further instructions or demands from Pledgor.

11.5     Additional Waivers. Notwithstanding anything herein to the contrary, Pledgor hereby absolutely, unconditionally, knowingly, and expressly waives, to the fullest extent permitted by law:

11.5.1   Any right it may have to revoke this Agreement as to future indebtedness;

11.5.2   (a) notice of acceptance hereof; (b) notice of any loans or other financial accommodations made or extended under the Loan Documents or the creation or existence of any Pledged Collateral; (c) notice of the amount of the Obligations; (d) notice of any adverse change in the financial condition of the Pledgor or of any other fact that might increase such Pledgor's risk hereunder; (e) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (f) in its capacity as Pledgor hereunder, notice of any default or Event of Default, except as may be expressly required under the Loan Documents; and (g) all other notices and demands to which Pledgor, in its capacity as Pledgor hereunder, might otherwise be entitled (except to the extent required hereunder or in any other Loan Document;

11.5.3   its right, if any, to require Lender to institute suit against, or to exhaust any rights and remedies which Lender has or may have against, any third party, or against any collateral provided by any third party; and Pledgor further waives any defense arising by reason of any disability or other defense or by reason of the cessation from any cause whatsoever of the liability of the any third party in respect thereof;

11.5.4   (a) any rights to assert against Lender any defense (legal or equitable), set-off, counterclaim (excluding mandatory counterclaims), or claim which Pledgor may now or at any time hereafter have against any party liable to Lender; (b) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Pledged Collateral or any security therefor; and (c) any defense Pledgor has to performance hereunder (excluding actual performance), and any right Pledgor has to be exonerated, arising by reason of: (i) the alteration by Lender of the Pledged Collateral; or (ii) the acceptance by Lender of anything in partial satisfaction of the Obligations; and

11.5.5   any defense arising by reason of or deriving from (a) any claim or defense based upon an election of remedies by Lender; or (b) any election by Lender under the Bankruptcy Code, to limit the amount of, or any collateral securing, its claim against Pledgor.

11.6    Attorney's Fees. In addition to and without limitation of any right to their fees and costs as set forth in any other Loan Document, Lender shall be obligated to pay to Lender within ten (10) days of demand therefor, all of Lender's reasonable costs and expenses actually incurred by them in connection with the exercise of any of its rights and remedies under this Agreement, including reasonable attorneys' and costs.

11.7    Demand to Perform; Default Rate. If Pledgor fails to perform or comply with any of its agreements contained herein for more than ten (10) days following written notice of such failure to Pledgor and Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of Lender incurred in connection with such performance or compliance, together with interest at the default rate of interest set forth in the Loan Documents if such expenses are not paid within ten (10) days of demand, shall be payable by Pledgor to Lender within ten (10) days of demand and shall constitute obligations secured hereby.

11.8    Release and Termination of Security Interests. Upon repayment in full of the Obligations, Lender's rights under this Agreement shall automatically terminate, and, at the request of Pledgor and at Pledgor's sole cost and expense, Lender shall promptly execute and deliver to Pledgor UCC-3 termination statements and other documents and agreements to release Lender's Lien on the Pledged Collateral, to terminate this Agreement and all of Lender's rights under this Agreement, including any power of attorney granted to Lender pursuant to this Agreement, and all other Loan Documents and deliver any and all certificates evidencing the Partnership Interests and any powers relating thereto to Pledgors.

11.9    JURY WAIVER; GENERAL TERMS. This Agreement constitutes a Loan Document. Pledgor acknowledges and agrees that this Agreement is subject to, governed by and to be interpreted and enforced pursuant to the Amendment to which Pledgor is a party, which agreement, among other things, includes valid, enforceable and fully effective provisions to which Pledgor is subject, including the governing law provisions, jurisdiction, venue provisions, the jury waiver provisions and the waivers. Pledgor further acknowledges and agrees, with full knowledge and understanding, that it is irrevocably and unconditionally subject to and bound by thereto and thereby, and that any actions or Claims (as that term is defined in the Amendment) which may be brought with respect to the Loan, this Agreement, the other Loan Documents or any other matters expressly subject thereto shall be governed thereby.

11.10   Limitation on Liability. Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement shall be satisfied, if at all, out of Lender's interest in and to the Pledged Collateral only. No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, any other asset or property of Lender or the asset or property of any of Lender's shareholders, directors, officers, employees, agents or representatives, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

*[Remainder of Page Intentionally Blank – Signature Pages Follow]*

**IN WITNESS WHEREOF**, the undersigned Pledgors have executed this Agreement as of the date first above written.

**PLEDGORS:**

_____
Gerald J. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family
Trust established May 9, 1997

_____
Carol L. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family
Trust established May 9, 1997

**WOODGLEN APTS., LLC,**
a California limited liability company
Its General Partner

By:_____
Gerald J. Marcil, Managing Member

By:_____
Carol L. Marcil, Member

By:_____
Gerald J. Marcil, individually and as
Authorized Trustee of, and on behalf of,
the Marcil Family Trust established May 9,
1997, a Limited Partner

By:_____
Carol L. Marcil, individually and as
Authorized Trustee of, and on behalf of,
the Marcil Family Trust established May 9,
1997, a Limited Partner

[*Company Acknowledgment on Following Page*]

## COMPANY CONSENT AND ACKNOWLEDGEMENT

PACIFICA GARDENS APTS., LP, a California limited partnership (the "**Company**"), with full knowledge and understanding of the Pledge and Security Agreement to which this Company Consent and Acknowledgement is attached (the "**Agreement**", with all defined terms therein being applicable hereto), hereby consents, agrees, acknowledges and represents to Lender as follows:

1.      Consent and Acknowledgement. The Company hereby consents, acknowledges and agrees to (i) Pledgors entering into the Agreement and pledging, assigning and granting to Lender a first in priority security interest in and to the Pledged Collateral pursuant to the Agreement as collateral for the Borrower's Obligations and (ii) the exercise of Lender's rights and remedies thereunder pursuant to the terms of the Agreement. The Company further agrees that at all times prior to repayment in full of the Obligations: (a) the Company shall note the security interests pledged, assigned and granted by the Agreement in any books and records of the Company pertaining to the Pledged Collateral; and (b) Lender shall have the right, during normal business hours and upon prior reasonable notice to the Company, to inspect and copy the books and records of the Company pertaining to the Pledged Collateral.

2.      Representations, Covenants, etc. The Company acknowledges, agrees and confirms to Lender that the representations and warranties set forth in the Agreement are true and correct and the Company agrees to comply with terms and conditions set forth therein applicable to it and shall not take any action, or consent to any action by any Pledgor, which is inconsistent with, or in violation of, the Agreement. In furtherance thereof, and without any limitation thereto, the Company represents, warrants and covenants that (i) the Pledgors are the legal and beneficial owners of 100% of the limited partnership interests and the general partnership interests of the Company; (ii) no other legal or beneficial ownership interests exist or have been issued with respect to the Company; and (iii) the Company shall not, without the prior written consent of Lender, (A) issue any additional certificates to evidence any interest in the Company or (B) elect, permit or otherwise cause to have any of the Partnership Interests treated as securities under Article 8 of the Uniform Commercial Code. Without the prior written consent of Lender (without any obligation to provide any such consent, the Company agrees that it will not grant or suffer to exist any Lien upon or with respect to any of the assets of the Company other than the existing Liens currently in place with respect to such assets. The Company agrees that, by executing this Company Consent, the Company is subject to and bound by the jury waiver, judicial reference and venue provisions set forth in the Amendment (with such provisions being deemed incorporated herein as though set forth in full) with respect to the Agreement and this Company Consent and all Claims (as that term is defined in the Amendment) with respect thereto. In the event the Lender commences any action to enforce its rights and remedies, or otherwise defend its security interests, rights and remedies, under the Agreement, Lender shall be entitled to its costs and expenses incurred in connection with any such action, including its reasonable attorneys' fees and costs.

*[Signature Page on Following Page]*

**IN WITNESS WHEREOF**, the undersigned Company have executed foregoing Company Consent as of the date first set for above.

COMPANY:                          **PACIFICA GARDENS APTS., LP,**
a California limited partnership

By:  Woodglen Apts., LLC,
a California limited liability company
Its General Partner

By: _____
Gerald J. Marcil, Managing Member

By: _____
Carol L. Marcil, Member

_____
Gerald J. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family Trust
established May 9, 1997, a Limited Partner

_____
Carol L. Marcil, individually and as Authorized
Trustee of, and on behalf of, the Marcil Family Trust
established May 9, 1997, a Limited Partner